# In The Matter Of:
*Selena Howard, et al. v*
*Forrest County, et al.*

*Chey Sumrall*
*April 27, 2020*



601-573-0961
amanda@awreporting.net



EXHIBIT
A

Min-U-Script® with Word Index

## Page 1

```
 1   IN THE UNITED STATES DISTRICT COURT
     FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                EASTERN DIVISION

 3   SELENA HOWARD, DARIOUS LEGGETT; AND
     ANTRINET LEGGETT                    PLAINTIFFS
 4
     VERSUS              NO. 2:19-CV-84-KS-MTP
 5
     FORREST COUNTY; CHEY SUMRALL
 6   INDIVIDUALLY AND IN HIS
     OFFICIAL CAPACITY; BLAKE BASS,
 7   INDIVIDUALLY AND IN HIS OFFICIAL
     CAPACITY                            DEFENDANTS
 8

 9   **************************************************

10             DEPOSITION OF CHEY SUMRALL
11              VIA ZOOM VIDEO CONFERENCE

12   **************************************************

14              APPEARANCES NOTED HEREIN

16              DATE: APRIL 27, 2020
                PLACE: ZOOM VIDEO CONFERENCE
                TIME: 2:00  p.m.

19   REPORTED BY:   AMANDA MAGEE WOOTTON
20                  CSR #1238
21   _____

23              AW Reporting
                amanda@awreporting.net
                338 Indian Gate Circle
24              Ridgeland, Mississippi 39157
                601.573.0961
```

## Page 2

```
APPEARANCES VIA ZOOM VIDEO CONFERENCE:

        Christina Smith, Esquire
        Allen, Allen, Breeland & Allen
        Post Office Box 751
        Brookhaven, Mississippi
        csmith@aabalegal.com

        Daniel M. Waide, Esquire
        Johnson, Ratliff & Waide, PLLC
        P. O. Box 17738
        Hattiesburg, Ms 39404
        dwaide@jhrlaw.net

        Mary Lee Holmes, Esquire
        Holmes, McLelland & Ferraez, PLLC
        601 E Central Avenue
        Petal, Mississippi 39465-2974
        marylee@hmflawfirm.com

_____

        AMANDA MAGEE WOOTTON
        AW REPORTING
        338 Indian Gate Circle
        Ridgeland, Mississippi  39157
        (601) 898-9990
```

## Page 3

* * * * * *

TABLE OF CONTENTS

| | |
|---|---|
| Appearances | 2 |
| Examination by Mr. Waide | 4 |
| Examination by Ms. Holmes | 27 |
| Examination by Ms. Smith | 29 |
| Examination by Mr. Waide | 34 |
| Conclusion of Deposition | 34 |
| Certificate of Reporter | 35 |
| Certificate of Deponent | 36 |
| Correction Sheet | 37 |

## Page 4

* * * * * *

    CHEY SUMRALL, after having first been duly sworn, was examined and testified under oath as follows, to-wit:

E X A M I N A T I O N

EXAMINATION BY MR. WAIDE:

Q  Give me your name for the record, please, sir.

A  I'm sorry?

Q  Would you give your name for the record, please, sir?

A  Chey, C-H-E-Y, Sumrall.

Q  Mr. Sumrall, my name is Daniel Waide. You may not recall, but I met you previously at justice court when we took these things to hearing.

A  Yes, sir.

Q  I like your choice in brand in t-shirts there.

A  Thank you.

Q  Yeah. All right. If you would, just kind of give me your educational background, please, sir.

A  I graduated from Sumrall High School with a diploma. I spent a short time in -- at Pearl River Community College, and then through the law

Page 5

1 enforcement academy.
2 Q When did you graduate from the law
3 enforcement academy?
4 A I graduated from the part-time, I believe,
5 in 2014, and the full-time academy 2016. I think
6 around through 2016.
7 Q Okay. And that's in Mississippi?
8 A Correct. Yes, sir. Served in the Southern
9 Regional Law Enforcement Academy.
10 Q All right. And have you worked in law
11 enforcement in any other jobs besides Forrest County?
12 A Yes, sir, I have an extensive job
13 background.
14 Q All right. Well, give me your law
15 enforcement background.
16 A I started in the Forrest County Detention
17 Center in 2012. And then I -- in 2014, I started as a
18 patrol deputy in Forrest County.
19 Q Okay. If you would, kind of walk me through
20 your career with Forrest County.
21 A I started in the jail, worked there up until
22 2014, maybe '15. Went as a reserve deputy in the
23 beginning. Went through the part-time academy,
24 graduated in. I went to the warrant's division at the
25 sheriff's office, and then I went to the full-time

Page 6

1 academy, and then I went to a full-time patrol deputy.
2 Q All right. How long were you a full-time
3 officer with Forrest County?
4 A Full-time certified or full-time working?
5 Q Certified.
6 A From 2016 to 2019.
7 Q Okay. And what's the highest rank you had
8 while you were with Forrest County?
9 A I never held any rank. I was a patrol
10 deputy throughout.
11 Q Okay. So you patrolled the entire time?
12 A Correct. Yes, sir. Well, my short time in
13 warrants. I started in warrants as I a deputy.
14 Q Okay. And where do you work currently?
15 A Oak Grove Land Company.
16 Q Is that in Oak Grove?
17 A It's everywhere. We do property
18 maintenance.
19 Q Okay. Property maintenance.
20 A Yes, sir.
21 Q All right. Have you ever given a deposition
22 before today?
23 A No, sir.
24 Q All right. But you have testified under
25 oath before, correct?

Page 7

1 A Yes, sir.
2 Q All right. If I ask you a question and you
3 don't understand it, or if it is confusing, please be
4 sure to let me know. Otherwise, I'm going to assume
5 you understood my question. Is that fair?
6 A That's fair. Yes, sir.
7 Q All right. And are you under the influence
8 of any drugs or alcohol this afternoon?
9 A No, I'm not.
10 Q Okay. And likewise, have you taken any
11 medicines that would impair your ability to think
12 clearly?
13 A No, sir.
14 Q Okay. And have you reviewed any documents
15 in preparing for today's deposition?
16 A Yes, sir.
17 Q Okay. What did you review?
18 A The Forrest County standard operating
19 procedures, the affidavits that were attached to the
20 e-mail, a 911 log, a taser log, and I can't remember
21 the other ones. There were a few.
22 Q Okay. I'm just going to ask -- I don't want
23 to get into any details of this, but as I understand
24 it, your separation with Forrest County stemmed from a
25 wreck on 49; is that right?

Page 8

1 A Correct.
2 Q Okay. All right. Like I said, I'm not
3 going to get into the details. I just didn't know if
4 there were anything else involved in your separation.
5 A Thank you.
6 Q Is there anything else besides the wreck
7 with your separation?
8 A No, sir.
9 Q Okay. All right. Now, you're aware that
10 this entire matter stems from an incident
11 September 27, 2017, correct?
12 A Yes, sir.
13 Q All right. Do you recall when you were
14 dispatched to the Elks Road house where Ms. Howard and
15 Mr. Leggett were living?
16 A We were never dispatched. It was
17 information from a county worker. And I believe it
18 was -- I'm certain that it was earlier that morning
19 that she had advised us about the dogs.
20 Q Okay. Who was that? Who was the county
21 worker?
22 A Her name was Haley Ryals.
23 Q Okay. And who is she?
24 A She works -- she's a volunteer firefighter,
25 but she does some type of maintenance for the county.

Page 9

1 I'm not exactly sure of her job title.
2  Q   Okay. And do you recall about what time it
3 was that -- let me ask you this, did she call you
4 directly, or how did you come to get the information?
5  A   I believe she did call me directly. I can't
6 remember how we received the information. We met with
7 her at the -- there is a little gas station down the
8 road from the Leggetts' residence, and she had met us
9 there and told us the dog's condition, what she knew,
10 and we had met her at that gas station.
11  Q   Okay. Now, we'll get into some of the
12 details, but in law enforcement, I mean, what is
13 your -- what is law enforcement's -- as an officer,
14 what is your priority? What is the goal of law
15 enforcement?
16  A   To preserve life, property, to maintain
17 order, to enforce state and local laws.
18  Q   Okay. Now, what exactly -- on the date in
19 question, September 27th, 2017, what information
20 did Mr. -- is it R-I-A-L-S for Ms. Ryals?
21  A   I think it is R-Y-A-L-S.
22  Q   Okay. What information did Ms. Ryals
23 translate -- give to you?
24  A   She had advised us that there was a dog tied
25 to a tree. From what I understand, she got this

Page 10

1 information from another county worker that mows -- I
2 guess there is a cemetery behind the Leggetts'
3 residence, and that county worker had been seeing this
4 dog tied to a tree with no food or water. So that's
5 what she told us.
6  Q   Okay. But when you -- when you went to
7 Ms. Howard's house, at that time you knew that the
8 information you had received was secondhand at best?
9  A   Correct.
10  Q   Okay. All right. And the property you were
11 going to was private property, correct?
12  A   I'm not sure.
13  Q   Okay. Well, were the -- the house that you
14 went to where Ms. Howard lived, that wasn't a public
15 park or anything like that, was it?
16  A   No, sir.
17  Q   Okay. It was a private resident, and they
18 lived there?
19  A   Yes, sir.
20  Q   All right. Now, before you got to the house
21 that day, had -- have you had any formal training on
22 doing welfare checks for animals?
23  A   Not any formal training, no, sir.
24  Q   Had you ever been trained on what the laws
25 are in regards to animal welfare?

Page 11

1  A   Yes, sir. I've read the laws.
2  Q   Okay. But have you ever been trained on
3 what constitutes a violation of some of the animal
4 welfare laws?
5  A   Yes, sir. In the full-time academy, there
6 is a animal -- she's actually an animal control
7 person, but she comes and teaches a class on animal
8 welfare and animal neglect and animal abuse.
9  Q   Okay. And how long was that class?
10  A   Oh, I can't remember, sir.
11  Q   Okay. Was it a day-long course? Was it
12 less than a day?
13  A   It was less than a day.
14  Q   Okay.
15  A   It's a very interesting course, one of my
16 favorites.
17  Q   Okay. And when you went to the house, you
18 did not have a warrant, correct?
19  A   Correct.
20  Q   All right. And do you recall how much time
21 passed between when Ms. Ryals gave you that
22 information until the time you went to the house?
23  A   It was not much time at all. It was down
24 the road, less than a mile, so we went straight from
25 the store to their house.

Page 12

1  Q   And there was nothing stopping you from
2 getting a warrant that day, correct?
3  A   No, sir.
4  Q   Okay. You could have gone to obtain a
5 warrant before going to the house, right?
6  A   I guess so. But, like, it was secondhand
7 information, so...
8  Q   Okay. When you say it was secondhand
9 information, are you saying the judge wouldn't have
10 given you a warrant on that?
11  A   I can't say what a judge would have done.
12  Q   Okay. But you didn't have firsthand
13 knowledge at that time to go get a warrant, right?
14  A   No, sir.
15  Q   Okay. All right. Now, when you got to the
16 property, Mr. Sumrall, what happened?
17  A   When we pulled down the driveway, we saw the
18 dog tied to the tree. We parked our patrol cars,
19 exited the patrol car, went over to the dog that was
20 tied to the tree and began an investigation.
21  Q   Okay. You say you began an investigation.
22 How long were you on the property before you made
23 contact with people who lived there?
24  A   I'm not sure.
25  Q   Okay. Before you -- how long did you see

Page 13

1  the dogs -- let me see if I can ask you a better
2  question.
3    A   Yes, sir.
4    Q   Who was the first person you saw on the
5  property?
6    A   I honestly can't recall who the first person
7  was that we made contact with.
8    Q   Okay.  Now, when you drove up to the house,
9  how long is that driveway to get to the house?
10   A   It's several yards long.  It is a fairly
11 long driveway.
12   Q   Okay.  When you say several yards, you mean
13 several hundred yards?
14   A   Maybe a hundred yards, 150.
15   Q   Okay.  But longer than several yards, right?
16   A   Correct.  Yes, sir.
17   Q   Okay.  And can you see the dogs from the
18 road without pulling into the driveway?
19   A   No, sir.
20   Q   Okay.  And where were you -- when you were
21 pulling up to the house, do you recall when you could
22 first see the dogs?
23   A   Probably 50 yards down the driveway you
24 could see the dog tied to the tree.
25   Q   Okay.  And how long were you on the

Page 14

1  property -- well, I think I've already asked you this.
2    A   Yes, sir.
3    Q   Do you recall how long it was before you
4  actually made contact with a person on that property?
5    A   As best I can remember, it was minutes.
6    Q   Okay.  So do you know how long those dogs
7  had been tied to the tree before you arrived?
8    A   I do not.
9    Q   Okay. All right.  And how many dogs -- when
10 you went to the -- were those two dogs, were they in
11 separate places or the same spot?
12   A   Well, the dog in question, I didn't know how
13 many dogs were at the property.  We only saw one dog
14 that was tied to the tree, so...
15   Q   Okay.
16   A   Which is what the initial complaint was, was
17 for the dog that was tied to the tree.
18   Q   Okay.  Let me ask you this.  The claim that
19 a dog is tied up, that in and of itself is not a
20 crime, correct?
21   A   Correct.
22   Q   Okay.  Where was the other dog when you
23 arrived?
24   A   When I arrived, I did not see another dog.
25   Q   Okay.  Now, the time that you arrived on the

Page 15

1  property, you had no evidence of any felony being
2  committed, right?
3    A   Correct.
4    Q   And what you ultimately charged my clients
5  with was a misdemeanor, right?
6    A   Correct.
7    Q   In regards to the dogs?
8    A   Correct.
9    Q   All right.  And you had -- no one had
10 relayed to you, had they, that they thought the dogs
11 had been beaten?
12   A   No, sir.
13   Q   No one had thought the dogs had been burned
14 or tortured?
15   A   No, sir.
16   Q   Okay.  Is the only thing that you had prior
17 to coming on the property that the dog was tied to a
18 tree?
19   A   With no food or water, or shelter, for that
20 matter.
21   Q   Okay.  Do you know how -- that's all
22 secondhand information, right?
23   A   Correct.
24   Q   Okay.  And you don't remember if you spoke
25 to Ms. Howard or Mr. Leggett first?

Page 16

1    A   I don't remember.  No, sir, I don't remember
2  who I spoke to first.
3    Q   Tell me what you remember after you see the
4  dog.
5    A   I remember exiting the patrol car, looking.
6  There was one food bowl or water bowl.  Neither were
7  present there.  There was no food or water in the one
8  bowl they had.  I remember Mr. Leggett, Darious,
9  coming outside where we were with the dog tied to the
10 tree.  And I can't remember who was with him.  It
11 was -- he was irate coming outside to us.
12   Q   Right.  Now -- and at this point in time,
13 were you aware yet that there was a second dog?
14   A   No, sir.
15   Q   Were you ever aware of there being a second
16 dog on the property?
17   A   I was, yes, sir.
18   Q   When did you become aware of a second dog?
19   A   When we went onto the porch, there was a
20 second dog on the porch.
21   Q   Okay.  And was he in one of those wire
22 cages?
23   A   I believe so, yes, sir.
24   Q   And who asked Darious to actually take the
25 dog -- unhook the dog from the tree?

Page 17

1 A I don't recall either myself nor Blake
2 asking Darious to take the dog off the leash.
3 Q Okay. Now, had you ever known Darious
4 before September 27th?
5 A I did not know Darious personally. I did
6 not know Darious even lived there before that
7 incident, no, sir.
8 Q Okay. Did you know Ms. Selena Howard before
9 this day?
10 A Yes, sir, I did.
11 Q How did you know Selena?
12 A She worked at the Subway at the corner fuel
13 station where I frequented a lot.
14 Q Okay. And now, did you know Ms. Leggett,
15 Darious' mom --
16 A Prior to --
17 Q -- prior to --
18 A Yes, sir, I did. We had a prior incident
19 with Ms. Leggett.
20 Q All right. As I understand it, that was
21 something to do with a warrant because of some unpaid
22 fines?
23 A Correct. Yes, sir.
24 Q Okay. And when she was arrested a month or
25 more before this incident, was it solely based upon

Page 18

1 those unpaid fines?
2 A I had stopped her vehicle on a traffic --
3 well, not her vehicle. I had stopped a vehicle that
4 Ms. Leggett was a passenger in, and I ran both the
5 driver and Ms. Leggett. Ms. Leggett had warrants.
6 Q Okay. All right. And after -- on this
7 particular date, do you recall when you made contact
8 with Ms. Leggett?
9 A I don't, no, sir.
10 Q Okay. After you and Darious and Blake were
11 out of the tree with the dog, Darious did unhook the
12 dog, right?
13 A Yes, sir, he did.
14 Q Okay. What happened after that?
15 A The only thing I can remember is I asked
16 Darious -- because there was only one bowl by the
17 tree. I asked Darious if he had food for the dog. He
18 explained that sometimes they eat table scraps, but he
19 did have food inside. I asked him -- I followed him
20 to the house. He was going to show me the food. We
21 got to the door. He brought out an empty container.
22 There was no food in the container.
23 Q Okay. Now, did you ever try to enter the
24 house?
25 A Yes, sir, I did.

Page 19

1 Q Okay. And were you told not to?
2 A Yes, sir. He asked me not to come inside
3 the house.
4 Q All right. And how long was Darious inside;
5 do you remember?
6 A Thirty, 45 seconds.
7 Q Okay. And when Darious brought the --
8 apparently, as I understand it, empty food bucket
9 outside, what happened then?
10 A I asked him to turn around and put his hands
11 behind his back.
12 Q Okay. And at that point in time, what crime
13 were you arresting Mr. Leggett for?
14 A The animal neglect.
15 Q All right. And had you been trained on what
16 constitutes animal neglect?
17 A Yes, sir.
18 Q Okay. What evidence did you have that
19 Mr. Leggett had been intentionally withholding food
20 from his animals?
21 A I had no evidence that he had been
22 intentionally withholding food from his animals.
23 Q Okay. And what evidence -- well, what
24 evidence, then, were you relying on in deciding to
25 arrest Mr. Leggett?

Page 20

1 A The condition of the dog, the no shelter, no
2 water, and there was no vaccine ever -- rabies vaccine
3 ever provided to us.
4 Q Well, now, just on the day in question, at
5 the time that you were there, how long had you
6 witnessed the animal tied around the tree?
7 A Just that time period I was there.
8 Q So at that point in time in which you say
9 you placed Mr. Leggett under arrest, would it be more
10 than ten minutes?
11 A Yes, sir.
12 Q Okay. More than 20 minutes?
13 A Twenty minutes is probably the max.
14 Q Okay. And do you know how long the dog's
15 water bowl had been empty?
16 A I do not.
17 Q Okay. And you don't know how long the dog,
18 other than the 20 minutes you were there, how long the
19 dog had been tied to a tree?
20 A I do not.
21 Q Okay. What evidence did you have at that
22 time to show that Mr. Leggett was intentionally
23 neglecting this dog?
24 A I had none.
25 Q Okay. Well, are you aware that the statute

Page 21

1  that he was charged with requires malicious intent?
2    A   He was never charged with it, so...
3    Q   You are saying he was never -- well, let me
4  ask you, you said he was under arrest, though.  What
5  evidence did you have of malicious intent on the part
6  of Mr. Leggett at the time you placed him under
7  arrest?
8    A   I don't suppose I had any.
9    Q   Okay.  Now, I know you said that there was a
10 class at the academy where they talk about animal
11 welfare.  Had you ever been trained on any sort of
12 animal welfare while you worked with Forrest County?
13   A   No, sir.
14   Q   Okay.  Now, let me ask you these questions,
15 and I know this is just based upon your training.  If
16 you don't know, that's fine.
17   A   Yes, sir.
18   Q   Based upon your training and experience, is
19 it lawful for a person to protest an unlawful arrest?
20   A   I'm not sure.
21   Q   Okay.  Now, what about -- did you, during
22 your interactions on that day, did you ever fire your
23 taser?
24   A   I had my -- I fired -- I did not ever --
25 it's kind of -- the way the taser that we were issued

Page 22

1  works is, I consider firing the taser -- it has a
2  cartridge on the end of it with wires and prongs.
3  That's what I consider firing my taser.  And no, I did
4  not fire my taser as I understand firing the taser.
5    Q   Okay.  Let me rephrase it just a little bit.
6  I know there is a difference when you've got the
7  prongs versus just contact with someone, for example.
8    A   Correct.
9    Q   Did you ever engage the taser as in, I
10 guess, cause it to discharge electricity?
11   A   Yes, I did.
12   Q   Okay.  When was that?
13   A   I used my taser when Blake was trying to
14 arrest Ms. Antrinet.  The dog -- I don't know which
15 dog it was, but one of the dogs was biting at Blake or
16 barking at Blake.  And typically, when a dog is trying
17 to attack someone, I use my taser to I guess you could
18 call -- to get the dog to stop.  Usually the sound is
19 enough to get the dog to stop has been my experience.
20   Q   Okay.  So basically, you just made your
21 taser make the popping sound?
22   A   Correct.
23   Q   Okay.  Now, do you know -- and I guess this
24 is one thing that might be a little confusing.  Do you
25 know if the taser you had had the correct time in the

Page 23

1  memory or not?
2    A   I did not know at the time.
3    Q   Okay.  All right.  And the reason I asked is
4  your taser has a discharge at 9:28 a.m., according to
5  the records, which would have been long after these
6  events, and I just didn't know if your time may be
7  wrong or if you know.
8    A   I know now.  I did not know at the time that
9  my taser -- the time was off on my taser.
10   Q   Okay.  So have you reviewed those records
11 and seen that?
12   A   Yes, sir.
13   Q   Okay.  Okay.  So we now know that the time
14 is wrong.  It's an hour off in the taser discharge
15 records?
16   A   From what I understand, yes, sir.
17   Q   Okay.  Good.  That makes my life a little
18 bit easier.  All right.
19       Now, did you place any of the plaintiffs
20 into your patrol car to be transported?
21   A   No, sir.
22   Q   Okay.  Now, did you go to the hospital with
23 or follow the ambulance to the hospital with Darious?
24   A   Yes, sir, I did.
25   Q   Okay.  And Blake is the one who discharged

Page 24

1  the taser with Darious, correct?
2    A   Correct.
3    Q   All right.  Now, at that -- when Blake
4  discharged his taser, were you watching at all or were
5  you dealing with Ms. Antrinet?
6    A   I was trying to -- I was with Darious.  I
7  was not dealing with Antrinet.
8    Q   Okay.  So what do you recall is happening
9  when Blake discharged his taser?
10   A   I remember us falling off the porch.  I
11 simply remember me and Darious falling off the porch
12 while I was trying to arrest him.  I was still
13 struggling to get his hands behind his back after I
14 told him to put his hands behind his back.  And then I
15 remember Blake tasing him.
16   Q   How far away was Blake; do you remember?
17   A   I'm not sure exactly how far Blake was.
18   Q   And once Blake discharged his taser, what
19 did you do?
20   A   Put the handcuffs on Darious.
21   Q   Okay.  What, if anything, did you do with
22 Ms. Antrinet after Darious was tased?
23   A   I don't recall specifically.  I remember a
24 struggle between Blake and Antrinet at some point.  I
25 can't remember which point it was.  And that's when

1  the dog was barking or biting at Blake, and that's
2  when I made the arking sound with my taser at the
3  dogs. That's the only time I actually remember any
4  interaction with Ms. Antrinet.
5  Q   Okay. Now, how long, if you can recall,
6  transpired between the time that the food bucket gets
7  brought out to the time that Darious gets tased?
8  A   Maybe five minutes. Maybe. It was minutes.
9  Q   At any time had -- and I may have asked you
10 this, and forgive me if I did, but you didn't know
11 Darious before this day, right?
12 A   No, sir.
13 Q   Okay. All right. And had Darious made any
14 threats towards you prior to being tased?
15 A   Not any verbal threats.
16 Q   Okay.
17 A   No, sir.
18 Q   Did he -- he didn't threaten you -- did he
19 threaten you in any way?
20 A   I don't recall if he did or not.
21 Q   Okay. And you say you were the one trying
22 to put cuffs on Darious when Blake tased him, right?
23 A   Correct.
24 Q   Okay. All right. Let's see. Now, who
25 actually put cuffs on Ms. Antrinet?

1  A   I want to say it was Blake. I -- I did not
2  put handcuffs on Ms. Antrinet.
3  Q   Okay. How many pairs of cuffs do you carry?
4  A   I carry -- I always carry two sets of
5  handcuffs.
6  Q   Okay. Now, when you got to the Forrest
7  General Hospital with Mr. Leggett, do you recall
8  anything in particular about his injuries?
9  A   Not anything in particular other than that
10 he was tased.
11 Q   Okay. Now, when he was tased on the ground,
12 do you recall whether or not those prongs were kind of
13 stuck with his t-shirt to where he couldn't even stand
14 up without the prongs pulling at his genitals?
15 A   I did not. I did not observe that, no, sir.
16 Q   Was Mr. -- do you recall whether or not
17 Mr. Leggett was able to walk after being tased?
18 A   I believe he was walking. I believe he
19 walked to the ambulance, if I remember.
20 Q   Do you recall whether or not the ambulance
21 got the stretcher out?
22 A   I don't recall, no, sir.
23     MR. WAIDE: Okay. If you'll give me
24 just a second and let me just talk with my clients
25 real quick. And Chey, you're probably done with me

1  anyway.
2     THE WITNESS: Thank you.
3         (Off the record.)
4     MR. WAIDE: All right. I have just a
5  couple of more questions and I'll be done. Are we
6  ready to go back?
7     THE WITNESS: I'm ready.
8  MR. WAIDE: (Continuing.)
9  Q   All right. Now, Mr. Sumrall, do you have
10 any idea what happened to Ms. Antrinet's phone during
11 this incident?
12 A   I don't recall, no, sir.
13 Q   Okay. And then I just went back during the
14 break just to look. The AAA records indicate that
15 Mr. Leggett was put on the stretcher to be taken to
16 the ambulance. Would you dispute that?
17 A   I wouldn't dispute it, but I don't know for
18 sure.
19 Q   Okay. That's fine.
20     MR. WAIDE: That's all I have.
21     THE WITNESS: Okay.
22     MS. HOLMES: I've got a few follow-up
23 questions. This is Mary Lee.
24     (Off the record.)
25     E X A M I N A T I O N

1  EXAMINATION BY MS. HOLMES:
2  Q   So I'm going to ask that -- Chey, prior to
3  the taser being deployed, can you describe the
4  demeanor of Darious?
5  A   The entire time we were at the property,
6  from us initially -- well, the entire time from when I
7  initially made contact with Darious, he was cussing
8  the entire time. The best way I can describe it is
9  aggressive the whole time we were there. I used -- I
10 tried to deescalate the situation as best I knew how,
11 and he was very upset, so -- and he was -- even prior
12 to this incident, on the traffic stop with his mother,
13 who I did not know the relation between the two, he
14 was hostile on the traffic stop. So...
15 Q   Did he -- prior to the taser being deployed,
16 did he act physically violent?
17 A   Yes, he did. Yes.
18 Q   Did he get in your face?
19 A   He did get in my face on the porch, yes.
20 Q   And he refused to comply with any of your
21 verbal commands?
22 A   Yes.
23     MS. HOLMES: Unless you've got some
24 questions, Christina, that's all I wanted to follow up
25 on.

Page 29

1  MS. SMITH: I do have a few questions.
2 Hold on.
3  (Off the record.)
4  E X A M I N A T I O N
5 EXAMINATION BY MS. SMITH:
6  Q  I just have a few quick questions. You were
7 conducting a welfare check on the property?
8  A  Correct.
9  Q  A welfare check on the animals?
10  A  On the animals, yes, ma'am, or the animal.
11  Q  Do you know if the county has a right-of-way
12 back there?
13  A  It was rumored that the county had a
14 right-of-way, but I don't know that for a fact.
15  Q  Did the county maintain some of the
16 property?
17  A  The county -- from my understanding, the
18 county maintained a cemetery behind their house. I've
19 never been to the cemetery. I had no knowledge of it
20 even existing until I was made aware of that.
21  Q  Okay. Did you observe the dog on the
22 property?
23  A  Yes.
24  Q  What did it look --
25  A  Well, I say on the property. Their driveway

Page 30

1 separated their house from where the dog, if I
2 remember correctly, the driveway separated the house
3 from where the dog was tied to the tree. There was
4 a driveway in between.
5  Q  I'm sorry. The dog was tied to the tree on
6 the side of the house?
7  A  Correct.
8  Q  On the other side of the driveway?
9  A  On the other side of the driveway, correct.
10  Q  What did the dog look like? Was it thin?
11  A  It was a thin -- it was very thin. It
12 was --
13  Q  Go ahead.
14  A  I'm sorry. Thin. I don't know if it was
15 malnourished, but it was very thin, yes.
16  Q  Well, did it look malnourished?
17  A  In my opinion, it did. It was hot that day.
18 It was -- to my standards, it was thin, yes.
19  Q  How hot was it? Do you know the weather, or
20 do you remember?
21  A  I don't know the exact weather that day.
22  Q  Was it in -- okay. But it was hot?
23  A  It was hot. Yes, ma'am.
24  Q  Could you see the dog's ribs?
25  A  Yes, ma'am.

Page 31

1  Q  Okay. And they had no water out for the
2 dog?
3  A  None that I saw. They had a bowl there, but
4 nothing was in it.
5  Q  And they didn't have any food on the
6 property?
7  A  He said they had food in the container.
8 When he brought the container out, there was no food
9 in it.
10  Q  So there was no food that you observed that
11 was on the property?
12  A  Correct.
13  Q  Okay. So did you suspect that the dog had
14 been neglected?
15  A  Yes.
16  Q  Based on your observations?
17  A  Correct.
18  Q  Based on your training as a law enforcement
19 officer?
20  A  Correct.
21  Q  Okay. And when you were on the porch, after
22 you asked Darious about getting the food, what
23 occurred?
24  A  On the porch, when you come outside -- and I
25 tried to go in with him, and he said that I couldn't

Page 32

1 go in, so I obliged, I guess.
2  Q  Okay. Really quick.
3  A  I'm sorry.
4  Q  You tried to arrest him, correct?
5  A  Correct.
6  Q  And did he resist arrest?
7  A  Yes, ma'am.
8  Q  How did he resist?
9  A  He would not give me his hands. Every time
10 I tried to get one of his hands, he pulled away. He
11 actually tried to get away from me, as in run, I
12 guess. Run is not the right word, but he resisted.
13  Q  Did he jump off the porch?
14  A  I can't remember if he jumped off the porch
15 or if he fell off the porch. I know there was an
16 incident where we both were off the porch at one time.
17  Q  Okay. And did he ever start acting
18 aggressive towards you?
19  A  Yes.
20  Q  Was he physical; did he get physical with
21 you?
22  A  He never made contact, as physical contact,
23 but, yes, he had an aggressive stance.
24  Q  Was he in your face?
25  A  Yes, ma'am.

Page 33

1  Q   Was he holding up his hands?
2  A   I don't recall.
3  Q   Okay. And you never deployed your taser,
4  correct?
5  A   I deployed my taser at the dog that was
6  biting Blake.
7  Q   Okay. You snapped it?
8  A   Correct.
9  Q   And it just made a sound?
10 A   It makes a very loud sound, yeah. That
11 usually deters a dog most of the time. Not all of the
12 time.
13 Q   Do you know how many times you did that?
14 A   I don't know how many times I did that.
15 Q   But you never deployed your prongs?
16 A   No, ma'am. Never.
17 Q   Did you even have the prongs in your taser?
18 A   My taser, when you pull the taser out of the
19 holster, it's got a cartridge on the end. You have to
20 take that cartridge off in order to park it without
21 the prongs being --
22 Q   Did you take the cartridge off?
23 A   Yes, ma'am.
24 Q   So you never had the prongs even in your
25 taser gun?

Page 34

1  A   Correct.
2  Q   Okay.
3      MS. SMITH: I think that's all of the
4  questions I have for you, Chey.
5      THE WITNESS: Okay.
6      MR. WAIDE: Chey, I've got a couple of
7  follow-up questions.
8      THE WITNESS: Sure.
9       E X A M I N A T I O N
10 EXAMINATION BY MR. WAIDE:
11 Q   So your testimony is that at 8 a.m. on
12 September 27th, 2017, it was already hot?
13 A   It was a warm day. Yes, sir.
14 Q   Okay. Would you dispute if the weather
15 records indicate it wasn't more than 75 degrees at
16 8 a.m.?
17 A   No, sir. I wouldn't dispute that, but
18 that's warm.
19 Q   Okay.
20     MR. WAIDE: That's all I have.
21     THE WITNESS: Thank you, Mr. Waide. I
22 appreciate it.
23     (WHEREUPON, THE DEPOSITION WAS
24     CONCLUDED AT APPROXIMATELY 2:40 p.m.)
25

Page 35

1
2              CERTIFICATE OF REPORTER
3
4     I, AMANDA WOOTTON, Court Reporter and Notary
5  Public for the State of Mississippi, do hereby certify
6  that the above and foregoing pages contain a full,
7  true and correct transcript of the proceedings had in
8  the aforenamed case at the time and place indicated,
9  which proceedings were recorded by me to the best of
10 my skill and ability.
11    I also certify that I placed the witness under
12 oath to tell the truth and that all answers were given
13 under that oath.
14    I certify that I have no interest, monetary or
15 otherwise, in the outcome of this case.
16        This the 28th day of April 2020.
17
18
19
20
21
22           AMANDA M. WOOTTON
23 My Commission Expires:
   December 15, 2022
24
25

Page 36

1              CERTIFICATE OF DEPONENT
2
3
4     I,_____, do hereby
5  certify that the foregoing testimony is true and
6  accurate to the best of my knowledge and belief, as
7  originally transcribed, or with the changes as noted
8  on the attached Correction Sheet.
9
10
11
12
13
14
15
16
17
18    Subscribed and sworn to before me
19 this the _____ day of _____, 2020.
20
21        _____
22           Notary Public
23
24 My Commission Expires:
25

```
 1                  CORRECTION SHEET
 2
 3        I,_____, do hereby
 4  certify that the following corrections and additions
 5  are true and accurate to the best of my knowledge and
 6  belief.
 7
    CORRECTION            PAGE    LINE    REASON
 8  _____
 9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17
18
19
         Subscribed and sworn to before me
20  this the _____ day of _____, 2020.
21
22
23                         _____
                                    Notary Public
24  My Commission Expires:
25
```

## A

**AAA (1)**
   27:14
**ability (1)**
   7:11
**able (1)**
   26:17
**abuse (1)**
   11:8
**academy (8)**
   5:1,3,5,9,23;6:1;
   11:5;21:10
**according (1)**
   23:4
**act (1)**
   28:16
**acting (1)**
   32:17
**actually (6)**
   11:6;14:4;16:24;
   25:3,25;32:11
**advised (2)**
   8:19;9:24
**affidavits (1)**
   7:19
**afternoon (1)**
   7:8
**aggressive (3)**
   28:9;32:18,23
**ahead (1)**
   30:13
**alcohol (1)**
   7:8
**always (1)**
   26:4
**ambulance (4)**
   23:23;26:19,20;
   27:16
**animal (13)**
   10:25;11:3,6,6,7,8,8;
   19:14,16;20:6;21:10,
   12;29:10
**animals (5)**
   10:22;19:20,22;29:9,
   10
**Antrinet (8)**
   22:14;24:5,7,22,24;
   25:4,25;26:2
**Antrinet's (1)**
   27:10
**apparently (1)**
   19:8
**appreciate (1)**
   34:22
**APPROXIMATELY (1)**
   34:24
**arking (1)**
   25:2
**around (3)**
   5:6;19:10;20:6
**arrest (9)**
   19:25;20:9;21:4,7,
   19;22:14;24:12;32:4,6
**arrested (1)**
   17:24
**arresting (1)**
   19:13
**arrived (4)**
   14:7,23,24,25
**assume (1)**
   7:4
**attached (1)**
   7:19
**attack (1)**
   22:17
**aware (6)**
   8:9;16:13,15,18;
   20:25;29:20
**away (3)**
   24:16;32:10,11

## B

**back (6)**
   19:11;24:13,14;27:6,
   13;29:12
**background (3)**
   4:22;5:13,15
**barking (2)**
   22:16;25:1
**based (5)**
   17:25;21:15,18;
   31:16,18
**basically (1)**
   22:20
**beaten (1)**
   15:11
**become (1)**
   16:18
**began (2)**
   12:20,21
**beginning (1)**
   5:23
**behind (5)**
   10:2;19:11;24:13,14;
   29:18
**besides (2)**
   5:11;8:6
**best (4)**
   10:8;14:5;28:8,10
**better (1)**
   13:1
**bit (2)**
   22:5;23:18
**biting (3)**
   22:15;25:1;33:6
**Blake (17)**
   17:1;18:10;22:13,15,
   16;23:25;24:3,9,15,16,
   17,18,24;25:1,22;26:1;
   33:6
**both (2)**
   18:4;32:16
**bowl (6)**
   16:6,6,8;18:16;
   20:15;31:3
**brand (1)**
   4:18
**break (1)**
   27:14
**brought (4)**
   18:21;19:7;25:7;
   31:8
**bucket (2)**
   19:8;25:6
**burned (1)**
   15:13

## C

**cages (1)**
   16:22
**call (3)**
   9:3,5;22:18
**can (7)**
   13:1,17;14:5;18:15;
   25:5;28:3,8
**car (3)**
   12:19;16:5;23:20
**career (1)**
   5:20
**carry (3)**
   26:3,4,4
**cars (1)**
   12:18
**cartridge (4)**
   22:2;33:19,20,22
**cause (1)**
   22:10
**cemetery (3)**
   10:2;29:18,19
**Center (1)**
   5:17
**certain (1)**
   8:18
**certified (2)**
   6:4,5
**charged (3)**
   15:4;21:1,2
**check (2)**
   29:7,9
**checks (1)**
   10:22
**CHEY (6)**
   4:2,13;26:25;28:2;
   34:4,6
**C-H-E-Y (1)**
   4:13
**choice (1)**
   4:18
**Christina (1)**
   28:24
**claim (1)**
   14:18
**class (3)**
   11:7,9;21:10
**clearly (1)**
   7:12
**clients (2)**
   15:4;26:24
**College (1)**
   4:25
**coming (3)**
   15:17;16:9,11
**commands (1)**
   28:21
**committed (1)**
   15:2
**Community (1)**
   4:25
**Company (1)**
   6:15
**complaint (1)**
   14:16
**comply (1)**
   28:20
**CONCLUDED (1)**
   34:24
**condition (2)**
   9:9;20:1
**conducting (1)**
   29:7
**confusing (2)**
   7:3;22:24
**consider (2)**
   22:1,3
**constitutes (2)**
   11:3;19:16
**contact (8)**
   12:23;13:7;14:4;
   18:7;22:7;28:7;32:22,
   22
**container (4)**
   18:21,22;31:7,8
**Continuing (1)**
   27:8
**control (1)**
   11:6
**corner (1)**
   17:12
**correctly (1)**
   30:2
**County (19)**
   5:11,16,18,20;6:3,8;
   7:18,24;8:17,20,25;
   10:1,3;21:12;29:11,13,
   15,17,18
**couple (2)**
   27:5;34:6
**course (2)**
   11:11,15
**court (1)**
   4:16
**crime (2)**
   14:20;19:12
**cuffs (3)**
   25:22,25;26:3
**currently (1)**
   6:14
**cussing (1)**
   28:7

## D

**Daniel (1)**
   4:14
**Darious (25)**
   16:8,24;17:2,3,5,6;
   18:10,11,16,17;19:4,7;
   23:23;24:1,6,11,20,22;
   25:7,11,13,22;28:4,7;
   31:22
**Darious' (1)**
   17:15
**date (2)**
   9:18;18:7
**day (11)**
   10:21;11:12,13;12:2;
   17:9;20:4;21:22;25:11;
   30:17,21;34:13
**day-long (1)**
   11:11
**dealing (2)**
   24:5,7
**deciding (1)**
   19:24
**deescalate (1)**
   28:10
**degrees (1)**
   34:15
**demeanor (1)**
   28:4
**deployed (5)**
   28:3,15;33:3,5,15
**deposition (3)**
   6:21;7:15;34:23
**deputy (5)**
   5:18,22;6:1,10,13
**describe (2)**
   28:3,8
**details (3)**
   7:23;8:3;9:12
**Detention (1)**
   5:16
**deters (1)**
   33:11
**difference (1)**
   22:6
**diploma (1)**
   4:24
**directly (2)**
   9:4,5
**discharge (3)**
   22:10;23:4,14
**discharged (4)**
   23:25;24:4,9,18
**dispatched (2)**
   8:14,16
**dispute (4)**
   27:16,17;34:14,17
**division (1)**
   5:24
**documents (1)**

7:14
**dog (43)**
    9:24;10:4;12:18,19;
    13:24;14:12,13,17,19,
    22,24;15:17;16:4,9,13,
    16,18,20,25,25;17:2;
    18:11,12,17;20:1,17,
    19,23;22:14,15,16,18,
    19;25:1;29:21;30:1,3,
    5,10;31:2,13;33:5,11
**dogs (13)**
    8:19;13:1,17,22;
    14:6,9,10,13;15:7,10,
    13;22:15;25:3
**dog's (3)**
    9:9;20:14;30:24
**done (3)**
    12:11;26:25;27:5
**door (1)**
    18:21
**down (4)**
    9:7;11:23;12:17;
    13:23
**driver (1)**
    18:5
**driveway (10)**
    12:17;13:9,11,18,23;
    29:25;30:2,4,8,9
**drove (1)**
    13:8
**drugs (1)**
    7:8
**duly (1)**
    4:3
**during (3)**
    21:21;27:10,13

**E**

**earlier (1)**
    8:18
**easier (1)**
    23:18
**eat (1)**
    18:18
**educational (1)**
    4:22
**either (1)**
    17:1
**electricity (1)**
    22:10
**Elks (1)**
    8:14
**else (2)**
    8:4,6
**e-mail (1)**
    7:20
**empty (3)**
    18:21;19:8;20:15
**end (2)**
    22:2;33:19
**enforce (1)**
    9:17

**enforcement (8)**
    5:1,3,9,11,15;9:12,
    15;31:18
**enforcement's (1)**
    9:13
**engage (1)**
    22:9
**enough (1)**
    22:19
**enter (1)**
    18:23
**entire (5)**
    6:11;8:10;28:5,6,8
**even (6)**
    17:6;26:13;28:11;
    29:20;33:17,24
**events (1)**
    23:6
**everywhere (1)**
    6:17
**evidence (7)**
    15:1;19:18,21,23,24;
    20:21;21:5
**exact (1)**
    30:21
**exactly (3)**
    9:1,18;24:17
**EXAMINATION (4)**
    4:7;28:1;29:5;34:10
**examined (1)**
    4:4
**example (1)**
    22:7
**existing (1)**
    29:20
**exited (1)**
    12:19
**exiting (1)**
    16:5
**experience (2)**
    21:18;22:19
**explained (1)**
    18:18
**extensive (1)**
    5:12

**F**

**face (3)**
    28:18,19;32:24
**fact (1)**
    29:14
**fair (2)**
    7:5,6
**fairly (1)**
    13:10
**falling (2)**
    24:10,11
**far (2)**
    24:16,17
**favorites (1)**
    11:16
**fell (1)**

32:15
**felony (1)**
    15:1
**few (4)**
    7:21;27:22;29:1,6
**fine (2)**
    21:16;27:19
**fines (2)**
    17:22;18:1
**fire (2)**
    21:22;22:4
**fired (1)**
    21:24
**firefighter (1)**
    8:24
**firing (3)**
    22:1,3,4
**first (6)**
    4:3;13:4,6,22;15:25;
    16:2
**firsthand (1)**
    12:12
**five (1)**
    25:8
**follow (2)**
    23:23;28:24
**followed (1)**
    18:19
**follows (1)**
    4:4
**follow-up (2)**
    27:22;34:7
**food (17)**
    10:4;15:19;16:6,7;
    18:17,19,20,22;19:8,
    19,22;25:6;31:5,7,8,10,
    22
**forgive (1)**
    25:10
**formal (2)**
    10:21,23
**Forrest (10)**
    5:11,16,18,20;6:3,8;
    7:18,24;21:12;26:6
**frequented (1)**
    17:13
**fuel (1)**
    17:12
**full-time (7)**
    5:5,25;6:1,2,4,4;11:5

**G**

**gas (2)**
    9:7,10
**gave (1)**
    11:21
**General (1)**
    26:7
**genitals (1)**
    26:14
**gets (2)**
    25:6,7

**given (2)**
    6:21;12:10
**goal (1)**
    9:14
**Good (1)**
    23:17
**graduate (1)**
    5:2
**graduated (3)**
    4:23;5:4,24
**ground (1)**
    26:11
**Grove (2)**
    6:15,16
**guess (7)**
    10:2;12:6;22:10,17,
    23;32:1,12
**gun (1)**
    33:25

**H**

**Haley (1)**
    8:22
**handcuffs (3)**
    24:20;26:2,5
**hands (6)**
    19:10;24:13,14;32:9,
    10;33:1
**happened (4)**
    12:16;18:14;19:9;
    27:10
**happening (1)**
    24:8
**hearing (1)**
    4:16
**held (1)**
    6:9
**High (1)**
    4:23
**highest (1)**
    6:7
**Hold (1)**
    29:2
**holding (1)**
    33:1
**HOLMES (3)**
    27:22;28:1,23
**holster (1)**
    33:19
**honestly (1)**
    13:6
**hospital (3)**
    23:22,23;26:7
**hostile (1)**
    28:14
**hot (5)**
    30:17,19,22,23;
    34:12
**hour (1)**
    23:14
**house (18)**
    8:14;10:7,13,20;

11:17,22,25;12:5;13:8,
9,21;18:20,24;19:3;
29:18;30:1,2,6
**Howard (4)**
    8:14;10:14;15:25;
    17:8
**Howard's (1)**
    10:7
**hundred (2)**
    13:13,14

**I**

**idea (1)**
    27:10
**impair (1)**
    7:11
**incident (7)**
    8:10;17:7,18,25;
    27:11;28:12;32:16
**indicate (2)**
    27:14;34:15
**influence (1)**
    7:7
**information (11)**
    8:17;9:4,6,19,22;
    10:1,8;11:22;12:7,9;
    15:22
**initial (1)**
    14:16
**initially (2)**
    28:6,7
**injuries (1)**
    26:8
**inside (3)**
    18:19;19:2,4
**intent (2)**
    21:1,5
**intentionally (3)**
    19:19,22;20:22
**interaction (1)**
    25:4
**interactions (1)**
    21:22
**interesting (1)**
    11:15
**into (5)**
    7:23;8:3;9:11;13:18;
    23:20
**investigation (2)**
    12:20,21
**involved (1)**
    8:4
**irate (1)**
    16:11
**issued (1)**
    21:25

**J**

**jail (1)**
    5:21
**job (2)**

5:12;9:1
**jobs (1)**
    5:11
**judge (2)**
    12:9,11
**jump (1)**
    32:13
**jumped (1)**
    32:14
**justice (1)**
    4:15

**K**

**kind (4)**
    4:21;5:19;21:25;
    26:12
**knew (3)**
    9:9;10:7;28:10
**knowledge (2)**
    12:13;29:19
**known (1)**
    17:3

**L**

**Land (1)**
    6:15
**law (9)**
    4:25;5:2,9,10,14;
    9:12,13,14;31:18
**lawful (1)**
    21:19
**laws (4)**
    9:17;10:24;11:1,4
**leash (1)**
    17:2
**Lee (1)**
    27:23
**Leggett (18)**
    8:15;15:25;16:8;
    17:14,19;18:4,5,5,8;
    19:13,19,25;20:9,22;
    21:6;26:7,17;27:15
**Leggetts' (2)**
    9:8;10:2
**less (3)**
    11:12,13,24
**life (2)**
    9:16;23:17
**likewise (1)**
    7:10
**little (4)**
    9:7;22:5,24;23:17
**lived (4)**
    10:14,18;12:23;17:6
**living (1)**
    8:15
**local (1)**
    9:17
**log (2)**
    7:20,20
**long (17)**
    6:2;11:9;12:22,25;
    13:9,10,11,25;14:3,6;
    19:4;20:5,14,17,18;
    23:5;25:5
**longer (1)**
    13:15
**look (4)**
    27:14;29:24;30:10,
    16
**looking (1)**
    16:5
**lot (1)**
    17:13
**loud (1)**
    33:10

**M**

**ma'am (7)**
    29:10;30:23,25;32:7,
    25;33:16,23
**maintain (2)**
    9:16;29:15
**maintained (1)**
    29:18
**maintenance (3)**
    6:18,19;8:25
**makes (2)**
    23:17;33:10
**malicious (2)**
    21:1,5
**malnourished (2)**
    30:15,16
**many (5)**
    14:9,13;26:3;33:13,
    14
**Mary (1)**
    27:23
**matter (2)**
    8:10;15:20
**max (1)**
    20:13
**may (3)**
    4:15;23:6;25:9
**maybe (4)**
    5:22;13:14;25:8,8
**mean (2)**
    9:12;13:12
**medicines (1)**
    7:11
**memory (1)**
    23:1
**met (4)**
    4:15;9:6,8,10
**might (1)**
    22:24
**mile (1)**
    11:24
**minutes (7)**
    14:5;20:10,12,13,18;
    25:8,8
**misdemeanor (1)**
    15:5
**Mississippi (1)**
    5:7
**mom (1)**
    17:15
**month (1)**
    17:24
**more (5)**
    17:25;20:9,12;27:5;
    34:15
**morning (1)**
    8:18
**most (1)**
    33:11
**mother (1)**
    28:12
**mows (1)**
    10:1
**much (2)**
    11:20,23
**myself (1)**
    17:1

**N**

**name (4)**
    4:8,11,14;8:22
**neglect (3)**
    11:8;19:14,16
**neglected (1)**
    31:14
**neglecting (1)**
    20:23
**Neither (1)**
    16:6
**none (2)**
    20:24;31:3
**nor (1)**
    17:1

**O**

**Oak (2)**
    6:15,16
**oath (2)**
    4:4;6:25
**obliged (1)**
    32:1
**observations (1)**
    31:16
**observe (2)**
    26:15;29:21
**observed (1)**
    31:10
**obtain (1)**
    12:4
**occurred (1)**
    31:23
**off (14)**
    17:2;23:9,14;24:10,
    11;27:3,24;29:3;32:13,
    14,15,16;33:20,22
**office (1)**
    5:25
**officer (3)**
    6:3;9:13;31:19
**once (1)**
    24:18
**one (14)**
    11:15;14:13;15:9,13;
    16:6,7,21;18:16;22:15,
    24;23:25;25:21;32:10,
    16
**ones (1)**
    7:21
**only (5)**
    14:13;15:16;18:15,
    16;25:3
**onto (1)**
    16:19
**operating (1)**
    7:18
**opinion (1)**
    30:17
**order (2)**
    9:17;33:20
**Otherwise (1)**
    7:4
**out (7)**
    18:11,21;25:7;26:21;
    31:1,8;33:18
**outside (4)**
    16:9,11;19:9;31:24
**over (1)**
    12:19

**P**

**pairs (1)**
    26:3
**park (2)**
    10:15;33:20
**parked (1)**
    12:18
**part (1)**
    21:5
**particular (3)**
    18:7;26:8,9
**part-time (2)**
    5:4,23
**passed (1)**
    11:21
**passenger (1)**
    18:4
**patrol (7)**
    5:18;6:1,9;12:18,19;
    16:5;23:20
**patrolled (1)**
    6:11
**Pearl (1)**
    4:24
**people (1)**
    12:23
**period (1)**
    20:7
**person (5)**
    11:7;13:4,6;14:4;
    21:19
**personally (1)**
    17:5
**phone (1)**
    27:10
**physical (3)**
    32:20,20,22
**physically (1)**
    28:16
**place (1)**
    23:19
**placed (2)**
    20:9;21:6
**places (1)**
    14:11
**plaintiffs (1)**
    23:19
**please (4)**
    4:8,12,22;7:3
**pm (1)**
    34:24
**point (5)**
    16:12;19:12;20:8;
    24:24,25
**popping (1)**
    22:21
**porch (11)**
    16:19,20;24:10,11;
    28:19;31:21,24;32:13,
    14,15,16
**preparing (1)**
    7:15
**present (1)**
    16:7
**preserve (1)**
    9:16
**previously (1)**
    4:15
**prior (8)**
    15:16;17:16,17,18;
    25:14;28:2,11,15
**priority (1)**
    9:14
**private (2)**
    10:11,17
**Probably (3)**
    13:23;20:13;26:25
**procedures (1)**
    7:19
**prongs (8)**
    22:2,7;26:12,14;
    33:15,17,21,24
**property (21)**
    6:17,19;9:16;10:10,
    11;12:16,22;13:5;14:1,
    4,13;15:1,17;16:16;
    28:5;29:7,16,22,25;
    31:6,11
**protest (1)**
    21:19
**provided (1)**
    20:3
**public (1)**

10:14
**pull (1)**
  33:18
**pulled (2)**
  12:17;32:10
**pulling (3)**
  13:18,21;26:14
**put (7)**
  19:10;24:14,20;
  25:22,25;26:2;27:15

**Q**

**quick (3)**
  26:25;29:6;32:2

**R**

**rabies (1)**
  20:2
**ran (1)**
  18:4
**rank (2)**
  6:7,9
**read (1)**
  11:1
**ready (2)**
  27:6,7
**real (1)**
  26:25
**Really (1)**
  32:2
**reason (1)**
  23:3
**recall (20)**
  4:15;8:13;9:2;11:20;
  13:6,21;14:3;17:1;
  18:7;24:8,23;25:5,20;
  26:7,12,16,20,22;
  27:12;33:2
**received (2)**
  9:6;10:8
**record (5)**
  4:8,11;27:3,24;29:3
**records (5)**
  23:5,10,15;27:14;
  34:15
**refused (1)**
  28:20
**regards (2)**
  10:25;15:7
**Regional (1)**
  5:9
**relation (1)**
  28:13
**relayed (1)**
  15:10
**relying (1)**
  19:24
**remember (24)**
  7:20;9:6;11:10;14:5;
  15:24;16:1,1,3,5,8,10;
  18:15;19:5;24:10,11,

  15,16,23,25;25:3;
  26:19;30:2,20;32:14
**rephrase (1)**
  22:5
**requires (1)**
  21:1
**reserve (1)**
  5:22
**residence (2)**
  9:8;10:3
**resident (1)**
  10:17
**resist (2)**
  32:6,8
**resisted (1)**
  32:12
**review (1)**
  7:17
**reviewed (2)**
  7:14;23:10
**R-I-A-L-S (1)**
  9:20
**ribs (1)**
  30:24
**right (40)**
  4:21;5:10,14;6:2,21,
  24;7:2,7,25;8:2,9,13;
  10:10,20;11:20;12:5,
  13,15;13:15;14:9;15:2,
  5,9,22;16:12;17:20;
  18:6,12;19:4,15;23:3,
  18;24:3;25:11,13,22,
  24;27:4,9;32:12
**right-of-way (2)**
  29:11,14
**River (1)**
  4:24
**Road (4)**
  8:14;9:8;11:24;
  13:18
**rumored (1)**
  29:13
**run (2)**
  32:11,12
**Ryals (4)**
  8:22;9:20,22;11:21
**R-Y-A-L-S (1)**
  9:21

**S**

**same (1)**
  14:11
**saw (4)**
  12:17;13:4;14:13;
  31:3
**saying (2)**
  12:9;21:3
**School (1)**
  4:23
**scraps (1)**
  18:18
**second (5)**

  16:13,15,18,20;
  26:24
**secondhand (4)**
  10:8;12:6,8;15:22
**seconds (1)**
  19:6
**seeing (1)**
  10:3
**Selena (2)**
  17:8,11
**separate (1)**
  14:11
**separated (2)**
  30:1,2
**separation (3)**
  7:24;8:4,7
**September (4)**
  8:11;9:19;17:4;
  34:12
**Served (1)**
  5:8
**sets (1)**
  26:4
**several (4)**
  13:10,12,13,15
**shelter (2)**
  15:19;20:1
**sheriff's (1)**
  5:25
**short (2)**
  4:24;6:12
**show (2)**
  18:20;20:22
**side (3)**
  30:6,8,9
**simply (1)**
  24:11
**situation (1)**
  28:10
**SMITH (3)**
  29:1,5;34:3
**snapped (1)**
  33:7
**solely (1)**
  17:25
**someone (2)**
  22:7,17
**sometimes (1)**
  18:18
**sorry (4)**
  4:10;30:5,14;32:3
**sort (1)**
  21:11
**sound (5)**
  22:18,21;25:2;33:9,
  10
**Southern (1)**
  5:8
**specifically (1)**
  24:23
**spent (1)**
  4:24
**spoke (2)**

  15:24;16:2
**spot (1)**
  14:11
**stance (1)**
  32:23
**stand (1)**
  26:13
**standard (1)**
  7:18
**standards (1)**
  30:18
**start (1)**
  32:17
**started (4)**
  5:16,17,21;6:13
**state (1)**
  9:17
**station (3)**
  9:7,10;17:13
**statute (1)**
  20:25
**stemmed (1)**
  7:24
**stems (1)**
  8:10
**still (1)**
  24:12
**stop (4)**
  22:18,19;28:12,14
**stopped (2)**
  18:2,3
**stopping (1)**
  12:1
**store (1)**
  11:25
**straight (1)**
  11:24
**stretcher (2)**
  26:21;27:15
**struggle (1)**
  24:24
**struggling (1)**
  24:13
**stuck (1)**
  26:13
**Subway (1)**
  17:12
**SUMRALL (6)**
  4:2,13,14,23;12:16;
  27:9
**suppose (1)**
  21:8
**sure (8)**
  7:4;9:1;10:12;12:24;
  21:20;24:17;27:18;
  34:8
**suspect (1)**
  31:13
**sworn (1)**
  4:3

**T**

**table (1)**
  18:18
**talk (2)**
  21:10;26:24
**tased (7)**
  24:22;25:7,14,22;
  26:10,11,17
**taser (29)**
  7:20;21:23,25;22:1,
  3,4,4,9,13,17,21,25;
  23:4,9,9,14;24:1,4,9,
  18;25:2;28:3,15;33:3,
  5,17,18,18,25
**tasing (1)**
  24:15
**teaches (1)**
  11:7
**ten (1)**
  20:10
**testified (2)**
  4:4;6:24
**testimony (1)**
  34:11
**thin (6)**
  30:10,11,11,14,15,18
**Thirty (1)**
  19:6
**though (1)**
  21:4
**thought (2)**
  15:10,13
**threaten (2)**
  25:18,19
**threats (2)**
  25:14,15
**throughout (1)**
  6:10
**tied (15)**
  9:24;10:4;12:18,20;
  13:24;14:7,14,17,19;
  15:17;16:9;20:6,19;
  30:3,5
**times (2)**
  33:13,14
**title (1)**
  9:1
**today (1)**
  6:22
**today's (1)**
  7:15
**told (4)**
  9:9;10:5;19:1;24:14
**took (1)**
  4:16
**tortured (1)**
  15:14
**towards (2)**
  25:14;32:18
**to-wit (1)**
  4:5
**traffic (3)**
  18:2;28:12,14
**trained (4)**

**Selena Howard, et al. v**
**Forrest County, et al.**                                                                                                           **Chey Sumrall**

  10:24;11:2;19:15;
  21:11
**training (5)**
  10:21,23;21:15,18;
  31:18
**translate (1)**
  9:23
**transpired (1)**
  25:6
**transported (1)**
  23:20
**tree (17)**
  9:25;10:4;12:18,20;
  13:24;14:7,14,17;
  15:18;16:10,25;18:11,
  17;20:6,19;30:3,5
**tried (5)**
  28:10;31:25;32:4,10,
  11
**try (1)**
  18:23
**trying (5)**
  22:13,16;24:6,12;
  25:21
**t-shirt (1)**
  26:13
**t-shirts (1)**
  4:18
**turn (1)**
  19:10
**Twenty (1)**
  20:13
**two (3)**
  14:10;26:4;28:13
**type (1)**
  8:25
**typically (1)**
  22:16

           **U**

**ultimately (1)**
  15:4
**under (6)**
  4:4;6:24;7:7;20:9;
  21:4,6
**understood (1)**
  7:5
**unhook (2)**
  16:25;18:11
**unlawful (1)**
  21:19
**Unless (1)**
  28:23
**unpaid (2)**
  17:21;18:1
**up (7)**
  5:21;13:8,21;14:19;
  26:14;28:24;33:1
**upon (3)**
  17:25;21:15,18
**upset (1)**
  28:11

**use (1)**
  22:17
**used (2)**
  22:13;28:9
**Usually (2)**
  22:18;33:11

           **V**

**vaccine (2)**
  20:2,2
**vehicle (3)**
  18:2,3,3
**verbal (2)**
  25:15;28:21
**versus (1)**
  22:7
**violation (1)**
  11:3
**violent (1)**
  28:16
**volunteer (1)**
  8:24

           **W**

**WAIDE (10)**
  4:7,14;26:23;27:4,8,
  20;34:6,10,20,21
**walk (2)**
  5:19;26:17
**walked (1)**
  26:19
**walking (1)**
  26:18
**warm (2)**
  34:13,18
**warrant (6)**
  11:18;12:2,5,10,13;
  17:21
**warrants (3)**
  6:13,13;18:5
**warrant's (1)**
  5:24
**watching (1)**
  24:4
**water (7)**
  10:4;15:19;16:6,7;
  20:2,15;31:1
**way (3)**
  21:25;25:19;28:8
**weather (3)**
  30:19,21;34:14
**welfare (8)**
  10:22,25;11:4,8;
  21:11,12;29:7,9
**what's (1)**
  6:7
**WHEREUPON (1)**
  34:23
**whole (1)**
  28:9
**wire (1)**

  16:21
**wires (1)**
  22:2
**withholding (2)**
  19:19,22
**without (3)**
  13:18;26:14;33:20
**WITNESS (6)**
  27:2,7,21;34:5,8,21
**witnessed (1)**
  20:6
**word (1)**
  32:12
**work (1)**
  6:14
**worked (4)**
  5:10,21;17:12;21:12
**worker (4)**
  8:17,21;10:1,3
**working (1)**
  6:4
**works (2)**
  8:24;22:1
**wreck (2)**
  7:25;8:6
**wrong (2)**
  23:7,14

           **Y**

**yards (6)**
  13:10,12,13,14,15,23

           **1**

**15 (1)**
  5:22
**150 (1)**
  13:14

           **2**

**2:40 (1)**
  34:24
**20 (2)**
  20:12,18
**2012 (1)**
  5:17
**2014 (3)**
  5:5,17,22
**2016 (3)**
  5:5,6;6:6
**2017 (3)**
  8:11;9:19;34:12
**2019 (1)**
  6:6
**27 (1)**
  8:11
**27th (3)**
  9:19;17:4;34:12

           **4**

**45 (1)**
  19:6
**49 (1)**
  7:25

           **5**

**50 (1)**
  13:23

           **7**

**75 (1)**
  34:15

           **8**

**8 (2)**
  34:11,16

           **9**

**9:28 (1)**
  23:4
**911 (1)**
  7:20

**Min-U-Script®**                    **AW REPORTING - 601-573-0961**                    **(5) training - 911**
                                          **AWREPORTING.COM**