SELENA HOWARD; DARIOUS LEGGETT;
AND ANTRINET LEGGETT

PLAINTIFFS,

V.

FORREST COUNTY; CHEY SUMRALL,
INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY;
BLAKE BASS, INDIVIDUALLY AND
IN HIS OFFICIAL CAPACITY

DEFENDANTS.

IN THE
UNITED STATES DISTRICT COURT
FOR THE
SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

CIVIL ACTION NUMBER: 2:19-CV-00084-KS-MTP

RULE 26(a) REPORT OF STEVEN D. ASHLEY

MAY 1, 2020



EXHIBIT
H

CLT-HOWARD-000948

# TABLE OF CONTENTS

NOTE: IN THE ELECTRONIC VERSION, CLICK TOC IN THE FOOTER OF EACH PAGE TO LINK BACK TO THIS TABLE OF CONTENTS
PRESSING ALT + LEFT ARROW RETURNS TO THE TABLE OF CONTENTS PAGE YOU LINKED FROM
PRESSING YOUR "HOME" KEY WILL RETURN YOU TO THE COVER PAGE

*Provisos* ...................................................................................................................................... v

**1. Declaration of Steven D. Ashley** ........................................................................................ 1

**2. Introductory Statements** ..................................................................................................... 2

    *Not Legal Advice or the Practice of Law* .................................................................... 2
    *Report Intent* ................................................................................................................. 2
    *Report Focus* ................................................................................................................. 2
    *Case Specific Limitation* .............................................................................................. 2
    *Expert Capacity* ............................................................................................................ 2
    *Right to Amend* .............................................................................................................. 2
    *Further Development* ..................................................................................................... 2
    *Specific References* ....................................................................................................... 2
    *Newly Identified Issues* ................................................................................................. 2
    *Degree of Certainty* ...................................................................................................... 2
    *Discussions and Explanations of Underlying Issues* ................................................... 2
    *Credibility Determinations* ........................................................................................... 2

**3. Executive Summary.** ........................................................................................................... 3

    Incident Synopsis .......................................................................................................... 3
    Opinions in Brief ........................................................................................................... 4

**4. Expert Qualifications.** ....................................................................................................... 5

    Introduction to Qualifications. ...................................................................................... 5
    Credentials in Brief. ....................................................................................................... 5
        *Formal Education.* ................................................................................................. 5
        *Training Completed and Certifications Earned.* .................................................. 6
        *Memberships.* ........................................................................................................ 7
        *Training Delivered.* ............................................................................................... 8
        *Risk Management.* ................................................................................................. 8
        *Authorship.* ........................................................................................................... 9
        *Currently.* .............................................................................................................. 9
    Expert Case Consultation Objectivity ........................................................................... 9

**5. Analysis Protocol.** ............................................................................................................. 9

    Terminology .................................................................................................................. 10
    Truth, Veracity, and Bias ............................................................................................. 10
    Methodology ................................................................................................................ 10
    Nature and Status of Opinions ..................................................................................... 11

**6. Scope of This Report.** ...................................................................................................... 11

    Claims Asserted ........................................................................................................... 12

**7. Background.** ...................................................................................................................... 13

**8. Facts or Data Considered.** ............................................................................................... 13

    Event Venue, Location, Time Frame, Weather, and Lighting ...................................... 13
        Venue .................................................................................................................... 13
        Location ................................................................................................................. 13
        Time ...................................................................................................................... 14
        Weather ................................................................................................................. 14

CLT-HOWARD-000949

Lighting ...................................................................................................................15
Centrally Involved Individuals.............................................................................................15
    *Other Potential Witnesses.* ...........................................................................................16
General Summary of Incident ...............................................................................................17
    *Blake Bass – Narrative.* ................................................................................................17
    *Blake Bass – Deposition.* ..............................................................................................18
    *Deputy Chey Sumrall's Deposition.* .............................................................................20
    *Darious Leggett's Deposition.* ......................................................................................21
    *Selena Howard's Deposition.* ........................................................................................23
    *Antrinet Leggett's Deposition.* ......................................................................................24
    *Involvement of Other Emergency Services Personnel.* ...................................................26

**9.    Information Focus.** .........................................................................................................**26**

**10.    TASER Function.** ..........................................................................................................**28**

TASER CEW Historical Context ..........................................................................................28
TASERs – Generally ............................................................................................................29
    *Illustration 1 – TASER X26P, with mounted cartridge* ...............................................30
Probe Deployment Mode ......................................................................................................30
    *Illustration 2 – TASER X26E, with mounted cartridge* ...............................................31
Drive-Stun Mode .................................................................................................................31
Three-Point Deployment ......................................................................................................31
Spark Test. ...........................................................................................................................32
Spark and/or Laser Warning. ...............................................................................................32
Reduced Effectiveness of Compromised Wires. ...................................................................32
Programmed Length of TASER CEW Discharges ................................................................32
    *In the instant case.* .......................................................................................................33
Overall Effectiveness of TASER CEWs ...............................................................................33
Electrical Output of X26 Family TASER CEWs ...................................................................33
Commonly Observed Effects of TASER CEW Discharges ....................................................34
    *CEW-Related Injuries.* .................................................................................................35
    *Muscle Contractions.* ...................................................................................................35
    *In the instant case.* .......................................................................................................35

**11.    TASER Device Data Capture and Download.** ............................................................**36**

TASER X26P CEW Data Capture ........................................................................................37
    *X26P USB Download* ....................................................................................................37
    *In the instant case.* .......................................................................................................38
TASER X26E CEW Data Capture ........................................................................................38
    *X26E USB Download.* ...................................................................................................39
TASER X26 Family CEW Clocks in General ........................................................................39
    *TASER X26P Clock Readings* ......................................................................................39
    *TASER X26E Clock Readings* ......................................................................................39
TASER CEW Clock Drift and Accuracy ..............................................................................39
    *In the instant case.* .......................................................................................................41

**12.    TASER Download Data Review.** .................................................................................**41**

Deputy Bass' X26P Download Report ..................................................................................41
    *Table 1 – TASER X26P carried by Deputy Blake Bass* ...............................................41
    *Time Relevance* .............................................................................................................41
    *Sequence.* ......................................................................................................................42
    *Analysis and Information Focus* ...................................................................................42
Deputy Sumrall's X26E Download Report ...........................................................................43
    *Table 2 – TASER X26e carried by Deputy Chey Sumrall* ...........................................43
    *Time Relevance* .............................................................................................................43
    *Sequence.* ......................................................................................................................44

CLT-HOWARD-000950

*Analysis and Information Focus* ...................................................................................................*44*

**13. TASER Download Data Conclusions.** ....................................................................................**45**

   Deputy Blake Bass' X26P TASER CEW Usage ...............................................................45
   Deputy Chey Sumrall's X26E TASER CEW Usage ..........................................................46

**14. Human Factors Research.** ..................................................................................................**47**

   Action vs. Reaction .............................................................................................................47
     *In the instant case* .........................................................................................................*48*
   Speed of a Subject ..............................................................................................................48
     *In the instant case* .........................................................................................................*49*

**15. Cognition and Performance During Stressful Events.** ....................................................**49**

   The Effect of Tense, Uncertain, and Rapidly Evolving Events ........................................49
     *In the instant case* .........................................................................................................*50*
   A Note Regarding Variations in Deputy Bass' Accounts of Events. ..................................50
     *In the instant case* .........................................................................................................*51*
   Situational Awareness and Perceptual Narrowing .............................................................51
     *In the instant case* .........................................................................................................*52*

**16. Risk Management in Law Enforcement Force and Control.** ...........................................**52**

   Managing Force and/or Control Options ...........................................................................53
     *In the instant case* .........................................................................................................*54*
   Managing Risk Through Likely Outcomes ........................................................................54
     *In the instant case* .........................................................................................................*54*

**17. Use of Force and Control – General Considerations.** ......................................................**55**

   Perspective of a Reasonable Officer on the Scene. ...........................................................55
     *The Rashomon Effect*....................................................................................................*55*
     *In the instant case* .........................................................................................................*56*

**18. Analysis.** ...............................................................................................................................**56**

   Analysis Context.................................................................................................................56
   Use of Force by Officers – Generally ................................................................................56
   Use of Force Under *Graham v. Connor* ...........................................................................57
   Application of the *Graham* Factors to Deputy Bass' and Deputy Sumrall's Use of Force...............58
   Consideration of Time and the Selection of Options .........................................................59
     *In the instant case* .........................................................................................................*60*
   The Importance of Perspective...........................................................................................60
   The Necessity for or Reasonableness of Force and Control ..............................................61
     *In the instant case* .........................................................................................................*61*

**19. Generally Recognized Preferred Practices for the Use of Force.** ...................................**61**

   The Difference Between Rules and Procedures .................................................................61
   Internal Department Rules and Procedures are Not Laws..................................................62
   Use of Sample or Model Documents .................................................................................62
   International Association of Chiefs of Police (IACP)..........................................................63
     *In the instant case* .........................................................................................................*63*

**20. Departmental Procedural Guidelines for Force and Control.** .........................................**64**

   Use of Force and Control Procedural Guidelines – Generally. .........................................64
   Forrest County's Use of Force and Control Procedural Guidelines ...................................64
   Application of Procedural Guidelines in a Real-World Context.........................................64
     *In the instant case* .........................................................................................................*65*

21.  Review of Departmental Training of Deputies Bass and Sumrall. ......................................65
       Required Department Training. ...............................................................................65
       Deputy Sheriff Blake Bass' Training. .....................................................................65
       Deputy Sheriff Chey Sumrall's Training. ...............................................................66
       Use of Force Training Rubrics and Memory............................................................66
       Applicability of Training to this Incident.................................................................67
           *Discussion.* ......................................................................................................67

22.  Opinions. ...........................................................................................................................68

23.  Compensation for Study and Testimony. ...........................................................................69
       Compensation for Study, Analysis, Testimony, and Travel....................................69
       Compensation as of this Writing .............................................................................69

24.  Exhibits. ............................................................................................................................69

Exhibit I – Document List .............................................................................................................70
       Documents ...............................................................................................................70
       References ................................................................................................................74
       Table of Cases .........................................................................................................78

Exhibit II – Curriculum Vitae .......................................................................................................79
       Special Qualifications .............................................................................................79
       Formal Education .....................................................................................................81
       Current Employment ...............................................................................................81
       Employment History ................................................................................................82
       Expert Case Consultation ........................................................................................84
       Membership Associations & Volunteer Activities ..................................................84
       Instructor / Armorer Certifications Completed/Earned ...........................................85
       Certificate Instructor Program Completed/Earned ..................................................88
       Career Certifications Completed/Earned .................................................................88
       Awards and Recognition ..........................................................................................89
       Publications (in the past ten years).........................................................................89
       Guest Lecturer .........................................................................................................90
       Training Videos & Multimedia Productions ...........................................................95
       Book Chapter ...........................................................................................................95

Exhibit III – Prior Testimony ........................................................................................................96
       Law Enforcement & Criminal Courts .....................................................................96
       Expert Court Testimony (within the past four years)...............................................96

Exhibit IV – Fee Schedule .............................................................................................................99

CLT-HOWARD-000952

*Provisos*

Gender Specificity: Unless referring – in context – to a specific individual, the use of masculine or feminine pronouns, i.e., he, she, her, his, etc., in this document is not intended to be gender specific.

Contemporaneous Context: Unless otherwise noted, identifying a reference in this report in the present context, i.e., is, is not meant to imply that the same reference was not identified in a past context, i.e., was, contemporaneous to the events being discussed.

Timing Calculations: Calculations of timing are based on any running on-screen display (OSD) clocks. Absent running OSD clocks, timing calculations are drawn from on-screen clocks incorporated into playback software, and are approximated to one second, to $\frac{1}{10}$ of a second, or to $\frac{1}{100}$ of a second, accordingly.

Time Convention: Various case-related documents in the record may utilize standard time nomenclature, while others may utilize military time nomenclature. For example, 10:30:45 pm – or 10:30 pm and 45 seconds – converted to military time is equivalent to 22:30:45 hours. Similarly, some military times in the record may be expressed in a slightly revised format (but with no difference in meaning), e.g., 2230:45. Additionally, tenths or hundredths of a second will be expressed in decimal, e.g., 22:30:45.01.

Bracketed Comments: Unless otherwise noted, comments and information appearing in brackets – particularly in conjunction with quoted text passages – have been inserted by the author of this report, to assist the reader, or to aid in clarity.

Misuse of TASER Trademark Terminology: The term TASER® is a registered trademark of TASER International, Inc. The term "TASER" is an acronym for *Thomas A. Swift's Electric Rifle*, and – as such – is properly written in all capital letters, without periods. The company has trained and cautioned instructors and others since at least 2007 to avoid misuse of the trademark or terminology. This is especially true of the use of modified terms such as "tase", "tasing", and "tased". Where these terms appear in quoted text, they will be marked thus [sic].

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### EASTERN DIVISION

| | | |
|---|---|---|
| SELENA HOWARD; DARIOUS LEGGETT; and ANTRINET LEGGETT | § § § § § | |
| Plaintiffs, | § | |
| v. | § § | Case No. 2:19-cv-00084-KS-MTP |
| FORREST COUNTY; CHEY SUMRALL, individually and in his official capacity; BLAKE BASS, individually and in his official capacity | § § § § § § § | |
| Defendants. | § | |

## RULE 26(a) REPORT OF STEVEN D. ASHLEY

### SUBMITTED: MAY 1, 2020

**1.  DECLARATION OF STEVEN D. ASHLEY.**

I, Steven D. Ashley, being of legal age and under penalty of perjury, state as follows:

1.  I am a competent adult and have personal knowledge of the following facts, or believe them to be true based on information and belief. Facts about which I do not have personal knowledge are of the type reasonably relied upon by experts in this field and have probative value to me in rendering my opinions.

2.  Attached hereto is a true and accurate copy of my expert report in this matter.

3.  This report summarizes my analyses and findings and includes a statement of my opinions and the basis and reasons for them. The report also includes facts or data considered by me in forming my opinions and sets out my qualifications (including my curriculum vitae).

4.  My opinions are expressed to a reasonable, or higher, degree of professional certainty.

5.  I affirm under penalty of perjury that the foregoing statements are true and correct.

| | |
|---|---|
| _May 1, 2020_ | _Steven D. Ashley_ |
| DATE | STEVEN D. ASHLEY, MSc, MLS, ARM/P, AFSS, IXCI, IICI |
| | MONROE, MICHIGAN |

CLT-HOWARD-000954

## 2. INTRODUCTORY STATEMENTS.

The following introductory statements apply to this entire report, including any attached exhibits, which are to be incorporated as integral parts thereof. Some of these introductory statements may be reiterated in the body of this report.

*Not Legal Advice or the Practice of Law*. The expert services rendered in this case and this document are not legal advice, and are not to be construed, in any way, as legal advice, or as the practice of law.

*Report Intent*. Nothing in this report intends to, or should be understood as an attempt to, usurp or subvert the function of the Court, or to intrude upon or inappropriately influence the role of the Jury or other trier of fact.

*Report Focus*. This report is focused solely on the incident captioned and related concerns and/or issues.

*Case Specific Limitation*. Any actions, statements, writings, this report, information, any testimony, etc., are specifically limited to this case.

*Expert Capacity*. This report and any subsequent reports, testimony, opinions, etc., are within my capacity as an independent criminal justice and governmental risk management expert.

*Right to Amend*. The opinions in this report are living opinions. That is, should additional discovery material be received, and/or additional research be completed, and then reviewed, these opinions may be altered and/or reinforced depending upon what information is obtained, reviewed, considered, and/or studied.

*Further Development*. The opinions expressed in this report are not necessarily final in nature. Rather, they are listed to comply with current report requests. Each opinion may be further developed through research, investigation, during deposition, and/or trial testimony.

*Specific References*. Some of the opinions in this report may list or cite specific references to some of the documents or research reviewed and/or considered. These listings and citations are not intended to be all inclusive. I specifically reserve the right to supplement the support for each of the opinions in this report.

*Newly Identified Issues*. If new issues are opined, identified, and/or developed subsequent to submission of this report, I reserve the right to supplement this report.

*Degree of Certainty*. All opinions stated in this report are in direct regard to the case captioned, and the underlying incident or events leading to this case, and are expressed to a reasonable, or higher, degree of professional certainty.

*Discussions and Explanations of Underlying Issues*. Any discussion or explanation of underlying issues is intended to assist the reader with understanding some of the concepts that inform my opinions in this matter.

*Credibility Determinations*. It is not my intent to make any credibility determinations in developing my opinions in this case.[1]

---

[1] I understand that credibility determinations are solely and exclusively within the province of the trier of fact, as instructed by the Judge.

CLT-HOWARD-000955

3. **EXECUTIVE SUMMARY.**

My name is Steven D. Ashley. I was contacted by defense counsel on or about January 15, 2020, and ultimately engaged on January 17, 2020,[2] in the above captioned matter – for the purpose of providing review, analysis, and opinions – regarding allegations made against Deputy Sheriffs Chey Sumrall and Blake Bass,[3] and Forrest County, Mississippi.[4]

Incident Synopsis.[5,6] During the morning of September 27, 2017, two deputies of the Forrest County Sheriff's Office went to a residence to check on the welfare of dogs that had been reported as being neglected.

Deputies met with two women at the scene; Antrinet Leggett[7] and Selena Howard. During their discussion, Ms. Leggett's son – one Darious Leggett – came out of the house, and became disruptive and aggressive toward the deputies.

Due to his continued aggression, the deputies arrested Mr. Leggett, and he fought against their efforts. His mother (Antrinet Leggett) attempted to prevent the arrest by wedging herself between her son and the deputies, continuing to push and shove the deputies away.

Mr. Leggett put his hands on Deputy Sumrall in an apparent attempt to push him away. Seeing this, Deputy Bass deployed his TASER device, striking Mr. Leggett in the groin area. Mr. Leggett fell to the ground but continued to resist. Deputy Bass turned to Ms. Leggett, who was continuing to resist, and was aggressive.

Both Mr. and Ms. Leggett were arrested for disorderly conduct, failure to comply, and resisting arrest. AAA ambulance was called to the scene, and Mr. Leggett was released to the care of the AAA medics, who transported him to hospital, due to the probe placement. He was not booked into the jail, but was instead cited.[8] Ms. Leggett was transported to jail.

---

[2] I was engaged by Ms. Christina Smith, Esq., of Allen, Allen, Breeland & Allen, PLLC, of Brookhaven, Mississippi.

[3] According to his deposition testimony (Blake Smith deposition, p. 4), Blake Bass changed his last name to Smith in January of 2020. Because most of the documentation provided to me references his previous last name, this report will do the same, and refer to him as Blake Bass, in the interest of clarity.

[4] Plaintiffs' Forrest County Circuit Court Complaint, Case Number W19-0106, dated 05/14/2019. [Removed to Federal Court, Case Number 2:19-cv-00084-KS-MTP, Document 1-2, filed 05/28/2019.

[5] This is intended to be a very brief synopsis of general events, as reported by officers and others. A more detailed version of my understanding of events that reportedly occurred or are claimed to have occurred is included, *infra*.

[6] The following brief synopsis is gleaned from the written report of Deputy Blake Bass, dated 09/28/2017, CLT-HOWARD-000006.

[7] Ms. Leggett's first name appears with two different spellings in the documentation provided to me; *Antrinet*, and *Antrinette*. On information provided by Counsel, I have used *Antrinet* throughout this report unless the citation is a direct quote from another document.

[8] The term that Deputy Bass' reports used for this process is *post-arrested*.

CLT-HOWARD-000956

Deputy Bass later secured a Court order to seize the dogs. As the owner of the animals, Ms. Howard was cited for animal cruelty.[9],[10]

Opinions in Brief. For the reasons set forth in this report, and to a reasonable – or higher – degree of professional certainty, I hold the following opinions.[11]

1. It is my opinion that <u>the use of force and control as reported by Deputy Sheriffs Blake Bass and Chey Sumrall, was based upon their perception that Darious Leggett had become increasingly agitated and aggressive, had refused to comply with commands, and that he then physically resisted deputies' attempts to gain compliance</u> and control.

2. It is my opinion that <u>the use of force and control as reported by Deputy Sheriffs Bass and Sumrall in arresting Antrinet Leggett was based upon her physically assaultive interference</u> in the arrest of her son.

3. It is my opinion that other trained and experienced officers are likely to logically conclude that <u>the reported actions of Darious Leggett – in the circumstances as described – posed a threat or risk of serious injury or death to Deputies Bass and Sumrall and/or others in the area</u>.

4. Further, it is my opinion that other officers who do so conclude, would likely determine that <u>it was necessary to use force and control methods</u> in order for Deputies Bass and Sumrall to reduce the likelihood of serious injury or death to themselves <u>and that it would be logical and appropriate for them to reach that conclusion, considering their training and experience</u>.

5. It is also my opinion that it is logical and appropriate to conclude that <u>many of those officers</u>, when faced with the same – or a substantially similar – situation as that reported by Deputies Bass and Sumrall, <u>would likely act in the same, or a similar, way as they did</u>.

6. It is my opinion that, if similarly trained and experienced, and faced with the same or similar reported circumstances, <u>other reasonable officers would believe that the conduct and actions of Deputies Bass and Sumrall were lawful</u> in using what force and control methods they did in their attempt to arrest and control Darious Leggett and Antrinet Leggett.

7. It is my opinion that <u>Deputy Bass' and Deputy Sumrall's perceptions regarding the use of force and control were consistent with known human factors research</u>.

8. It is my opinion that, within the context of the circumstances in which they found themselves, Deputy Bass' and Deputy Sumrall's actions during the incident in question were consistent with the FCSO use of force and control procedural guidelines.

---

[9] Forrest County Sheriff's Office, Narrative Report of Deputy Blake Bass, Case Number 201711423, dated 09/28/2017 [sic], CLT-HOWARD-000006.

[10] Ms. Howard was not arrested at the scene, and was not subjected to any force or control techniques.

[11] I hold any statements of opinion made here, or elsewhere in the body of this report, to a reasonable – or higher – degree of professional certainty, based upon my skill and/or knowledge, as gained through my education, experience, and/or training.

CLT-HOWARD-000957

9. It is my opinion that the actions reportedly taken by Deputy Blake Bass and Deputy Chey Sumrall do not suggest a lack of proper training. It is my opinion that Bass and Sumrall met or exceeded recommended training preferred practices that I am familiar with, through my education, research, training, and experience, and that are in wide use in the law enforcement community.

A reiterated statement of these opinions is set forth later in this report.[12]

## 4. EXPERT QUALIFICATIONS.[13]

Introduction to Qualifications.  This report is provided based upon my personal and professional skill, knowledge, experience, education, and/or training, in and of the law enforcement, corrections, security, criminal justice, governmental service, and risk management fields, gained over the past 44 years and more.

I am a retired law enforcement officer, formerly employed as a full-time, sworn police officer, deputy sheriff, and law enforcement supervisor, trainer, and manager. As such, I have supervised and instructed law enforcement, security, and corrections officers – as well as supervisors, managers, and executives – in the performance of their duties, to include, *inter alia*, arrest, restraints, use of force and deadly force, conducted energy weapons, motor vehicle operations, corrections operations, and the training, supervision, and management of other criminal justice and municipal professionals, and trainers.

Credentials in Brief.  More specifically, I served for 15 years as a professional law enforcement officer, trainer, and manager, with approximately one-half of that time as a supervisor, field supervisor, and manager. In addition to my certification as a Michigan police officer, I earned four Advanced Police Officer Training certificates, three Police Management Development certificates, and one Police Supervisor Development certificate, from the Michigan Law Enforcement Officers Training Council.[14]

Subsequently, I served for 12 years as a full-time, credentialed, governmental risk manager. In that capacity, I counseled municipalities, municipal insurance pools, and other government entities – throughout the United States – on managing the risks of employee injuries and litigation, particularly as regards law enforcement and jail training, operations, and management.

*Formal Education.*  I earned and was awarded a Bachelor of Arts Degree in Communication Arts, and a Master of Science Degree in Criminal Justice, from Michigan State University. Additionally, I earned and was awarded a Master of Liberal Studies Degree in Interdisciplinary Technology – with criminal justice focus – from Eastern Michigan University, graduating with a perfect academic record. I am a graduate of the Northwestern University School of Police Staff and Command, again with a perfect academic record. I completed and earned professional designations as an Associate in Risk Management, and as an Associate in Risk

---

[12] Other statements of opinion may be incorporated into the body of this report.

[13] My detailed Curriculum Vitae is attached to, and incorporated into, this report as Exhibit II.

[14] MLEOTC, now formally renamed MCOLES (Michigan Commission on Law Enforcement Standards), is the state-mandated law enforcement certifying entity in Michigan.

CLT-HOWARD-000958

Management for Public Entities, from the Insurance Institute of America.[15] I successfully completed police academy training and earned certification as a Michigan police officer.

*Training Completed and Certifications Earned.*  I have attended and successfully completed more than 6,000 hours of law enforcement, corrections, criminal justice, and public entity, operational and risk management related training. Much of my training has been – and is – of an advanced nature, and includes more than 70 law enforcement instructor, instructor-trainer, and Master instructor-trainer[16] certification courses. These advanced- and instructor-level courses include, *inter alia*, firearms, defensive tactics, officer safety and survival, aerosol weapons, impact weapons, handcuffing, weapon retention and disarming techniques, conducted energy weapons,[17] use of force, use of deadly force, police driving, pursuit driving, emergency vehicle operations, and policy development.[18]

I have been trained and certified as a TASER Senior Master Instructor,[19] by TASER International,[20] and hold a Master Use of Force Instructor™ certification from the Police Policy Studies Council®, as well as a Master Force and Control Instructor™ certification from the Smith & Wesson Academy®.[21] I am an IADLEST® Nationally Certified Instructor (INCI)™, certified as a Charter INCI Member, and an IADLEST International Certified Instructor (IICI)™, certified as a Charter IICI Member, by the International Association of Directors of Law Enforcement Standards and Training.[22]

---

[15] The Insurance Institute of America (IIA) was rebranded as *The Institutes* in 2009. The Institutes is the insurance industry's primary credentialing organization.

[16] Instructor-trainer courses are often referred to as *train-the-trainer* courses; Master Instructor-Trainers typically train other instructor-trainers.

[17] Conducted energy weapons are sometimes referred to as electronic control devices, conducted electronic devices, conducted electrical weapons, and other similar naming conventions. In some cases, the brand-name *TASER* is inappropriately applied as a generic reference. Generally – and in the context of this report – all of these terms have the same, or a similar, meaning.

[18] In addition to the aforementioned, I have successfully completed numerous armorer and technician courses, regarding various handgun, long gun, and non-lethal weapon systems, including TASER branded devices.

[19] As such, I have trained hundreds of TASER Instructors, and hundreds of TASER Master Instructors (instructor-trainers), as well as TASER end-users. Notably, as a member of the instructional cadre, I trained TASER Master Instructors on downloads and the interpretation of same, at Master Instructor Schools presented by the manufacturer of TASER branded devices, TASER International, Inc. Additionally, as part of the TASER, International, Quality Assurance Program, I was chosen to provide quality assurance oversight and review of TASER Master Instructors, as they presented instructor courses, at numerous locations across the United States.

[20] TASER, International, Inc., has been rebranded AXON Enterprise, Inc.

[21] This credential is sometimes referred to as a Master Use of Force Instructor certification.

[22] I am also an IADLEST member. From the IADLEST.org website, *"IADLEST is an association of standards and training managers and leaders. Its primary focus is criminal justice standards and training. To the extent that the focus and the values promoted thereby can be furthered and shared, all training professionals are welcome as members. The mission of IADLEST is to research, develop, and share information, ideas and innovations which assist states in establishing effective and defensible standards for employment and training of law enforcement officers, and, in those states where dual responsibility exists, correctional personnel."* Accessed and retrieved by Steve Ashley on 28 May 2018.

CLT-HOWARD-000959

I am a Certified Force Science Analyst™ and an Advanced Force Science Specialist™, trained by the Force Science Institute®, and am an Instructor Graduate of the Law of Self Defense™ Instructor Program, presented by the Law of Self Defense Institute®. I successfully completed both the Federal Driving Instructor Training Program and the Federal Firearms Instructor Training Program, conducted by and at the Federal Law Enforcement Training Center.

*Memberships.*  In order to remain professionally current, I maintain active and professional memberships in numerous associations and organizations. My memberships include, *inter alia*,

- Alpha Phi Sigma, National Criminal Justice Honor Society
- American Jail Association – Professional Member
- American Society for Testing and Materials, International (ASTM) – Voting Member
- Concerns of Police Survivors (COPS) – Family/Survivor Member
- Concordia University Criminal Justice Alliance – Faculty Member/Co-Advisor
- Concordia University Justice & Public Policy – Advisory Council
- Concordia University School of Business – Advisory Council
- Illuminating Engineering Society of North America – Professional Member
- International Association of Chiefs of Police (IACP) – Academic Member
- International Association of Correctional Training Personnel (IACTP) – Professional Member
- International Association of Directors of Law Enforcement Standards and Training (IADLEST)
- International Association of Law Enforcement Emergency Vehicle Response Trainers (ALERT)
- International Association of Law Enforcement Firearms Instructors (IALEFI)
- International Foundation for Protection Officers – Professional Member
- International Law Enforcement Educators and Trainers Association (ILEETA) – Advisory Board, Managing Editor Emeritus, and Founding Charter Member
- Law Enforcement & Emergency Services Video Association, International (LEVA)
- Michigan Association of Chiefs of Police (MACP) – Active Member
- Michigan Sheriffs' Association – Professional Member
- Michigan State University (MSU) Alumni Association – Life Member
- National Law Enforcement Academy Resource Network (NLEARN) – Member
- National Rifle Association (NRA) – Benefactor (Life) Member

- Northwestern University Traffic Institute Alumni Association
- OSS Academy – TCOLE Advisory Board Member (§ 1701)
- Phi Kappa Phi Academic Honor Society
- Police Marksman Association – Life Member
- Society for Police and Criminal Psychology – Active Member

*Training Delivered.* I have taught law enforcement, corrections, security, and criminal justice, courses at colleges, universities, civic organizations, and law enforcement agencies, throughout the United States. I have been an invited presenter on a broad range of law enforcement, security, corrections, and risk management topics, at numerous state, regional, national, and international conferences. Among the many topics I have taught – and upon which I have presented – are law enforcement and jail operations, policies and procedures, civil rights, arrest tactics, officer safety, use of force and deadly force, use of force management, training management, law enforcement driving, conducted energy weapons, law enforcement liability, and jail liability.[23]

Prior to my retirement after 22 years of service, I was the Use of Force Coordinator, Chief Firearms - Use of Force Instructor, and Chief Driving Instructor, for a college-based police academy. As such – along with teaching firearms, use of force, and both recruit and in-service driving – my primary tasks included program and curriculum development and oversight, as well as the training and certification of use of force, firearms, and police driving instructors. Since 1976, I have personally delivered over 150,000 man-hours of training to more than 16,500 officers, trainers, supervisors, and managers.

*Risk Management.* As a credentialed risk manager, I have personally conducted more than 400 detailed – on-site – risk management reviews of law enforcement agencies and detention facilities, and have completed in-depth critical reviews of more than 500 law enforcement policy and procedure manuals[24] from law enforcement agencies and jails located across the United States. These risk management and manual reviews routinely and frequently result in documented recommendations for improvement. In many cases, compliance with my recommendations has been mandated by municipalities' insurance carriers.

I have served on – as well as conceived, formulated, mentored, and managed – subject matter expert (SME) panels. The objective of said SME panels

---

[23] Training related to legal issues and constructs is presented from an informed lay-person's perspective.

[24] Operating manuals for criminal justice agencies are identified in many different ways: common naming conventions include, *inter alia*, policies, procedures, policies and procedures, rules and regulations, general orders, operating guidelines, standard operating procedures, and directives. Colloquially, these documents are often referred to as *policies*. In some contexts, rules and regulations are considered to be more oriented toward mandated workplace rules, while policies and procedures are intended more as procedural guidelines. Within the context of this report – and unless specified differently – all these terms are defined as having generally the same meaning.

CLT-HOWARD-000961

was the development of sample policies and suggested procedural guidelines for critical law enforcement, security, and corrections, management and operations.[25]

*Authorship*.  In my over 44 years as a criminal justice professional and trainer, I have authored and published more than 120 articles on various law enforcement, security, and criminal justice topics, in numerous publications. In my writing, my primary focus has been on use of force, police vehicle operations, and other critical aspects of law enforcement and corrections operations, as well as the training and supervision of criminal justice professionals. Additionally, I have – at the request of both authors and publishers – edited, fact-checked, and content reviewed, criminal justice and risk management-oriented manuscripts, books, periodicals, and publications, authored by other criminal justice professionals.

*Currently*.  I am an independent criminal justice advisor, risk manager, and trainer. As such, I conduct risk assessments of law enforcement and jail operations – as well as policy reviews – for agencies throughout the United States. I am frequently consulted for risk management advice by criminal justice leaders and municipal officials. Additionally, I present staff and management training for peace officers and corrections personnel, as well as public sector managers, trainers, and government officials.

In maintenance and furtherance of my professional skills and knowledge, I also attend training programs and conferences on an on-going basis. I maintain a professional library of over 3,000 books and research publications, and continue receipt and review of numerous professional journals, periodicals, and other publications.

I have the honor of serving as an Adjunct Professor of Justice and Public Policy, at Concordia University in Ann Arbor, Michigan. As such, I teach traditional undergraduate and graduate students in various courses, including, *inter alia*, Law Enforcement Policy and Practices, Administration of Justice, Corrections Theory and Practice, Juvenile Justice Theory, Foundations of Justice, Management of Law Enforcement Agencies, Ethics in Criminal Justice, and Public Safety Risk Management.

Expert Case Consultation Objectivity.  I have been privileged to provide expert consultation and review in more than 170 cases since 1994, approximately 75% of which have been defense cases. During the same years, I have had the honor of testifying as an expert – at deposition, hearing, or trial – 49 times in 42 cases, approximately 65% of which have been defense cases.[26]

5. **ANALYSIS PROTOCOL.**

In preparation of this review and development of associated opinions, I have conducted an analysis of much of the documentation and data currently available, and

---

[25] Examples are the Law Enforcement Committee of the Michigan Municipal Risk Management Authority (MMRMA), the Law Enforcement Action Forum (LEAF committee) of the Michigan Municipal Liability and Property Pool (a division of the Michigan Municipal League), and the law enforcement advisory committee of the Iowa Communities Assurance Plan (ICAP).

[26] A listing of cases in which I have testified as an expert at deposition, hearing, or trial, in the past four years, is attached to, and incorporated into, this report as Exhibit III.

CLT-HOWARD-000962

analysis continues.[27] These documents and other materials are of the type typically relied upon by consultants and experts when conducting analyses of law enforcement, corrections, security, and criminal justice issues, and have provided me with enough relevant data to develop my opinions to a reasonable – or higher – degree of professional certainty.

In addition to my evaluation of documents and other materials, I rely upon my skill and/or knowledge – as gained through my many years of experience, education, and/or training – in the law enforcement, security, corrections, and risk management fields; consultation with peers, review of professional literature, and independent research; as well as my understanding of the instant case.

Terminology.  Any opinions I proffer or statements that I make in this report that relate to legal terminology, standards, best practices, preferred practices, case law, or similar constructs, are drawn from my training and/or experience as a criminal justice practitioner, manager, educator, and trainer, as well as my experience and/or training as a researcher, governmental risk manager, and advisor. Use of specific legal terminology in this report is not intended to usurp or subvert the function of the Court, or to intrude upon or inappropriately influence the role of the Jury or other trier of fact.[28]

Truth, Veracity, and Bias.  The following analysis is not intended to presume that any one version of the claims made in this case is more truthful than any other. Information drawn from various documents and other sources may be reported and contrasted for the purpose of relating events as they were perceived by those involved.[29]

Methodology.  I understand that a non-scientific expert must be qualified to offer expert testimony by skill, knowledge, experience, education, or training.[30] Similarly, I understand that the role of the expert is to provide specialized knowledge that will assist the trier of fact to understand the evidence or to determine a fact in issue; and that said expert's contribution must be both relevant and reliable.[31]

In this report I have provided both general and specific qualifications that demonstrate and illustrate my qualifications to provide expert testimony in this case.

---

[27] A listing of documents and data received, reviewed, or considered – thus far – is attached to, and incorporated into, this report as Exhibit I.

[28] Like many other criminal justice managers, trainers, and instructors, I use such terms in training that I present to police and corrections personnel, because they are commonly understood by criminal justice practitioners, and are typically used in daily operations by law enforcement and corrections professionals.

[29] Where practical I rely upon undisputed facts, and attempt to indicate those that are disputed when appropriate. Where facts and evidence appear to directly contradict statements and assertions of any party to this action, I attempt to point out the contradictions, and place them into context. Any apparent assumption of truth or implied assignment of veracity by me is undertaken solely for the purpose of analysis and the rendering of opinion, and is not intended to usurp the role of the Jury or other trier of fact.

[30] Fed. R. Evid. 702.

[31] *Kumho Tire Co., et al., v. Carmichael, et al.*, 526 U.S. 137, 147 (1999).

The methodology I used in this case is the same that I have utilized for many years, and that has been peer-reviewed – at my request – by numerous other experts. Dependent upon the specific nature of each case, my methodology generally incorporates the following:[32]

- Orientation to case issues and elements;

- Review of provided case documents and materials;

- Development of a timeline, as well as a geographical and climatological context for the incident;

- Review of case related documents available on PACER and/or other on-line resources;

- Literature review regarding issues indicated in the instant case;

- General context consideration, regarding the backdrop of current and historical practices in relevant fields;

- Comparative analysis of case-related issues against the backdrop of current practices;

- Research and review of other relevant resource materials;

- Formulation of opinions.

This methodology has been accepted by presiding Judges in previous cases wherein I have had the privilege of testifying at trial. My methodology is consistent with that utilized by other competent experts in the field of criminal justice when conducting analyses of criminal justice practices.[33]

<u>Nature and Status of Opinions</u>.  Within the scope of the information thus far received, and unless otherwise indicated, each of my opinions is held to a reasonable – or higher – degree of professional certainty, whether stated in the body of this report, or in the opinions section.[34,35]

## 6.  SCOPE OF THIS REPORT.

I was engaged by defense counsel, and was asked to review and opine regarding the reported actions of Deputy Sheriffs Blake Bass and Chey Sumrall, and Forrest

---

[32] While these elements are typically part of my methodology, not every element listed here is necessary – or will be undertaken – in every case. In some cases, additional elements may be undertaken.

[33] When feasible, on-scene examination is undertaken of the locales where the incident occurred. This aspect is sometimes completed after my report is submitted, but usually before sworn testimony is provided, either at deposition or trial.

[34] Some of the opinions that I have expressed in this report may contain references to some of the case specific documents or other resources reviewed or considered. Such references are not intended to be all-inclusive, and I specifically reserve the right to supplement the support for each of the opinions in this report.

[35] In this report, I state my opinions based upon my understanding of the incident and circumstances in question. That understanding is drawn from the documents and other information that is available to me as of this writing. Other documents and materials may yet be discovered, disclosed, or provided. As my review and consideration of documents continues, further discovery occurs, and/or other information becomes available, I reserve the right to modify, revise, extend, and/or affirm my opinions.

CLT-HOWARD-000964

County, Mississippi, concerning the events that gave rise to this action. I was specifically asked to opine regarding plaintiffs' claims of excessive force.

<u>Claims Asserted</u>. It is my understanding that the following claims are asserted in this case.[36,37,38]

- Plaintiffs assert a claim of *"Unlawful Seizure"* against *"defendants"*.[39]

- Plaintiffs assert a claim for violation of the *"1st Amendment"*.[40]

- Plaintiffs assert a claim of *"False Imprisonment"*.[41]

- Plaintiffs assert a claim of excessive force against *"defendants"*.[42]

- Plaintiffs assert a claim for – apparently – failure to provide *"Equal Protection"*.[43]

- Plaintiffs assert a claim of *"Racial Discrimination"*.[44]

- Plaintiffs assert a claim of *"Fabrication/Misrepresentation of Evidence"*.[45]

---

[36] Plaintiffs' Forrest County Circuit Court Complaint, Case Number W19-0106, dated 05/14/2019. [Removed to Federal Court, Case Number 2:19-cv-00084-KS-MTP, Document 1-2, filed 05/28/2019.

[37] Initially, this case was filed in Forrest County Circuit Court, and was removed to Federal Court by the defendants on 05/28/2019. Any attributions cited in this report are based upon the original, State Court complaint.

[38] Paragraph 7 of the complaint states that *"The misconduct complained of herein arose in Lamar County, Mississippi."* Lamar County is the next county west of Forrest County.

[39] Plaintiffs' Forrest County Circuit Court Complaint, Case Number W19-0106, dated 05/14/2019. [Removed to Federal Court, Case Number 2:19-cv-00084-KS-MTP, Document 1-2, filed 05/28/2019, Count I, ¶¶ 47 – 53.

[40] Plaintiffs' Forrest County Circuit Court Complaint, Case Number W19-0106, dated 05/14/2019. [Removed to Federal Court, Case Number 2:19-cv-00084-KS-MTP, Document 1-2, filed 05/28/2019, Count II, ¶¶ 54 – 59.

[41] Plaintiffs' Forrest County Circuit Court Complaint, Case Number W19-0106, dated 05/14/2019. [Removed to Federal Court, Case Number 2:19-cv-00084-KS-MTP, Document 1-2, filed 05/28/2019, Count III, ¶¶ 60 – 66.

[42] Plaintiffs' Forrest County Circuit Court Complaint, Case Number W19-0106, dated 05/14/2019. [Removed to Federal Court, Case Number 2:19-cv-00084-KS-MTP, Document 1-2, filed 05/28/2019, Count IV, ¶¶ 67 – 71.

[43] Plaintiffs' Forrest County Circuit Court Complaint, Case Number W19-0106, dated 05/14/2019. [Removed to Federal Court, Case Number 2:19-cv-00084-KS-MTP, Document 1-2, filed 05/28/2019, Count V, ¶¶ 72 – 75.

[44] Plaintiffs' Forrest County Circuit Court Complaint, Case Number W19-0106, dated 05/14/2019. [Removed to Federal Court, Case Number 2:19-cv-00084-KS-MTP, Document 1-2, filed 05/28/2019, Count VI, ¶¶ 76 – 80.

[45] Plaintiffs' Forrest County Circuit Court Complaint, Case Number W19-0106, dated 05/14/2019. [Removed to Federal Court, Case Number 2:19-cv-00084-KS-MTP, Document 1-2, filed 05/28/2019, Count VII, ¶¶ 81 – 86.

CLT-HOWARD-000965

The claims appear to be asserted by the plaintiffs collectively against the defendants collectively, except where Forrest County – and, at one point, the Forrest County Sheriff's Department[46] (but not the Sheriff) – is specifically cited.[47]

**7. BACKGROUND.**

This action arises out of allegations concerning an incident that occurred during the morning of Wednesday, September 27, 2017, involving deputies of the Forrest County, Mississippi, Sheriff's Office.[48]

**8. FACTS OR DATA CONSIDERED.**

The following reflects my understanding of the events and circumstances that are alleged to have occurred during the incident that gave rise to the instant case. It is drawn from the information currently available to me and is an amalgam of the various accounts, information, and perceptions, related to my specific imprimatur in this case. It is not intended to be an exhaustive or exclusive recitation of events or circumstances.

<u>Event Venue, Location, Time Frame, Weather, and Lighting</u>. The events giving rise to the instant case occurred in and around the curtilage of a residence located south of the City of Hattiesburg, Mississippi. The events occurred during the morning of Wednesday, September 27, 2017.

*Venue*. On the day of the incident, the residence was located in Forrest County, at 1348 Elks Lake Road, Hattiesburg, Mississippi.[49] The residence was approximately nine miles south of the city of Hattiesburg; roughly equidistant from Interstate 59, which is just over three miles to the west, and Camp Shelby, which is just over three miles to the east.[50]

*Location*. As seen in overhead satellite views[51] the location appears to be set far back – some 700 feet – from Elks Lake Road, at the end of a long drive. The Confederate cemetery referred to in the case documentation appears to be located some 900 feet farther to the east, essentially behind the residence if one stands at the roadside, facing the residence to the east.[52] The specific location of events was

---

[46] Plaintiffs' Forrest County Circuit Court Complaint, Case Number W19-0106, dated 05/14/2019. [Removed to Federal Court, Case Number 2:19-cv-00084-KS-MTP, Document 1-2, filed 05/28/2019, ¶ 65.

[47] From the format of the complaint, it is unclear to me which specific actions by which individual defendant are the bases of which specifically asserted claim being alleged against which specific defendant by which specific plaintiff.

[48] Plaintiffs' Forrest County Circuit Court Complaint, Case Number W19-0106, dated 05/14/2019. [Removed to Federal Court, Case Number 2:19-cv-00084-KS-MTP, Document 1-2, filed 05/28/2019.

[49] While the mailing address is Hattiesburg, Mississippi, the location is actually in a wooded, rural setting, some distance from town.

[50] Various Google Maps and Satellite view captures, accessed by Steve Ashley during 01/2020.

[51] Various Google Maps and Satellite view captures, accessed by Steve Ashley during 01/2020.

[52] Various Google Maps and Satellite view captures, accessed by Steve Ashley during 04/2020.

CLT-HOWARD-000966

reportedly outside the residence, in a yard area. Except for a clearing around the residence, the area appears heavily wooded.[53]

*Time*. Reports in the record indicate that Deputies Bass and Sumrall *"… conducted a welfare check …"* of dogs[54] at the Elks Lake Road location at approximately 0800 hours.[55] Deputy Bass' hand-written TASER use report indicates that his TASER was used at 0824 hours.[56,57] The Blotter Report notes that the initial call was received at 08:17:43, that Deputy Bass (F70) was on-scene at 08:18:10, and that Deputy Sumrall (F17) was on-scene at 08:18:40. The report notes that Bass *"Cleared Call"* at 09:23:47, and that Sumrall did so at 11:02:14.[58,59]

*Weather*.[60] At the time of the incident,[61] the weather was fair,[62] with temperatures near 78°, and humidity at approximately 84%.[63] The dewpoint was approximately 73°.[64] Civil twilight was scheduled at 6:24 am; sunrise was at 6:48 am.[65] The winds were calm.[66]

---

[53] Various Google Maps and Satellite view captures, accessed by Steve Ashley during 01/2020.

[54] Forrest County Sheriff's Office, Narrative Report of Deputy Blake Bass, Case Number 201711423, dated 09/28/2017 [sic], CLT-HOWARD-000006.

[55] 8:00 am.

[56] 8:24 am.

[57] Forrest County Sheriff's Office, M26 Advanced TASER [sic] Use Report of Blake Bass, incident date 09/27/2017, CLT-HOWARD-000017.

[58] [Forrest County] Blotter Report for date(s) 9/27/2017 to 9/27/2017, date printed 02/13/2020, CLT-HOWARD-000900 – CLT-HOWARD-000901.

[59] Deputy Sumrall reportedly followed AAA ambulance (transporting Darious Leggett) to hospital.

[60] Historical weather readings utilized in this report originate from Hattiesburg Muni – Bobby L. Chain Airport weather station, which is located approximately six miles north/northeast of the residence (as the crow flies) and approximately 9 ¼ miles from the residence via local roads.

[61] The actual weather data were recorded at 7:53 am. "Weather for Hattiesburg-Muni Station at Bobby L. Chain Airport, Hattiesburg, MS for September 27, 2017". Weather Underground, 27 September 2017, https://www.wunderground.com/history/daily/us/ms/Hattiesburg/KHBG/date/2017-9-27. Accessed and retrieved by Steve Ashley on 17 January 2020.

[62] "Weather for Hattiesburg-Muni Station at Bobby L. Chain Airport, Hattiesburg, MS for September 27, 2017". Weather Underground, 27 September 2017, https://www.wunderground.com/history/daily/us/ms/Hattiesburg/KHBG/date/2017-9-27. Accessed and retrieved by Steve Ashley on 17 January 2020.

[63] "Weather for Hattiesburg-Muni Station at Bobby L. Chain Airport, Hattiesburg, MS for September 27, 2017". Weather Underground, 27 September 2017, https://www.wunderground.com/history/daily/us/ms/Hattiesburg/KHBG/date/2017-9-27. Accessed and retrieved by Steve Ashley on 17 January 2020.

[64] "Weather for Hattiesburg-Muni Station at Bobby L. Chain Airport, Hattiesburg, MS for September 27, 2017". Weather Underground, 27 September 2017, https://www.wunderground.com/history/daily/us/ms/Hattiesburg/KHBG/date/2017-9-27. Accessed and retrieved by Steve Ashley on 17 January 2020.

[65] "Sunrise and sunset times in Hattiesburg for September 2017". https://www.timeanddate.com/sun/usa/hattiesburg?month=9&year=2017. Accessed and retrieved by Steve Ashley on 17 January 2020.

[66] "Weather for Hattiesburg-Muni Station at Bobby L. Chain Airport, Hattiesburg, MS for September 27, 2017". Weather Underground, 27 September 2017, https://www.wunderground.com/history/daily/us/ms/Hattiesburg/KHBG/date/2017-9-27. Accessed and retrieved by Steve Ashley on 17 January 2020.

There had been no precipitation recorded for the previous 48 hours.[67,68]

*Lighting*. This was a daytime incident. Specific lighting conditions are not recorded in the record provided to me. I note that, while the incident occurred in the morning – shortly after 8 am – it occurred approximately one and ¾ hours after civil twilight,[69] at 6:24 am, and one and ½ hours after sunrise at 6:48 am. However, the degree to which lighting in the yard may have been subdued due to the sun's angle, and shading from trees and the house is unknown.

<u>Centrally Involved Individuals</u>. Various law enforcement officers and individuals are mentioned in the documentation of this case. This report primarily focuses on the following:[70]

- *Selena Howard, a named Plaintiff*.[71] Selena Howard (Ms. Howard, Howard) was the owner of the dogs mentioned in this case, and was reportedly the owner of the residence. She was reportedly the girlfriend of Darious Leggett. Ms. Howard was involved in an incident which culminated in an interaction between her, the other plaintiffs, and two Forrest County deputies, after which she was cited for animal cruelty.

- *Darious Leggett, a named Plaintiff*.[72] Darious Leggett (Mr. Leggett, Darious[73]) was reportedly the boyfriend of Selena Howard. Mr. Leggett was involved in an incident which culminated in an interaction between him, the other plaintiffs, and two Forrest County deputies, during which he was physically restrained and arrested.

- *Antrinet Leggett, a named Plaintiff*.[74] Antrinet Leggett (Ms. Leggett, Antrinet[75]) was reportedly the mother of Darious Leggett. Ms. Leggett was involved in an incident which culminated in an interaction between her, the

---

[67] "Weather for Hattiesburg-Muni Station at Bobby L. Chain Airport, Hattiesburg, MS for September 26, 2017". Weather Underground, 26 September 2017, https://www.wunderground.com/history/daily/us/ms/Hattiesburg/KHBG/date/2017-9-26. Accessed and retrieved by Steve Ashley on 17 January 2020.

[68] "Weather for Hattiesburg-Muni Station at Bobby L. Chain Airport, Hattiesburg, MS for September 25, 2017". Weather Underground, 25 September 2017, https://www.wunderground.com/history/daily/us/ms/Hattiesburg/KHBG/date/2017-9-25. Accessed and retrieved by Steve Ashley on 17 January 2020.

[69] Morning civil twilight begins when the geometric center of the sun is 6 degrees below the horizon and ends at sunrise. Evening civil twilight begins at sunset and ends when the geometric center of the sun is 6 degrees below the horizon. Under these conditions absent fog or other restrictions, the brightest stars and planets can be seen, the horizon and terrestrial objects can be discerned, and in many cases, artificial lighting is not needed. *National Weather Service*.

[70] This proviso is made for the sake of brevity and is not intended to imply that any individual associated with the instant case is less credible, or that their information is less relevant or material. Any other – more tangentially – involved individuals may be listed elsewhere in this report.

[71] Plaintiffs' Forrest County Circuit Court Complaint, Case Number W19-0106, dated 05/14/2019. [Removed to Federal Court, Case Number 2:19-cv-00084-KS-MTP, Document 1-2, filed 05/28/2019.

[72] Plaintiffs' Forrest County Circuit Court Complaint, Case Number W19-0106, dated 05/14/2019. [Removed to Federal Court, Case Number 2:19-cv-00084-KS-MTP, Document 1-2, filed 05/28/2019.

[73] Mr. Leggett's first name is utilized here in order to differentiate him from another plaintiff.

[74] Plaintiffs' Forrest County Circuit Court Complaint, Case Number W19-0106, dated 05/14/2019. [Removed to Federal Court, Case Number 2:19-cv-00084-KS-MTP, Document 1-2, filed 05/28/2019.

[75] Ms. Leggett's first name is utilized here in order to differentiate her from another plaintiff.

CLT-HOWARD-000968

other plaintiffs, and two Forrest County deputies, during which she was physically restrained and arrested.

- *Blake Bass, a named Defendant*.[76] At the time of this incident, Blake Bass (Deputy Bass, Bass) was engaged as a fully empowered, Deputy Sheriff, by the Forrest County Sheriff's Office.[77] On September 27, 2017, Deputy Bass – in uniform[78] – was designated as patrol unit F70,[79] and – accompanied by his partner, Chey Sumrall (in a separate vehicle, designated as patrol unit F17) – went to the Elks Lake Road address regarding a *"welfare check"*[80] of dogs following a report of neglect.

- *Chey Sumrall, a named Defendant*.[81] At the time of this incident, Chey Sumrall (Deputy Sumrall, Sumrall) was engaged as a fully empowered, Deputy Sheriff, by the Forrest County Sheriff's Office.[82] On September 27, 2017, Deputy Sumrall – in uniform[83] – was designated as patrol unit F17,[84] and – accompanied by his partner, Blake Bass (in a separate vehicle, designated as patrol unit F70) – went to the Elks Lake Road address regarding a *"welfare check"*[85] of dogs following a report of neglect.

<u>Other Potential Witnesses</u>.   There were no other potential witnesses to the incident described or identified in the documentation provided to me. Both deputies testified that they received the initial information regarding the animal complaint from a woman named [Haley] Ryals,[86,87] however I have no contemporaneous statement from her, and there is no indication in the record provided to me that Ms. Ryals was at the scene of the incident, or observed the arrests of the Leggetts.

---

[76] Plaintiffs' Forrest County Circuit Court Complaint, Case Number W19-0106, dated 05/14/2019. [Removed to Federal Court, Case Number 2:19-cv-00084-KS-MTP, Document 1-2, filed 05/28/2019.

[77] Blake Bass is no longer employed in law enforcement; he has testified that he is, *"[…] just a part-time officer, reserve."* (Blake Smith deposition, p. 5) However, in the interest of clarity and continuity, this report will refer to Mr. Bass as Deputy Sheriff Bass.

[78] Email correspondence from Counsel, following her interview with Defendant Bass, dated 02/06/2020.

[79] [Forrest County] Blotter Report for date(s) 9/27/2017 to 9/27/2017, date printed 02/13/2020, CLT-HOWARD-000898 – CLT-HOWARD-000912.

[80] Forrest County Sheriff's Office, Narrative Report of Deputy Blake Bass, Case Number 201711423, dated 09/28/2017 [sic], CLT-HOWARD-000006.

[81] Plaintiffs' Forrest County Circuit Court Complaint, Case Number W19-0106, dated 05/14/2019. [Removed to Federal Court, Case Number 2:19-cv-00084-KS-MTP, Document 1-2, filed 05/28/2019.

[82] Chey Sumrall is no longer employed in law enforcement; he has testified that he now works for the *"Oak Grove Land Company."* (Chey Sumrall deposition, p. 6) However, in the interest of clarity and continuity, this report will refer to Mr. Sumrall as Deputy Sheriff Sumrall.

[83] Email correspondence from Counsel, following her interview with Defendant Bass, dated 02/06/2020.

[84] [Forrest County] Blotter Report for date(s) 9/27/2017 to 9/27/2017, date printed 02/13/2020, CLT-HOWARD-000898 – CLT-HOWARD-000912.

[85] Forrest County Sheriff's Office, Narrative Report of Deputy Blake Bass, Case Number 201711423, dated 09/28/2017 [sic], CLT-HOWARD-000006.

[86] Deposition transcript of Blake Smith, dated 04/27/2020, p. 7.

[87] Deposition transcript of Chey Sumrall, dated 04/27/2020, p. 8.

<u>General Summary of Incident</u>. The general incident description that follows is drawn primarily from the reports of Deputy Bass,[88,89] as his perceptions and impressions were those that informed his actions during the incident. Additionally, Deputy Bass' account is supplemented by his recent deposition, as well as the recent deposition of Deputy Sumrall.

I note that I have just received deposition transcripts of the plaintiffs, and have briefly reviewed them. I have no statements from any of the plaintiffs that were taken contemporaneous to the incident.

<u>*Blake Bass – Narrative*</u>. The following is drawn from Deputy Blake Bass' statements in his written narrative, which was part of his initial report of the incident.[90] It is based on Bass' reported perception of the incident.[91]

> "On 09-27-2017 at approximately 0800 hours I, Deputy Bass and Deputy Sumrall conducted a welfare check at [redacted in original] in reference to three dogs. A Forrest County employee from District One called in to report that the dogs being neglected.

> "Upon arrival on scene, we came in contact with Selena Howard and Antrinette [sic] Leggett concerning the dogs. After discussing the situation, Ms. Howard stated that the dogs were hers and they were just bad on their luck. Darious Leggett then came out with being disruptive and immediately was aggressive towards both deputies.

> "Mr. Leggett came from the porch area and continued to be aggressive and curse at both Deputies. He did although, [sic] undo one of the dogs from a tree it was chained too, [sic] where it did not have any food or water. Mr. Leggett stated that they were bad on their luck and that the dogs were fine. He did try and show deputies that he had food ,but [sic] the bucket he showed deputies had no food in it. Deputies continued to try and calm down [sic] Mr. Leggett and the whole situation as a whole.

> "Mr. Leggett continued to be aggressive, at which point we attempted to arrest the subject but he attempted to fight with Deputies. His mother,Antrinette, [sic] wedged herself in between Deputies and her son to prevent the arrest. She also disobeyed lawful orders by both Deputies and continued to push and shove, at which point Mr. Leggett put his hands on Deputy Sumrall to push him away. I Deputy Bass, [sic] deployed my Taser [sic] and hit Mr. Leggett in the groin area. He immediately fell and still resisted to comply with Deputies [sic]

---

88 Forrest County Sheriff's Office, Narrative Report of Deputy Blake Bass, Case Number 201711423, dated 09/28/2017 [sic], CLT-HOWARD-000006.

89 Forrest County Sheriff's Office, M26 Advanced TASER [sic] Use Report of Blake Bass, incident date 09/27/2017, CLT-HOWARD-000017 – CLT-HOWARD-000018.

90 Forrest County Sheriff's Office, Narrative Report of Deputy Blake Bass, Case Number 201711423, dated 09/28/2017 [sic], CLT-HOWARD-000006.

91 Beyond added bracketed insertions, the text is quoted here verbatim.

CLT-HOWARD-000970

*commands. I Deputy Bass [sic] turned towards Ms. Leggett to attempt to arrest her at which point she continued to resist and be aggressive.*

*"Both subjects were arrested for Disorderly Conduct: Failure to Comply and Resisting Arrest. Mr. Leggett was released to Triple A ambulance service to be transported to Forrest General Hospital. He was post-arrested on his charges from the incident. Ms. Leggett was taken to the Forrest County Jail and booked in on her charges.*

*"At that point the dogs stayed at the address with the owner Selena Howard. I Deputy Bass [sic] then went to the Forrest County Justice Court concerning the dogs. I acquired a order [sic] of seizure for the dogs to be taken by Southern Pines Animal Shelter on 09-28-2017 as seen in the scanned documents.*[92] *Ms. Howard is also post-arrested for simple cruelty for the dogs at [redacted in original]. Nothing further to report at this time."*[93]

<u>*Blake Bass – Deposition.*</u> Deputy Bass' deposition was taken on 04/27/2020, and I have just received a draft copy of the transcript. Although more detailed, Deputy Bass' deposition testimony is generally consistent with his written narrative, despite the passage of time since the incident in September of 2017.[94] There is some variance in his recollection of specific details.

From Blake Bass' deposition transcript:

- Sumrall actually got the information for the original complaint; Bass went along to assist. (p.6)

- They went directly from meeting with the complainant to the Leggett residence. (p. 7)

- When they first pulled into the yard, they, *"…saw a malnourished dog tied to a tree [ … ] the dog was very skinny and didn't have any food or water."* (p. 8)

- The dog was approximately a couple of yards from the house, if that. (p. 11)

- Bass did not ask that the dog be taken off of the tree. (p. 12)

- Sumrall and Darious Leggett were on the porch; Bass was just below the steps, a few feet away. (p. 12)

- When Darious brought the food bucket out of the house, he, *"[ … ] was very aggressive …"*. Sumrall was trying to turn Darious around, in order to arrest him, but Darious, *"[ … ] was not having it."* (p. 14)

- Bass does not remember how Sumrall and Darious ended up off the porch and on the ground, but he was not able to get up onto the porch before they were off of it. (p. 14)

---

[92] I did not receive the *"scanned documents."*

[93] Forrest County Sheriff's Office, Narrative Report of Deputy Blake Bass, Case Number 201711423, dated 09/28/2017 [sic], CLT-HOWARD-000006.

[94] Deposition transcript of Blake Smith, dated 04/27/2020.

CLT-HOWARD-000971

- Darious was *"yelling and cussing"*, but did not make any threats toward Bass. (p. 14)

- Bass does not recall if Darious made any threats toward Sumrall. (p. 15)

- When Sumrall was attempting to handcuff Darious, Antrinet Leggett was trying to push Sumrall. (p. 15)

- During the attempted handcuffing, in the struggle, Bass remembers Darious *"swinging"* as they were giving Darious verbal commands. (p. 15)

- Bass stepped back and fired his TASER. (p. 15)

- Bass does not recall if he gave any warning before firing his TASER. (p. 16)

- Bass does not recall if Sumrall attempted any physical techniques before the TASER was deployed. (p. 16)

- Bass told Darious to stop resisting several times. (p. 17)

- Bass did not arrest Darious; Sumrall actually put handcuffs on Darious. (p. 17)

- When Darious swung at Sumrall, he did not make contact. (p. 18)

- Bass quickly fired his TASER upon stepping back. (p. 21)

- After firing the TASER, Darious fell down. (p. 22)

- Bass threw his TASER on the ground, and went to arrest Antrinet for interfering with the arrest. He had given her several commands to step back. She was standing off to the side; he believes she was by a lawn mower. (p. 23)

- Bass had difficulty handcuffing Antrinet, and had to try several times. (p. 24)

- Antrinet did not fall to the ground. (p. 25)

- The dogs ribs were definitely showing; there were food and water bowls, but they were empty. There was no shelter. (p. 30)

- No one told them (Bass and Sumrall) to leave. (p. 30)

- Bass did not *"tase"* [sic] Ms. Leggett. (p. 30)

- Bass removed his TASER cartridge when he put the TASER on the ground. He picked up the TASER and sparked it in order to scare the dog away. (p. 31)

- Bass testified that – while he was trying to arrest Antrinet – the dog was, *"[ ... ] actually biting my pants leg [ ... ]"* and *"[ ... ] I remember the dog trying to bite me."* (p. 31)

- Sumrall tried to help Bass [by sparking his CEW to scare the dog]. (p. 31)

- Antrinet resisted when Bass attempted to arrest her for interfering. (p. 32)

*Deputy Chey Sumrall's Deposition.* Deputy Sumrall arrived shortly after Deputy Bass, at 08:18:40.[95,96] While there is no contemporaneous statement from Deputy Sumrall in the record provided to me, his deposition was taken on 04/27/2020, and I have just received a draft copy of the transcript. Sumrall's deposition testimony is generally consistent with Deputy Bass' narrative and deposition, although there is some variance regarding certain details.

From Chey Sumrall's deposition transcript:

- They were not dispatched; they met the complainant, Haley Ryals, at a business nearby. (p. 8)

- Ryals told them she got the information about the dog(s) from a county worker that mows the old cemetery; the worker had seen the dog tied to a tree with no food or water. (p. 9)

- When they went to the residence, Sumrall knew the information was *"secondhand at best."* (p. 10)

- When they arrived they saw one dog tied to a tree. (p. 14)

- Sumrall testified, *"There was no food or water in the one bowl they had."* (p. 16)

- Darious came out of the house irate. (p. 16)

- Sumrall does not recall either he or Bass asking Darious to take the dog off the leash. (p. 17)

- Darious did unhook the dog. (p. 18)

- Darious went in the house, and brought out an empty container, with no food in it. (p. 18)

- Darious was in the house for 30 – 45 seconds. (p. 19)

- When he came out with the empty container, Sumrall told him to turn around and put his hands behind his back, in order to arrest him for *"Animal Neglect."* (p. 19)

- The charge was based on, *"The condition of the dog, the no shelter [sic], no water [ … ]"* (p. 20)

- The only time Sumrall fired his TASER was to spark it at the dog that was *"biting at Blake or barking at Blake."* (p. 22)

- When Bass discharged his TASER at Darious, Sumrall was dealing with Darious; he was not dealing with Antrinet. (p. 24)

- Sumrall remembers he and Darious falling off of the porch while he was trying to arrest Darious. He was still struggling to get Darious' hands behind his back. Then he remembers Bass *"tasing"* [sic]. (p. 24)

---

[95] 8:18 am and 40 seconds.

[96] [Forrest County] Blotter Report for date(s) 9/27/2017 to 9/27/2017, date printed 02/13/2020, CLT-HOWARD-000900 – CLT-HOWARD-000901.

CLT-HOWARD-000973

- Sumrall remembers a struggle between Bass and Antrinet; a dog was barking or biting at Bass, and Sumrall arced his TASER to scare the dog. (p. 25)

- Sumrall did not handcuff Antrinet. (p. 26)

- Sumrall does not know what happened to Antrinet's phone. (p. 27)

- Sumrall characterized Darious' demeanor as, *"the entire time [ … ] he was cussing [ … ] The best way I can describe it is aggressive the whole time we were there. … he was very upset"* (p. 28)

- Darious acted *"physically violent"* and *"got in [Sumrall's] face"* and *"refused to comply with any of [Sumrall's] verbal commands."* (p. 28)

- The dog was tied to a tree on the other side of the driveway … it was *"very thin."* (p. 30)

- Based on his observations and training, he suspected the dog had been neglected. (p. 31)

- Sumrall doesn't actually remember if Darious jumped or fell off of the porch, but does remember that they both went off the porch at one time. (p. 32)

- Sumrall does not know how many times he sparked his TASER at the dog, but he never deployed his *"prongs."* (p. 33)

- Sumrall would not dispute if the temperature was recorded as 75 degrees at the time, but he maintains that it was hot/warm. (p. 34)

*Darious Leggett's Deposition.*  Mr. Leggett apparently disputes much of Deputy Bass' report, as he is a plaintiff in the instant case. However, I note that the documentation I have contains no statement from Mr. Leggett that was written contemporaneous to the event. Mr. Leggett's deposition was taken on April 27, 2020, and I have just received a draft copy of the transcript.[97]

Following an initial transcript review, I note the following:

- On the day of the incident, Darious Leggett and Selena Howard lived at the location (Selena Howard was the lease holder). Antrinet Leggett was staying with them. (p. 9)

- The day before the incident, an older couple came to the location, wanting to see the cemetery, but only stayed a few minutes, and never mentioned the dog(s). (p. 12)

- There were two dogs, both pit bull/Labrador mix. (p. 14)

- The dogs have a dog house, and they have food and water, as well as shade from the trees. (p. 14)

- When the officers came to the house, they were hostile and aggressive from the start. (pp. 17, 20)

- Sumrall did the talking, but Bass *"chimed in."* (p. 22)

---

[97] Deposition transcript of Darious Leggett, dated 04/27/2020, with attached exhibits.

- Sumrall told him that it was illegal to tie the dog to a tree. (p. 22)

- When Darious came out of the house with the food bucket, Sumrall leaned in and kept saying *"What do you want to do, do something"* as if trying to provoke Darious to swing at him. (p. 24)

- The dogs had two bowls, one with water in it, and the other an empty food bowl, because they had been fed earlier. (p. 25)

- The dogs did not look skinny and did not have their rib cages showing. (p. 26)

- Darious did not try to get aggressive with Sumrall, and did not get in his face. (pp. 28, 29)

- Sumrall never gave any commands, just started grabbing at Darious; Sumrall never told him he was under arrest. (p. 29)

- Darious didn't jump off the porch, he was more or less shoved. (p. 29)

- Bass came to help Sumrall, and put his hands on Darious, then *"…it was like all three of us went off the porch because they shoved me. They shoved me off the porch."* (p. 30)

- They wouldn't tell Darious anything; Bass never said anything. (p. 30)

- Antrinet was on the phone, but, *"… by that time, my mom had done been pushed and shoved and tased [sic], you know, by Chey [Sumrall]."* (p. 31)

- Antrinet came off the porch, and tried to get in between Darious, Sumrall, and Bass. (p. 32)

- Antrinet did not physically touch the officers, but she did try to intervene. (p. 32)

- The officers did tell Antrinet to back up. (p. 32)

- Sumrall shoved and pushed Antrinet, she tripped over a step and fell, hitting her head on the lawn mower. Bass was pointing his TASER at Darious. (p. 33)

- Darious saw Antrinet fall, then Sumrall *"…shot the taser [sic] at her, and it hit her in the hand."* (p. 34)

- Darious saw Bass' TASER aim down at his (Darious') waistband area, and he was *"shot in the scrotum"*.(p. 34)

- According to Darious, *"At first I was standing up before my mom fell. But once my mom fell and was tased [sic], Chey [Sumrall] tased [sic] my mom, and Blake [Bass] tased [sic] me in the genitals."* (p. 35)

- Sumrall pointed the TASER at Antrinet, and it *"shot prongs out"* into her hand. (p. 35)

- Bass tased [sic] Darious two or three seconds after Sumrall tased [sic] Antrinet. Darious does not know how long they were tased [sic] but he felt *"tons of watts"* and it was extremely painful. (p. 36)

CLT-HOWARD-000975

- Bass was *"No less than 5 yards"* away when he fired his TASER at Darious. (p. 37)

- Sumrall was *"...about the same, 3 to 5 yards"* away from Antrinet when he tased [sic] her. (p. 37)

- Darious saw Antrinet fall, hit her head, and get tased [sic], then he was tased [sic] right after. (p. 37)

- According to Darious, *"I cannot say how long [he was "tased"]. But I can tell you it was over 20 something seconds, like he was just ... like his finger, his trigger finger, laid on the trigger. And I was just laying there shaking like a rag doll ..."*. (p. 37)

- Sumrall did not put Antrinet in the police car, Bass did. (p. 39)

- The officers never asked Darious to put his hands behind his back. (p. 42)

- Sumrall aimed a TASER at the dog that was growling at him, but Darious doesn't know if Sumrall tased [sic] the dog, because it ran off. (p. 46)

- When the officers were getting *"rough"* with Darious, the dog *"started to get a little aggressive."* (p. 47)

- According to Darious, Sumrall came to him in the hospital, and apologized for what had happened. (p. 52)

- After firing it, Bass *"handed the taser [sic] to [Sumrall], and [Bass] put my mom in his squad car."* (p. 73)

- The officers did not *"unplug the prongs"*. They, *"had it attached to the gun the whole time."* (p. 73)

- According to Darious, *"...the whole time before the ambulance ever showed up, the prongs was [sic] in me. The cords were still attached to the gun, and everything."* (p. 73)

- When asked if he was saying that while he was on the ground, the officers kept tasing [sic] him, Darious said, *"While I'm on the ground,... I never stopped shaking. [ ... ] Like, I just feel watts. It never stopped. Like, the pain never stopped. I still felt it. I don't know how many times he laid his hand on that trigger. I know for a fact that you can ... hold that tase [sic]. You can hold that watt. [ ... ] I know for that fact."* (p. 74)

- When asked if, at that point, Darious thought that's what the officer did [hold that watt], Darious said, *"I believe so."* (p. 74)

*Selena Howard's Deposition.*  Ms. Howard apparently disputes much of Deputy Bass' report, as she is a plaintiff in the instant case. However, I note that the documentation I have contains no statement from Ms. Howard that was written contemporaneous to the event. Ms. Howard's deposition was taken on April 27, 2020, and I have just received a draft copy of the transcript.[98]

From my initial transcript review, I note the following additional items:

---

[98] Deposition transcript of Selena Howard, dated 04/27/2020.

CLT-HOWARD-000976

- There were two dogs, one at the front of the house, and one at the side. The one in front had a dog house. (p. 18)

- When Darious began walking away from Sumrall, Sumrall tried to grab him. Eventually, Darious started backing up away from Sumrall, Sumrall tried to grab him again, and pushed Darious off the porch. (p. 21)

- Once Darious and Sumrall were on the ground, the dog ran up barking, and Sumrall pointed a TASER at the dog. (p. 23)

- The officers never told Darious that he was under arrest. (pp. 23, 24)

- When Darious stood up, Antrinet got *"kind of in the middle of the, but it wasn't directly in the middle."* (p. 24)

- At some point, Sumrall shoved Antrinet, her head hit the lawn mower, and she fell to the ground. Mr. Howard is not sure at what point Sumrall did tase [sic] Antrinet. (p. 25)

- Antrinet grabbed her phone, Sumrall pushed her down, her head hit the lawn mower, and she hit the ground. *"And then that's when they put her in cuffs."* (p. 26)

- When the officers pushed Antrinet down, Darious leaned and said *"Mom"*, and that's when Bass shot him in the genitals with the TASER. (p. 26)

- Ms. Howard remembers seeing Bass taking Ms. Leggett to his patrol car, and that Sumrall was then holding the TASER that Bass had fired at Darious. (p. 29)

- Ms. Howard doesn't remember exactly when Ms. Leggett was tased [sic], but she does remember it happening. The probe, *"didn't stick in her hand, but her hand was tingly. She [Antrinet] kept complaining about tingling, that she couldn't feel her hand."* This was before Darious was tased [sic]. (p. 30)

- Sumrall was the officer that shoved Antrinet, and the one that tased [sic] her. (p. 31)

- Ms. Leggett was tased [sic] in the hand with the prongs. *"They didn't stick into her skin, but she did get tased [sic]"*. (p. 31)

- Sumrall handcuffed Ms. Leggett. (p. 33)

- The arrests of Darious and Antrinet happened at the exact same time. (p. 35)

- Ms. Howard saw both arrests at the same time, and saw everything perfectly. (p. 35).

*Antrinet Leggett's Deposition.*  Ms. Leggett apparently disputes much of Deputy Bass' report, as she is a plaintiff in the instant case. However, I note that the documentation I have contains no statement from Ms. Leggett that was written contemporaneous to the event. Ms. Leggett's deposition was taken on April 27, 2020, and I have just received a draft copy of the transcript.[99]

---

[99] Deposition transcript of Antrinet Leggett, dated 04/27/2020, with attached exhibits.

From my initial transcript review, I note the following additional items:

- Sumrall told Darious to go and *"let the dogs off the chain."* (p. 19)

- One of the officers shot one of the dogs with a TASER because the dog *"pooped himself on the porch."* (p. 26)

- The officers would *"have had to shoot [the dog] with prongs. They didn't just, you know, stick it to him. But the dog was down around their feet at the time."* (p. 26)

- Darious was on the ground, and then *"...he pulled out his taser [sic] to shoot his taser [sic] at me, it hit my hand, and I fell and hit the lawnmower."* (p. 26)

- The officers didn't try to put handcuffs on Darious until they had put Antrinet in the car and took her phone. (p. 27)

- Darious and the officers did not get into a tussle. *"There was no tussle."* (p. 27)

- The officers didn't touch Darious at all. Antrinet doesn't *"... remember nobody [sic] putting his hands on him [Darious]."* (p. 28)

- Ms. Leggett wasn't directly between the officers and Darious. She was beside Darious *"a little bit ... Maybe 2 or 3 feet."* (p. 28)

- Ms. Leggett was trying to talk to Sumrall because he, *"seemed to be the one that was more level with his understanding and speaking."* She characterized *"the other one [Bass]"* as being *"hotheaded"*. (p. 28)

- Ms. Leggett did not try to put her hands in between Darious and the officers, or try to push them apart. (p. 29)

- The situation was *"heated"*. She doesn't remember the exact words that were said, but the officers and Darious were *"in each other's faces, yelling at each other."* (p. 29)

- Bass took her phone. (p. 30)

- Bass did not tell her she was under arrest; he just put her arms behind her back, and *"pretty much dragged me to the car in my nightgown, no shoes on, no panties, no bra. Drug me to the car, and that's how I went to the station."* (p. 31)

- Bass tased [sic] her when she was standing in front of Darious, before Bass grabbed her phone. (p. 32)

- When Bass tased [sic] her, it hit her hand with one prong. *"It was a little scratch. I guess it missed it. Like, it didn't go all the way in."* (p. 32)

- The same officer tased [sic] her that tased [sic] Darious. (p. 33)

- The same officer also was the officer that took her to the car. (p. 34)

- Darious was tased [sic] after her, as she could see it happening from where she was at the car. But they tased [sic] Darious before she was put in the car. (p. 34)

CLT-HOWARD-000978

- She felt the electricity after the one probe scratched her hand, and she still has the shakes from it. (p. 36)

- According to Ms. Leggett, after she was scratched by the probe fired from Bass' TASER, he turns and tases [sic] Darious, then takes her to the car and puts handcuffs on her. (p. 36)

_Involvement of Other Emergency Services Personnel._  Following the exchange between deputies and the plaintiffs, medics from the AAA Ambulance Service were summoned to the scene. Mr. Leggett was transported to hospital.[100] As of this date, I have no statements or reports attributable to EMS or hospital personnel.

## 9. INFORMATION FOCUS.

I draw the reader's attention to the following items, in order to specifically focus on or to underscore additional points that inform my opinions.

- When they arrived, Deputies Bass and Sumrall each saw a dog tied to a tree outside the residence.[101,102]

- Deputy Bass characterized the dog's condition as _"malnourished"_, and testified that, _"The dog was very skinny and didn't have no [sic] food or water."_[103]

- Deputy Sumrall characterized the dog's condition as _"very thin"_ and that he could see the dog's ribs.[104]

- While Deputy Bass knew Darious Leggett and Selena Howard from school, Deputy Sumrall did not know Darious (he knew Ms. Howard from a local business).[105] Sumrall had arrested Antrinet Leggett some time before.[106]

- Deputies Bass and Sumrall had no knowledge regarding Leggett's motivation for his aggressive hostility.

- Deputies Bass and Sumrall had no opportunity to check any of the three plaintiffs for weapons, or to ascertain if there were weapons nearby.

- Deputies Bass and Sumrall had no knowledge whether there was someone else in the house.

---

[100] Forrest County Sheriff's Office, Narrative Report of Deputy Blake Bass, Case Number 201711423, dated 09/28/2017 [sic], CLT-HOWARD-000006.

[101] Deposition transcript of Chey Sumrall, dated 04/27/2020, p.12.

[102] Deposition transcript of Blake Smith, dated 04/27/2020, p. 8.

[103] Deposition transcript of Blake Smith, dated 04/27/2020, p. 8.

[104] Deposition transcript of Chey Sumrall, dated 04/27/2020, p. 30.

[105] Deposition transcript of Chey Sumrall, dated 04/27/2020, p. 17.

[106] Deposition transcript of Chey Sumrall, dated 04/27/2020, pp. 17-18.

CLT-HOWARD-000979

- The scene was undoubtedly chaotic. The dogs were likely agitated (there was a second dog on the porch, in a cage[107]). At one point, Ms. Howard was on the telephone with the 911 operator, and can be heard screaming and yelling.[108]

- At some point during the altercation, Darious Leggett "unhook[ed] the dog"[109] from the tree.

- Ms. Howard was a third person at the scene, which necessitated that the deputies split their attention three ways, in order to manage a scene with at least three possible suspects, as they fought to control Mr. Leggett and his mother, while avoiding the dog(s).

- As Leggett escalated his aggressive resistance, Deputy Bass deployed his TASER.[110]

- Bass reported that the distance between him and Mr. Leggett when he deployed was *"5 FT"*, and that the probe spread on Leggett's body was *"5 INCH"[sic]*.[111,112]

- After Leggett fell, he reportedly continued to resist before complying with deputies' commands.[113]

- While both deputies were equipped with TASER conducted energy weapons, reportedly only Deputy Bass deployed his (i.e., actually fired his cartridge), and then reportedly only against Mr. Leggett. Deputy Bass utilized one TASER cartridge.[114]

- At some point during the deputies' attempt to arrest her son, Ms. Leggett interfered physically, pushing herself between her son and the deputies.[115]

- During the altercation, the loose dog was *"biting at"* Deputy Bass, so Sumrall removed his TASER cartridge,[116] and sparked his TASER at the dog in an

---

[107] Deposition transcript of Chey Sumrall, dated 04/27/2020, p. 16.

[108] Audio file *audio.wav (2)*, undated, [length 00:12:46].

[109] Deposition transcript of Chey Sumrall, dated 04/27/2020, p. 18.

[110] Forrest County Sheriff's Office, Narrative Report of Deputy Blake Bass, Case Number 201711423, dated 09/28/2017 [sic], CLT-HOWARD-000006.

[111] Forrest County Sheriff's Office, M26 Advanced TASER [sic] Use Report of Blake Bass, incident date 09/27/2017, CLT-HOWARD-000017 – CLT-HOWARD-000018.

[112] This is generally consistent with expected probe spread; as discussed, *infra*, X26P probes spread at a rate of approximately 12 inches for every 7 feet of travel down range. At an estimated 3- to 5-foot range, probes can be expected to spread approximately 5 to 8 inches on a stationary target. The spread is less predictable on a moving target.

[113] Forrest County Sheriff's Office, Narrative Report of Deputy Blake Bass, Case Number 201711423, dated 09/28/2017 [sic], CLT-HOWARD-000006.

[114] Forrest County Sheriff's Office, M26 Advanced TASER [sic] Use Report of Blake Bass, incident date 09/27/2017, CLT-HOWARD-000017 – CLT-HOWARD-000018.

[115] Forrest County Sheriff's Office, Narrative Report of Deputy Blake Bass, Case Number 201711423, dated 09/28/2017 [sic], CLT-HOWARD-000006.

[116] Deposition transcript of Chey Sumrall, dated 04/27/2020, p. 33.

CLT-HOWARD-000980

effort to get it to stop biting.[117] He does not remember how many times he sparked it.[118]

- Sumrall testified that he never deployed the "*prongs*" from his TASER.[119]

This incident escalated quickly. While the timing is approximate, the record indicates that within a few minutes of their arrival, Deputies encountered an increasingly aggressive, non-compliant, Darious Leggett. As they attempted to deal with the situation that was developing by arresting Mr. Leggett, they were interfered with by Ms. Leggett. Without knowledge of the presence or absence of weapons or other individuals, or the reason that Mr. Leggett was apparently so aggressive, Deputy Bass utilized his TASER when he observed Leggett pushing Deputy Sumrall.

## 10. <u>TASER Function</u>. [120]

Due to the use of TASERs during the events that gave rise to this case, a discussion of TASER technology is in order.[121] There were two different TASER models involved in this case, and each is described and discussed, *infra*.

<u>TASER CEW Historical Context</u>. The initial technology which led to the current crop of TASER conducted energy weapons was developed in the 1970s, and continued through the development of the first TASER CEW that was specifically intended for law enforcement use, and to today's crop of TASER conducted energy weapons.

Consider the following timeline:

- In 1974, what can be considered the first "TASER", the TF-76, was available.[122] Because it utilized a gunpowder propellant, it was ruled to be a firearm by BATF,[123] making it very difficult to market.

- In 1994, the Air TASER Model 34000 was developed. However, due to contractual and non-compete issues, it could not generally be sold to law enforcement agencies until after February of 1998.[124] By then, the manufacturer had determined it was too low powered for successful law

---

[117] Deposition transcript of Chey Sumrall, dated 04/27/2020, p. 25.

[118] Deposition transcript of Chey Sumrall, dated 04/27/2020, p. 33.

[119] Deposition transcript of Chey Sumrall, dated 04/27/2020, p. 33.

[120] Deputy Bass deployed his X26P TASER probes during this incident. Because there are allegations that Deputy Sumrall also deployed his TASER X26E probes, some of the following will refer to characteristics of the X26E model TASER device. I note that Deputy Sumrall specifically denies deploying probes.

[121] This discussion of TASER technology and attendant issues is intended to assist the reader with understanding some of the concepts that inform my opinions in this matter. An understanding of the underlying technology and TASER operational issues will assist the reader in assessing various aspects of this case.

[122] Due to its shape and configuration, this model was colloquially referred to as the *dustbuster* model, after a household vacuum.

[123] Bureau of Alcohol, Tobacco, and Firearms.

[124] A few agencies purchased the Air TASER 34000 before the 1998 date, leading to litigation, which forced the cessation of law enforcement sales.

CLT-HOWARD-000981

enforcement use. It was released to the civilian self-defense market, under the company name AIR-TASER, Inc.[125]

- The Advanced TASER M26 – colloquially referred to as the "M26" – was introduced in 1999, under the company name TASER International, Inc.[126] This was the first model successfully marketed for law enforcement use.

- The TASER Model X26 – now termed the X26E – was introduced late 2002, officially hitting the market in 2003. It gained widespread popularity and is still used in significant portions of the law enforcement community. It is, however, discontinued and is no longer manufactured.

- The TASER Model X3 was first available in July of 2009. The X3 platform introduced more advanced circuitry, as well as a 3-shot capability. Due to its size and weight, it found little favor in the law enforcement community, and has been discontinued. The X3 was the first TASER CEW to incorporate the enhanced logging still offered today in later models. It is considered the first of the Smart CEWs.[127]

- The TASER Model X2 became available in April of 2011. The X2 was significantly designed based upon the newer circuitry of the X3, but was downsized to a more manageable level, and featured a 2-shot capability.

- The TASER X26P CEW became available in January of 2013, and is a single-shot variety, significantly designed upon the technology present in the X2 CEW. It is a hybrid of sorts, utilizing the advanced circuitry of the X2, but firing the older model cartridge that was used in the M26 and X26E models.

- Later models continue to be developed.

<u>TASERs – Generally</u>.[128] TASER brand[129] manufactured conducted energy weapons (CEWs) are hand-held, belt-holster carried, devices. Law enforcement versions of TASER CEWs are designed in the general shape of a handgun; in use, one points a TASER CEW at the target in much the same manner. There is an ambidextrous on-off switch on each side of TASER[130] weapons, that is located and functions much like a safety lever on a semi-automatic pistol. When intending to "fire" the TASER, the switch is pushed up to the on – or fire – position, and the trigger is pulled.

---

[125] Founded in 1993.

[126] The company name was changed in 1998.

[127] Smart Conducted Energy Weapon is a term coined and utilized by the manufacturer of TASER CEWs, to denote newer technology.

[128] Much of the following discussion of TASER brand conducted energy weapons is drawn from various training and product information issued by TASER International over the years, as well as independent research.

[129] While TASER branded CEW devices are still referred to colloquially by the product name TASER, the manufacturer, i.e., TASER International, Inc., has been rebranded AXON Enterprise, Inc.

[130] In the interest of brevity and clarity, this report will refer to TASER manufactured conducted energy weapons using either the truncated terms *TASER*, or *TASER CEW*.

CLT-HOWARD-000982

The TASER model X26P conducted energy weapon[131] carried by Forrest County Deputy Bass[132] and the TASER model X26E carried by Deputy Sumrall[133] in 2017 each had two primary methods of operation, probe deployment mode and drive-stun mode. Generally, officers are trained to prefer probe deployment mode, as it can be used without coming within arm's reach of the target subject, and is generally recommended due to its increased effectiveness.[134]



*Illustration 1 – TASER X26P, with mounted cartridge*
*(note that this is not the actual X26P from this case)*

Conversely, drive-stun mode requires close contact with the targeted subject. While both modes are generally painful to the targeted individual (and may cause voluntary compliance), only the probe deployment mode is capable of creating involuntary incapacitation.

<u>Probe Deployment Mode</u>. When used in probe mode, the officer attaches a cartridge[135] to the front of the TASER, and when it is deployed, two probes – or darts – are projected downrange, each trailing a wire.[136] The TASER cartridge is designed in such a way that these probes separate as they travel downrange;[137] the farther the probes travel, the greater the spread is between the probes.[138]

Ideally, when the probes strike an individual, a circuit is completed, and low amperage electrical current is delivered to the subject, causing neuro-muscular incapacitation, or NMI (formerly referred to as Electro-Muscular Disruption, or

---

[131] There are three X26 models: the X26c, or civilian model; the X26E, or law enforcement model; and the X26P, a newer law enforcement model. In 2017, Deputy Bass carried the X26P, (Deputy Sumrall carried the X26E, which is now discontinued). This report may refer to the model used by Deputy Bass as the X26P, and model used by Deputy Sumrall as the X26E.

[132] Serial number X12006NRK.

[133] Serial number X00-616611.

[134] *Electronic Control Weapons - Model Policy.* International Association of Chiefs of Police (IACP). March 2018.

[135] X26 generation TASER cartridges are sometimes referred to as *Air Cartridges*.

[136] Commonly referred to as probes, or darts, these are small, tubular, metal projectiles that are each fastened to the end of a thin wire, which is coiled inside the TASER cartridge. There is a needle-like dart projecting from the front of each probe. The dart is configured similar to a straightened fishhook, with a barb on the end.

[137] Each probe is mounted in the cartridge at a 4 degree angle to center, resulting in an 8 degree angle between the probes. The cartridge mounting bay of the TASER device is angled downward at 4 degrees. This arrangement allows for cartridges to be mounted "either side up." The result is that, whichever probe is "on top" will travel essentially line-of-sight to the target, while the bottom probe will travel downward at an 8 degree angle to the top probe.

[138] Under static conditions, probe spread is approximately 12 inches for every 7 feet of travel downrange. Thus at 7 feet, the spread will be approximately 12 inches; at 14 feet, the spread will be approximately 24 inches, and so on.

EMD).[139] In order for NMI to be effective, officers are generally trained that the probes should be more than four inches apart, and that greater spread between the probes will yield more effective incapacitation due to the increased muscle mass located between the probes. Research has shown that probe-deployment induced neuro-muscular incapacitation, *"[… by all measures [is] … a function of spread; generally increasing in effectiveness up to spreads between 9 and 12 inches."*[140] Additionally, other researchers have found that this *"[m]uscle contraction force increased as the spacing increased from 5 to 20 [centimeters (cm)], with no further change in force above 20 cm of spacing."*[141,142]



*Illustration 2 – TASER X26E, with mounted cartridge*
*(note that this is not the actual X26E from this case)*

<u>Drive-Stun Mode</u>. In drive-stun mode,[143] the officer presses the front of the TASER device hard against the body of the subject[144] and pulls the trigger. The TASER device then functions like a stun gun, causing localized pain, but because the electrodes – or contact points – on the front of the TASER device are relatively close together, and since probes aren't deployed to facilitate probe-spread, there is no neuro-muscular incapacitation.

A drive-stun is usually delivered after first removing the cartridge from the front of the TASER device. However, if necessary, a drive-stun can also be delivered with a cartridge in place. In such a scenario, if the cartridge has already been fired, there are electrodes on the front of the cartridge that will deliver the electrical charge to the target. If an unfired cartridge is in place, and the officer does not remove it prior to delivering a drive-stun, then the probes will deploy into the targeted subject at contact range,[145] and because they are very close together, the electrical effect on the target will be much the same as a regular drive-stun.

<u>Three-Point Deployment</u>. If probe mode is used, but poor contact is achieved, or something else interferes with the completion of a full circuit – and if at least one wire connection exists between the subject and the CEW – the TASER can be pressed

---

[139] Such incapacitation occurs because the low-amperage current that passes through the targeted subject's subcutaneous muscle layer interferes with his ability to volitionally control his movements; in essence, interference is caused on the communication circuit between the subject's brain and his muscles.

[140] Ho, J., Dawes, D., Miner, J., Kunz, S., Nelson, R., & Sweeney, J. (2012). Conducted electrical weapon incapacitation during a goal-directed task as a function of probe spread. *Forensic Science, Medicine, and Pathology, 8*(4):358-366.

[141] Beason, C.W., Jauchem, J.R., Clark III, C.D., Parker, J.E., & Fines, D.A. Pulse Variations of a Conducted Energy Weapon (Similar to the TASER® X26 Device): Effects on Muscle Contraction and Threshold for Ventricular Fibrillation. *Journal of Forensic Sciences, 54*(5):1113-1118.

[142] 5 cm ≅ 1.97 in; 20 cm ≅ 7.87 in.

[143] Sometimes colloquially referred to as *touch stun* or *dry stun*.

[144] The term *drive-stun* derives from the fact that officers are generally trained to not just touch the subject with the TASER, but to – in effect – drive, or thrust, the TASER into the subject, as if delivering a punch. This is done in order to assure positive contact.

[145] TASER probes are designed such that, even when pressed directly into the body of a subject, the metal body of the probes will not pass through the skin.

CLT-HOWARD-000984

against the subject in a drive-stun, which provides the second point of contact for the electrical current, and the circuit is completed in that manner, resulting in likely neuro-muscular incapacitation. This last – hybrid – technique is commonly referred to as a three-point (or sometimes a four-point) deployment, combining elements of both probe deployment and a drive-stun. A variant sometimes used is to angle the CEW during the drive stun; this variant is referred to as an *angled drive stun*.

Spark Test. X26 family TASER CEWs are fired electrically, that is by generating a spark that arcs across the front of the cartridge (or, in the absence of a cartridge, across the front of the TASER CEW itself), and causes the cartridge to deploy. Thus, officers can remove the cartridge from their X26P or X26E, and "spark test" the device in the air, without contacting a target. This is encouraged as a means to ensure that the CEW is working properly.

Spark and/or Laser Warning. This sparking technique is also taught as a means to warn a subject to comply. When a TASER CEW is sparked without a completed circuit, the result is arcing across the front of the TASER or the front of the TASER cartridge, which results in a loud, rapid, clacking sound. The sound can be intimidating. When this is done, the CEW's event log will show a trigger event, and will not differentiate between such a spark and an actual probe deployment or drive stun.[146]

Officers will also – on occasion – warn subjects to comply by turning on the CEW switch, thus activating the red laser sight, and shine it on a subject, without actually sparking the CEW. When this is done, the event log of an X26P will show an armed event, but the event log of an X26E will not capture any entry.

Officers are frequently taught each of these warning methodologies in formal TASER training programs. Officers are also taught that, if they utilize a TASERE CEW, and they hear the loud clacking sound, the targeted subject is not receiving the electrical charge.

Reduced Effectiveness of Compromised Wires. During training, officers are cautioned that if the integrity of their deployed TASER wires is compromised, or if the wires are crossed or come into contact with other conductive surfaces, the effectiveness of their CEW discharge may be reduced or negated. This sometimes happens during an arrest.

Programmed Length of TASER CEW Discharges. Both TASER X26E and TASER X26P conducted energy weapons are programmed such that, when the trigger is pulled and released, they will deliver electricity for five seconds, and then automatically stop. The trigger can then be pulled again to deliver another five-second discharge.[147] If the trigger is held down beyond the five second time frame, the TASER will continue to discharge until the trigger is released (or until the power source is depleted). At any time during the programmed, five-second

---

[146] The X26P and other smart CEWs will capture data in the pulse log which can sometimes be used to determine if an actual target was contacted, thus closing the circuit. As described, *infra*, these pulse logs are only available if the device is downloaded to an Evidence.com account; they are not available in a stand-alone download.

[147] Law enforcement versions of the X26 CEW are programmed such that additional trigger pulls during a five-second discharge will have no effect on the length of the five-second discharge.

CLT-HOWARD-000985

discharge, the operator can shut off the switch (located on the side of the TASER), proactively terminating the electrical discharge at that time. This discharge schema is the same, whether probes are deployed, a drive-stun is delivered, or the CEW is sparked in the air.

Some agencies that issue the X26P may utilize an optional replacement battery known as an APPM, or Automatic-shutdown Performance Power Magazine, that will automatically stop the electrical cycle after five seconds even if the trigger is held down past the cycle.  The operator must release and press the trigger again to re-energize the fired cartridge.

_In the instant case._ Deputy Bass' X26P TASER was equipped with an APPM, as can be seen at sequence number 37 on the data download from his TASER.[148]

Overall Effectiveness of TASER CEWs. In order to meet their intended design outcomes, TASER branded CEWs require that certain conditions be met, including – but not necessarily limited to – the following:

- A completed and maintained circuit between the electrodes (or probes) that will allow current to flow;

- Sufficient spread, or distance, between the electrodes or probes;

- Sufficient motor-nerve mediated muscle mass between the electrodes or probes.

If these conditions are met, the targeted individual will likely experience some degree of neuro-muscular incapacitation. As such, he will lose at least some volitional muscle control of the affected muscles due to those muscles contracting. However, such neuro-muscular incapacitation does not always result in complete effectiveness. Ultimate effectiveness depends upon many factors, including, _inter alia_, probe spread, location of probes on the target's body, clothing, subject movement, and various environmental factors.

Electrical Output of X26 Family TASER CEWs. The X26P conducted energy weapon is powered by three 3-volt lithium batteries, enclosed in a housing with an electrical circuit board. Collectively, this battery package is referred to as a performance power magazine, or PPM.

The X26E CEW is powered by two 3-volt lithium batteries, which are also enclosed in a housing with an electrical circuit board. This package is referred to as a digital power magazine, or DPM.

A discussion of terminology is illustrative:[149]

- Voltage is the amount of "pressure" pushing the electrons or electric charge through a circuit.

- Current is the measure of the flow of electrons (i.e., how many electrons are delivered each second). The unit of measure is the ampere. X26 family CEWs deliver an average of 19 pulses per second. The average X26E current is

---

[148] TASER X26P Data Download, Serial Number X12006NRK, [Deputy Bass], download date 02/11/2020, CLT-HOWARD-000276.

[149] Paraphrased from TASER International training materials.

0.0021 amperes or 2.1 milliamps. The average X26P current is 0.0012, or 1.2 milliamps.

- X26 family CEWs are capable of developing up to 50,000 volts peak arcing voltage, in order to arc across any gap in the circuit of two inches or less (the smaller the gap, the less voltage is required to arc across it). This results in the aforementioned loud, clacking noise.

- If there is no gap, or once a gap is crossed, the voltage delivered drops to 1,200 volts or less.[150] In fact, some research has found that voltage drops to the vicinity of 580 volts.[151]

- Current output is very low.

A commonly made error is to state that X26 family CEWs deliver 50,000 volts into a person.

<u>Commonly Observed Effects of TASER CEW Discharges</u>. Individuals that experience a probe deployment where neuro-muscular incapacitation is achieved generally report that – while they were fully aware of ongoing events – they were unable to volitionally control their muscle movements. Said individuals are often seen as rigid, or stiffened, in a frozen-looking posture; sometimes falling down, either during or immediately after, the exposure. They report that the experience is very painful.[152]

Those experiencing a drive-stun report feeling an intense, localized pain, but not incapacitation. They are often seen to flinch and pull away from the TASER contact, as a source of the pain.

Not everyone reacts to a TASER exposure in the same way. Common reactions to neuro-muscular incapacitation may include:[153]

- Falling immediately to the ground;

- Yelling or screaming;

- Involuntary muscle contractions;

- Subject may freeze in place with legs apparently locked;

- Subject may feel dazed;

- Potential vertigo;

- Temporary tingling sensation;

- May experience critical stress amnesia;

- May not remember any pain.

---

[150] Per factory specifications.

[151] Dawes, D., Ho, J., Kroll, M., & Miner, J. (2009). Electrical Characteristics of an Electronic Control Device Under a Physiologic Load: A Brief Report. *Pacing and Clinical Electrophysiology, 33*(3):330-6.

[152] A point to which I can personally attest, having been subjected to both drive stuns and probe deployments.

[153] Listed in various TASER International training and product materials.

CLT-HOWARD-000987

While officer training refers to a possible dazed feeling after an NMI event, research has found that it is typical for subjects to functionally recover almost immediately, i.e., in slightly more than one second.[154] The average was approximately 1.3 seconds.

*CEW-Related Injuries.*  Serious injuries from TASER CEW use are extremely rare, with one study indicating that 99.75% of criminal suspects who experience a TASER CEW exposure received no injuries or mild injuries only, i.e. scrapes and bruises.[155] Another study reported an overall major complication rate for CEW usage of 13.1 per million field uses, primarily from falls, fires, and eye injuries.[156] Additionally, researchers in a 2017 study found that, *"With over 500 uses resulting in no significant injuries, these data suggest that CEW use is the force option least likely to result in significant suspect injury. This finding is consistent with prior epidemiology studies of CEW use."*[157]

Most individuals see TASER exposure as a painful experience. Drive-stuns often leave a red mark, and sometimes a more significant mark – similar to a burn mark – in longer drive-stun exposures.[158,159] When probes penetrate the skin, they leave small puncture marks.[160]

*Muscle Contractions.* Researchers have found that under optimal probe spread circumstances, TASER conducted energy weapons produce muscle contractions equal to about 46% of maximal contractions likely.[161]

*In the instant case.* Deputy Bass' X26P TASER was equipped with an XP cartridge, identified by the green blast doors on the front of the cartridge body.[162] The range of XP cartridges is 25 feet, and the cartridge darts – or needles – are .55 inches long.

---

[154] Criscione, J., & Kroll, M. (2014). Incapacitation recovery times from a conductive electrical weapon exposure. *Forensic Science, Medicine, and Pathology, 10*(2):203-7.

[155] Bozeman, W., Hauda II, W., Heck J., Graham, D., Martin, B., & Winslow, J. (2009). Safety and Injury Profile of Conducted Electrical Weapons Used by Law Enforcement Officer Against Criminal Suspects. *Annals of Emergency Medicine, 53*(4):480-9.

[156] Kroll, M., Brave, M., Pratt, H., Witte, K., Kunz, S., & Luceri, R. (2019). Benefits, Risks, and Myths of TASER Handheld Electrical Weapons. *Human Factors and Mechanical Engineering for Defense and Safety, 3*(7).

[157] Bozeman, W.P., Stopyra, J.P., Klinger, D.A., Et al. (2017). Injuries Associated with Police Use of Force. *Journal of Trauma and Acute Care Surgery, 84*(3):466-472.

[158] Under typical conditions, paired drive-stun marks – sometimes referred to as signature marks – will be approximately 40 millimeters (1.6 inches) apart if made by the electrodes on the front of a TASER Air cartridge, and approximately 32 millimeters (1.25 inches) apart if made by the electrodes on the front of the TASER cartridge bay, without an attached air cartridge. This is true for both the X26E and X26P CEWs.

[159] Ho, J., Dawes, D., & Kroll, M. (Eds.). (2012). *Atlas of Conducted Electrical Weapon Wounds and Forensic Analysis*. New York: Springer.

[160] The dart projecting from the front of a 21-foot cartridge probe is .4 inches (1 cm) long, while the dart of the 25-foot cartridge probe is .55 inches (1.4 cm) in length.

[161] Sweeney, J.D. (2009). Theoretical Comparisons of Nerve and Muscle Activation by Neuromuscular Incapacitation Devices. Conference proceedings: 31st Annual International Conference of the IEEE Engineering in Medicine and Biology Society. *IEEE Engineering in Medicine and Biology Society. Conference, 2009*. 3188-90.

[162] Email correspondence from Counsel, following her interview with Defendant Bass, dated 02/06/2020.

CLT-HOWARD-000988

Because Deputy Sumrall did not deploy his cartridge, I have no information on which cartridge he was issued.

## 11. TASER DEVICE DATA CAPTURE AND DOWNLOAD.[163]

Law enforcement versions of TASER brand conducted energy weapons capture data regarding firing events and other information, and store it in internal memory. A copy of this data can later be downloaded as an encrypted computer file.[164] Software installed on a computer can then read the downloaded data, and print it as an Adobe Acrobat PDF file.

Early model TASER CEWs were less sophisticated, and therefore retained limited data, while later models captured more information. Thus, the Advanced TASER M26 device[165] captures less information than the TASER X26E device, and the X26E captures less data than more recent models (e.g., X26P and X2). X26E CEW devices do not capture information regarding whether a particular discharge was a probe deployment or a drive-stun, or whether the target was hit or contacted (i.e., *sparking* a TASER X26E CEW in the air will record the same as if an actual target was struck or contacted). Newer models capture additional information which a trained and equipped individual can review in graph form.[166]

With earlier versions of the X26, it was common to colloquially refer to each entry in the stored memory as a *firing event*, but this was not exactly correct. Firing an X26 would create an entry, captured as a line or sequence number.[167] However, X26E time synchronizations also create entries, reflected as one or two consecutive sequence numbers.[168] For this reason, among others,[169] individual entries were more appropriately referred to as *time stamps*.

The X26P TASER is more sophisticated and captures more data during each activation cycle, as well as other data not related to the actual activations. The X26P captures three time stamps, i.e., when the X26P's power switch is turned on, when and if the device's trigger is pulled, and when the X26P power switch is turned off.

---

[163] Advances in CEW technology, as well as an Internet-based evolution of the download process, have significantly modified both the extent of data captured and stored, and the procedures for downloading and utilizing the captured data.

[164] The downloaded data is a copy of the original information, which remains stored in the CEW's memory. The data thus stored cannot be modified or deleted by users, and remains in memory until overwritten by subsequent firing events. Depending on the model of TASER device and the version of software installed, either hundreds or thousands of event time stamps are retained, prior to being overwritten. Generally, an X26P CEW will retain 16,000 time stamps, while an X26E will retain approximately 2,000 (depending on the software version). When these limits are exceeded, the next event will begin overwriting at line or sequence 0001.

[165] While the M26 device is typically referred to as an *M26*, the actual, branded name is *Advanced TASER M26*.

[166] When utilizing the on-line version of the TASER download regimen.

[167] The X26E did not capture a time stamp when the power switch was turned on or off.

[168] Depending on the download method/software used.

[169] Using the term *time stamp* also avoided confusion regarding the fact that older TASER models captured the time stamp at the *beginning* of a discharge, while the X26E captures it at the *end* of a discharge. Newest generation TASER CEW devices, i.e., the X26P and X2, capture time stamps at the *beginning* of the event.

---

CLT-HOWARD-000989

Thus, if an officer turns his X26P on, then turns it off without firing it, the device will capture two time stamps. If the officer turns his device on, fires it, and then turns it off, the device will capture three time stamps.

When conducting a download of captured CEW data, software settings enable one to download all data currently stored in the CEW's memory, or to designate a specific date range of data to be downloaded.

<u>TASER X26P CEW Data Capture</u>. The model X26P CEW captures the date and time, as well as the duration of each event,[170] as well as other information. Time is recorded as UTC (Coordinated Universal Time) or Greenwich Mean Time (GMT).[171] The software used to download the data to a computer calculates local time, based on the time-zone setting of the computer. Typically, local date and time are then listed on the download report, and a reference to UTC and local time-zone shift is indicated in the download report header (e.g., Central Standard Time UTC -0600). Military time format is used; thus the format is *Date Month Year hours:minutes:seconds*.[172]

TASER X26P time stamps are captured at the beginning of each individual event. Thus, there are potentially three time stamps for each activation cycle:[173]

- The officer moves the power switch to the up, or on, position. The download report will indicate a sequence entry as *Armed*. No duration is recorded.

- The officer pulls the trigger. The download report will indicate a sequence entry as *Trigger*. A duration – in seconds – for the trigger event will be recorded.

- The officer moves the power switch to the down, or off, position. The download report will indicate a sequence entry as *Safe*. A duration will be recorded for the entire event cycle – from switch on to switch off (this duration will include the time the trigger was activated).

Data from both TASER X26P and X26E devices is downloaded via a USB connection to a computer.

<u>*X26P USB Download*</u>. If the X26P download computer is connected to an AXON evidence.com[174] account, the available download will consist of three logs known as Trilogy Logs. These are:

---

[170] The CEW also captures the relative remaining battery strength, as well as the internal temperature (in C°) of the TASER device. However, these two data points are more commonly utilized as diagnostic and maintenance dimensions, and have limited application to analysis of a field event.

[171] Depending on the download method/software used.

[172] Some versions of the TASER download software record GMT – Greenwich Mean Time – rather than UTC. Some versions print out both UTC/GMT and local time, while others print only local time.

[173] If the officer keeps the CEW turned on, and triggers it more than once, then there will be an additional Trigger event recorded for each event.

[174] Evidence.com is an online cloud-based solution for managing digital evidence, as well as data captured by various TASER and AXON CEWs and other devices.

CLT-HOWARD-000990

- Event Log – The event log contains the aforementioned Armed, Trigger, and Safe events, as well as some other support data.[175]

- Pulse Logs – The Pulse logs record any pulse activity. The records include how long the CEW was discharged, and the charge of every pulse. This data can be viewed and analyzed in graph form.

- Engineering Logs – The Engineering logs monitor the performance of key sub-systems within the X26P CEW. This log provides alerts if a subsystem is not performing properly and if maintenance is advisable. Any internal circuitry errors that occur inside the X26P CEW are written to this log. This information is used for diagnostics.[176]

If the X26P download computer is functioning as a stand-alone (i.e., in offline mode), without an evidence.com account connection, the download will be facilitated through the use of software provided by AXON, and will reside on the local computer. In this case, only the event logs will be downloaded.[177]

Each X26P captured time stamp is assigned a sequence number, and data is downloaded to a PDF file in tabular list format.

*In the instant case*. The download report provided to me was from a stand-alone download.

TASER X26E CEW Data Capture. The model X26E CEW captures the date and time, as well as the duration of each event.[178] Time is recorded as UTC (Coordinated Universal Time) or Greenwich Mean Time (GMT).[179] The software[180] used to download the data to a computer calculates local time, based on the time-zone setting of the computer. Typically, local date and time are then listed on the download report, and a reference to UTC and local time-zone shift is indicated in the download report header (e.g., Central Standard Time UTC -0600). Military time format is used; thus the format is *Date Month Year hours:minutes:seconds*.[181]

---

[175] The X26P Event Log rounds the duration of events up to the next second after 0.499 seconds, e.g., an event duration of 1.45 seconds will show as 1 second, while a duration of 1.50 seconds will show as 2 seconds.

[176] (2015). *TASER X26P User Manual, MMU0042 Rev B*. TASER International.

[177] (2015). *TASER X26P User Manual, MMU0042 Rev B*. TASER International, pp. 27-28.

[178] The X26E CEW also captures the relative remaining battery strength, as well as the internal temperature (in C°) of the TASER device. However, these two data points are more commonly utilized as diagnostic and maintenance dimensions, and have limited application to analysis of a field event.

[179] Depending on the download method/software used.

[180] AXON provides a software solution for those agencies that desire to download and store their TASER data locally. Historically, software provided by TASER International was used for this local solution (without an online option), albeit within a more difficult to manage construct. Some agencies may still be using the older software.

[181] Some versions of the TASER download software record GMT – Greenwich Mean Time – rather than UTC. Some versions print out both UTC/GMT and local time, while others print only local time.

CLT-HOWARD-000991

TASER X26E time stamps are captured at the end of a discharge. In order to determine the time of a particular firing event, or trigger pull, one must subtract the recorded duration from the time stamp reading.[182,183]

*X26E USB Download*. The X26E does not capture trilogy logs, so whether the download computer is functioning as a stand-alone, or is connected to an evidence.com account, the download will consist of an event log, as described, *supra*.

Each X26E captured time stamp is assigned a sequence number, and data is downloaded to a PDF file in tabular list format.

TASER X26 Family CEW Clocks in General. Both the X26E and X26P have internal clocks, much like those in a personal computer.

*TASER X26P Clock Readings*. The X26P CEW has a real-time clock powered by its battery pack and an internal battery as well. The CEW clock should continue to run even when the battery pack is removed.[184]

*TASER X26E Clock Readings*. The X26E has an internal clock, but does not have a built-in power source, and is thus dependent on the removable digital power magazine (DPM)[185] to maintain the internal clock. The DPM can be removed for a short time, and an internal capacitor will retain enough energy to power the X26E clock.

However, when the DPM is removed for an extended period of time,[186] the internal clock of the X26E CEW will stop running.[187] Once a DPM is inserted, the clock will begin running again, but will – in all likelihood – have reset itself to the factory default setting,[188] much like a bedside digital alarm clock that loses power. The clock will continue to run normally, but will be "off" by however many years, months, and days (and, of course, hours, minutes, and seconds) the default setting caused. In order to accurately reflect the date and time-of-day again, the X26E CEW clock must be resynchronized. In the past this was done manually, during the download process, by synchronizing the TASER device to the computer facilitating the download.[189]

TASER CEW Clock Drift and Accuracy. Both X26P and X26E CEWs have real-time clocks, as discussed. Due to the nature of the electronics involved in each CEW,

---

[182] For example, if an X26E time stamp reads 16:11:25, and the download report indicates a five second duration, then the actual trigger pull would have occurred at 16:11:20, or 4:11 pm and 20 seconds.

[183] The X26E download process rounds the duration of events up to the next second after 0.1 seconds, e.g., an event duration of 1.1 seconds will show as 2 seconds. However, the time stamp clock runs in real time. On rare occasions, this can result in two consecutive, very short, activations recording as the same time, with 0 seconds indicated between.

[184] (2015). *TASER X26P User Manual, MMU0042 Rev B*. TASER International, p. 28.

[185] *Digital Power Magazine* is the manufacturer's designation for the battery component of the X26E.

[186] Officers are trained that four hours is the maximum length of time that an X26E DPM can be removed without causing the clock to default.

[187] This does not result in the loss of previously captured data. The existing data is stored internally, much like a computer file is saved to the hard drive of a computer.

[188] Usually 1/1/00 based on Greenwich Mean Time. Local time may indicate 12/31/1999.

[189] Current technology accomplishes this automatically, when the download procedure begins.

CLT-HOWARD-000992

under normal operating conditions, these clocks can unpredictably "drift" several minutes a month.

All clocks, other than reference atomic clocks, whether digital or analog, are subject to some inherent clock drift. "Clock drift" is defined as the phenomenon wherein a clock runs at a different rate than a reference clock. All non-atomic clocks will experience some amount of drift. The amount of drift experienced is dependent upon several factors, including component tolerances, temperature, subtle environmental changes, and power source. For these reasons, two clocks of the same design may have different rates of drift. Without synchronizing clocks periodically (setting them to the same time reference with known tolerances), clocks lose accuracy over time. This is why you may notice that two clocks that had been set to the same time, can show a different time at a later date. The clock drift of both clocks caused the times to drift from the original synchronization.[190]

Because of this natural clock drift, the internal clock of the X26P CEW can drift up to ± 2 minutes per month, while the X26E CEW clock can drift up to ± four minutes per month.[191,192]

Whenever one or both of the conditions described, *supra*, occurs, the internal CEW clock will be "off" in the sense that it will not read the correct date and/or time-of-day. However, it's important to note that the timing of specific events will still be accurately captured: That is, the amount of time between events in close chronological proximity will be accurate, as will the recorded duration of discharges reported by the X26E or X26P download.

In a practical sense, what this means is that one will still be able to accurately determine the duration of CEW discharges and the pauses between CEW discharges, as reported in a download. However, without additional documentation, one will not be able to accurately place that particular set of events into the exact context of time-of-day and date, or construct a timeline involving discharges from several different TASER devices.

The solution for this problem is to always assure the completion of a time synchronization (to an accurately clocked computer) at the beginning of any download procedure.[193] In fact, the manufacturer recommends – and has for many years – that downloads be done on a regular basis (at least quarterly),[194,195] as well as following any actual field use.

The effect of this is two-fold: First, the synchronization will reset the TASER clock to the correct date and time as shown on the synchronizing computer, and second, upon

---

[190] See, (2008) NIST Special Publication 811 (SP 811), *Guide for the Use of the International System of Units (SI)*, and (2019) NIST Special Publication 330 (SP 330), *The International System of Units (SI)*.

[191] Per manufacturers specifications.

[192] Generally, the drift will be in the same direction.

[193] For many departments, this is now done automatically when a device is plugged into an Internet connected computer to be downloaded. There may still be some agencies that utilize free-standing software, thus sometimes necessitating a manual time sync.

[194] Version 20 TASER CEW Instructor Certification Course, effective 01/01/2016, slide 64.

[195] Version 21 TASER CEW Instructor Certification Course, effective 01/01/2019, slide 126.

CLT-HOWARD-000993

noting the amount of adjustment required[196] – either adjusting the clock forward or back – the person performing the download (or any future reviewer of the download report) can add or subtract the time adjustment to the download read-out, to calculate a more accurate time-of-day and date for the time-stamped events that are of interest.[197]

_In the instant case_. Following the incident that gave rise to the instant case, neither Deputy Bass' X26P or Deputy Sumrall's X26E were immediately downloaded. Because they were not, no time synchronization contiguous to the event exists on the download report for either CEW.[198,199]

## 12. TASER DOWNLOAD DATA REVIEW. [200]

Deputy Bass' X26P Download Report.[201] Deputy Bass' X26P CEW was downloaded on February 11, 2020,[202] at the request of defense counsel. Following analysis of the download report, the following table was developed illustrating relevant data.[203]

|   | A<br>SEQUENCE # | B<br>TIME STAMP | C<br>DURATION | D<br>SHUT OFF | E<br>TIME BETWEEN |
|---|---|---|---|---|---|
| **1** | 3133 | 08:22:33 | 0:00:01 | 08:22:34 | 0:08:10 |
| **2** | 3140 | 08:30:44 | 0:00:05 | 08:30:49 | 0:01:05 |
| **3** | 3143 | 08:31:54 | 0:00:02 | 08:31:56 | 0:00:24 |
| **4** | 3146 | 08:32:20 | 0:00:01 | 08:32:21 | 0:00:24 |
| **5** | 3149 | 08:32:45 | 0:00:03 | 08:32:48 | 0:00:14 |
| **6** | 3152 | 08:33:02 | 0:00:01 | 08:33:03 | 0:04:02 |
| **7** | 3157 | 08:37:05 | 0:00:05 | 08:37:10 | n/a |

_Table 1 – TASER X26P carried by Deputy Blake Bass_

_Time Relevance_. This review and analysis is set forth here for purposes of the record. Recall that the X26P, unlike the X26E, captures trigger events at the beginning of the activation

---

[196] The time adjustment – showing both _old time_ and _new time_ – is indicated on the downloaded report.

[197] The importance of time synchronization is stressed when TASER Master Instructors and instructors review the download procedure during their instructor training. Despite this, downloads and time synchronizations are not always completed as recommended.

[198] TASER X26P Data Download, Serial Number X12006NRK, [Deputy Bass], download date 02/11/2020, CLT-HOWARD-000273 – CLT-HOWARD-000572.

[199] TASER X26E Data Download, Serial Number X00-616611, [Deputy Sumrall], download date 02/13/2020, CLT-HOWARD-000913 – CLT-HOWARD-000934.

[200] Because of the claims made by Plaintiffs in this case, both Deputy Bass' and Deputy Sumrall's TASER CEW downloads will be discussed here. Operational characteristics and explanations for each CEW's downloaded data are discussed in greater detail, _supra_.

[201] TASER X26P Data Download, Serial Number X12006NRK, [Deputy Bass], download date 02/11/2020, CLT-HOWARD-000273 – CLT-HOWARD-000572.

[202] The download was conducted by Chris Johnson, Badge ID T-1, of the Hattiesburg Police Department, on 02/11/2020, at 10:46:43 CST, and the report was generated at 10:51:40, CST.

[203] Column and row alpha-numeric identifiers added to assist the reader.

CLT-HOWARD-000994

The lack of a contemporaneous time synchronization prevents the absolute time placement of Bass' X26P activations. However, a review of the entire download report reveals that there was a factory time sync performed on 12/02/2016.[204] The next time sync was logged some 38 months later, on 02/11/2020,[205] at which time Bass' X26P was found to be running 29 minutes and 4 seconds fast.[206] This means that the most the X26P could have been running fast during the events in question was 00:29:04. However, because the date of the incident was 09/27/2017 – some nine and a half months after the factory time sync – it is likely that the clock drift was significantly less.

An examination of the download report for dates surrounding the date of the incident reveals that the most recent trigger event prior to the incident time frame occurred early in the evening of 09/26/2017,[207] many hours before the events in question. The first trigger event following the time frame of the incident occurred early in the morning of 09/28/2017,[208] many hours after the events in question. Neither of the aforementioned trigger events could have been associated with the event time frame for the incident in question.

The activations discussed here, from sequence number 3133 through sequence number 3157, were the only trigger events logged for the date of the incident.

_Sequence_. The relevant data from Deputy Bass' X26P CEW download report begins at sequence number 3133 and ends at sequence number 3157. Within this span, there are seven activations, or _Trigger_ events, indicated, thus:

- Time stamped at 8:22 am and 33 seconds, for _1 second_;

- Time stamped 8 minutes and 10 seconds later, at 8:30 am and 44 seconds, for _5 seconds_;

- Time stamped 1 minute and 5 seconds later, at 8:31 am and 54 seconds, for _2 seconds_;

- Time stamped 24 seconds later, at 8:32 and 20 seconds, for _1 second_;

- Time stamped 24 seconds later, at 8:32 am and 45 seconds, for _3 seconds_;

- Time stamped 14 seconds later, at 8:33 am and 2 seconds, for _1 second_;

- Time stamped 4 minutes and 2 seconds later, at 8:37 am and 5 seconds, for _5 seconds_.

_Analysis and Information Focus_. A review of Bass' download shows that, within the possible time frame of the events giving rise to the instant case, the X26P was activated for a total of 18 seconds, in 7 activations, over a time span of 14 minutes and 37 seconds. All of the activations were for either 1, 2, or 3 seconds, except the

---

[204] Logged on 20 Dec 2016 at 08:08:55, at sequence number 36.

[205] Logged on 11 Feb 2020 at 10:46:43, at sequence number 8924.

[206] The time sync reset Bass' X26P from old time 11:15:47 to new time 10:46:43.

[207] Logged on 26 Sep 2017 at 19:11:52, at sequence number 3118.

[208] Logged on 28 Sep 2017 at 05:47:57, at sequence number 3192.

CLT-HOWARD-000995

second activation and the last activation, each of which were 5 seconds in duration. Others points for consideration include:

- The short activations indicate that the X26P was proactively shut off before the programmed 5 second activation was completed.

- There was significant time between activations;

  - the shortest "between" time was 14 seconds (cell 5-E);

  - the longest between times immediately preceded the two 5 second activations, 8 minutes and 10 seconds (cell 1-E), and 4 minutes and 2 seconds (cell 6-E).

- As discussed, *supra*, without additional information, there is no way to determine which, if any, Trigger events made contact or delivered energy to a target.

Deputy Sumrall's X26E Download Report.[209] Deputy Sumrall's X26E CEW was downloaded on February 13, 2020,[210] at the request of Counsel. Following analysis of the download report, the following table was developed illustrating relevant data.[211]

|   | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
|   | SEQUENCE # | TIME STAMP | DURATION | TRIGGER TIME | SHUT OFF (SAME AS B) | TIME BETWEEN |
| 1 | 484 | 07:12:06 | 0:00:01 | 07:12:05 | 07:12:06 | 02:15:59 |
| 2 | 485 | 09:28:06 | 0:00:01 | 09:28:05 | 09:28:06 | 00:00:35 |
| 3 | 486 | 09:28:44 | 0:00:03 | 09:28:41 | 09:28:44 | n/a |

*Table 2 – TASER X26E carried by Deputy Chey Sumrall*

*Time Relevance*. This review and analysis is set forth here for purposes of the record. Recall that the X26E, unlike the X26P, captures trigger events at the end of the activation.

The lack of a contemporaneous time synchronization prevents the absolute time placement of Sumrall's X26E activations. However, a review of the entire download report reveals that there was a factory time sync performed on 05/12/2011.[212] The next time sync was logged some 8 years and 9 months later, on 02/13/2020.[213] However, because some time after November of 2019, the battery was removed from Sumrall's X26E, this last time sync was unable to be used to calculate clock drift.[214]

An approximation of potential clock drift can be accomplished utilizing the manufacturer's estimate of maximal drift as ± 4 minutes per month. The events that gave rise to the instant case occurred on 09/27/2017, some 76 months following the

---

[209] TASER X26E Data Download, Serial Number X00-616611, [Deputy Sumrall], download date 02/13/2020, CLT-HOWARD-000913 – CLT-HOWARD-000934.

[210] The download was conducted – evidently by someone at Forrest County (no name is indicated on the report) – on 02/13/2020, at 13:55:17, CST, and the report was generated at 13:55:48 CST.

[211] Column and row alpha-numeric identifiers added to assist the reader.

[212] Logged on 12 May 2011 at 11:51:06, at sequence number 2.

[213] Logged on 13 Feb 2020 at 13:55:17, at sequence number 946.

[214] As discussed, this caused a clock reset to 31 Dec 1999, at 18:00:09, when the battery was reinserted.

CLT-HOWARD-000996

factory time sync on 05/12/2011. Calculating the maximum drift of minus 4 minutes per month, yields a possible negative clock drift for Sumrall's X26E of 304 minutes, or 5 hours and 4 minutes.[215] The same calculation yields a possible positive drift of the same length, 5 hours and 4 minutes. When set against the logged trigger events for the date in question, the resulting 10 hour and 8 minute time span falls completely within the incident date of 09/27/2017.

An examination of the X26E download report for the date of the incident reveals that there are only three trigger events logged for 09/27/2017, from sequence number 484 through sequence number 486.

A further examination of the download report for dates surrounding the date of the incident reveals that the most recent trigger event prior to the incident time frame occurred during the morning of 09/23/2017,[216] several days before the events in question. The first trigger event following the time frame of the incident occurred during the morning of 10/12/2017,[217] many days after the events in question. Because both of these trigger events fall well outside the approximated possible positive or negative clock drift of 5 hours and 4 minutes, neither of the aforementioned trigger events could have been associated with the event time frame for the incident in question.[218]

_Sequence_. The relevant data from Deputy Sumrall's X26E CEW download report begins at sequence number 484 and ends at sequence number 486. Within this span, there are three activations, or _Trigger_ events, indicated, thus:

- Trigger time (as adjusted) at 7:12 am and 5 seconds, for _1 second_;

- Trigger time (as adjusted) 2 hours, 15 minutes, and 59 seconds later, at 9:28 am and 5 seconds, for _1 second_;

- Trigger time (as adjusted) 35 seconds later, at 9:28 am and 41 seconds, for _3 seconds_.

_Analysis and Information Focus_. A review of Sumrall's download shows that, within the possible time frame of the events giving rise to the instant case, the X26E was activated for a total of 5 seconds, in 3 activations, over a time span of 2 hours, 16 minutes and 39 seconds. All of the activations were for either 1 or 3 seconds in duration. Others points for consideration include:

- The short activations indicate that the X26E was proactively shut off before the programmed 5 second activation was completed.

- There was significant time between activations;
  - the shortest "between" time was 35 seconds (cell 2-F);
  - the longest between time was over 2 hours and 15 minutes (cell 1-F).

---

[215] 76 months × 4 minutes = 304 minutes ÷ 60 minutes = 5 hours and 4 minutes.

[216] Logged on 23 Sep 2017 at 11:32:17, at sequence number 483.

[217] Logged on 12 Oct 2017 at 09:57:14, at sequence number 487.

[218] Based on the manufacturer's specification.

CLT-HOWARD-000997

- The lengthy time span between the first and second activations indicates a probable spark test at the beginning of Sumrall's shift on 09/27/2017.

- As discussed, *supra*, without additional information, there is no way to determine which, if any, Trigger events made contact or delivered energy to a target.

## 13. TASER DOWNLOAD DATA CONCLUSIONS. [219]

The following conclusions are drawn from the download analysis outlined, *supra*, in relation to described events and documents reviewed. They are a reflection of, and are supported by, my skill, knowledge, and experience, as gained through my years of experience, education and training.

Deputy Blake Bass' X26P TASER CEW Usage.[220] Deputy Bass' X26P CEW was triggered a total of seven times during the time frame of the incident. I note the following:

- Bass fired one TASER air cartridge from a distance he estimated to be 5 feet. Bass reported the firing to the department.[221]

- The probes struck Darious Leggett in the groin area (or in his genitals), and Bass estimated that the probe strikes were 5 inches apart.

- Probe spread is approximately 12 inches for every 7 feet of downrange travel. This results in an ideal spread of 1.71 inches for each foot of downrange travel.

- At a range of 5 feet, expected ideal spread on a stationary target is $\cong$ 8.5 inches. At a range of 3 feet, expected ideal spread on a stationary target is $\cong$ 5.1 inches.

- The length of the average human arm is 25 inches, or $\cong$ 2 feet.

- If Bass was standing at his estimated distance from Darious of 5 feet, holding his X26P CEW at arm's length, the CEW was approximately 3 feet from Darious when it was fired, resulting in a probe spread on target of Bass' estimated 5 inches.

- Under ideal conditions, with a stationary target, at an estimated 3- to 5-foot range, probe spread is expected to be 5-8 inches.

- Bass' estimates are not exact, but they are consistent with expected outcomes, and they do indicate that he was within arm's reach of Darious when he fired his CEW.

---

[219] Because of the claims made by Plaintiffs in this case, both Deputy Bass' and Deputy Sumrall's TASER CEW downloads will be discussed here. Operational characteristics and explanations for each CEW's downloaded data are discussed in greater detail, *supra*.

[220] TASER X26P Data Download, Serial Number X12006NRK, [Deputy Bass], download date 02/11/2020, CLT-HOWARD-000273 – CLT-HOWARD-000572.

[221] Forrest County Sheriff's Office, M26 Advanced TASER [sic] Use Report of Blake Bass, incident date 09/27/2017, CLT-HOWARD-000017 – CLT-HOWARD-000018.

CLT-HOWARD-000998

<u>Deputy Chey Sumrall's X26E TASER CEW Usage</u>.[222] Deputy Sumrall's X26E CEW was triggered a total of two times during the time frame of the incident. I note the following:

- While Sumrall's X26E CEW was triggered three times on the date of the incident, the first trigger event occurred over two hours before the other two trigger events. This first trigger event was – in all likelihood – not associated with the incident.

- Sumrall testified that he did not deploy probes from his CEW, but removed the cartridge before sparking the CEW in the air in order to scare away the dog(s).

- There is nothing in the record provided to me that Sumrall went to the department in order to be issued a replacement CEW cartridge. (Bass did so, as he had fired his cartridge[223]).

- Of the two trigger events that occurred during the time frame of the incident, both were short, logging at 1 second and 3 seconds in length.

- Because of the functional rounding built into the X26E software,[224] the 1 second trigger event could have been as short as 0.1 second, and the 3 second trigger event could have been as short as 2.1 seconds.

- Antrinet testified that she was "tased" [sic] with probes, then Darious was "tased" [sic] with probes. This would have required two cartridges to be fired.

- Darious testified that Antrinet was "tased" [sic] by Chey Sumrall,[225,226] then he (Darious) was "tased" [sic] by Bass.[227] This would have required two cartridges to be fired.

- Selena Howard testified that Chey Sumrall "tased" [sic] Antrinet in her hand, but that the prongs[228] didn't stick.[229,230] This would have required two cartridges to have been fired.

- There is nothing in the record provided to me that indicates the presence of, or the firing of, a second air cartridge, by either Bass or Sumrall.

---

[222] TASER X26E Data Download, Serial Number X00-616611, [Deputy Sumrall], download date 02/13/2020, CLT-HOWARD-000913 – CLT-HOWARD-000934.

[223] Forrest County Sheriff's Office, M26 Advanced TASER [sic] Use Report of Blake Bass, incident date 09/27/2017, CLT-HOWARD-000017 – CLT-HOWARD-000018.

[224] Recall that the X26E download process rounds the duration of events up to the next second after 0.1 seconds, e.g., an event duration of 1.1 seconds will show as 2 seconds.

[225] Deposition transcript of Darious Leggett, dated 04/27/2020, with attached exhibits, p. 31.

[226] Deposition transcript of Darious Leggett, dated 04/27/2020, with attached exhibits, p. 35.

[227] Deposition transcript of Darious Leggett, dated 04/27/2020, with attached exhibits, p. 35.

[228] In several places throughout the documentation provided to me, different individuals refer to TASER *prongs*. Within context, it is clear that they are referring to *probes* when they do so; that is their meaning as I understood them.

[229] Deposition transcript of Selena Howard, dated 04/27/2020, p. 25.

[230] Deposition transcript of Selena Howard, dated 04/27/2020, p. 31.

- If, as she testified, Antrinet was struck by a CEW probe that did not lodge in her hand, she could only have been struck if she – or at least her hand – was between Bass and Darious, and down lower toward the ground (in a direct line between the CEW and Darious' genitals) at the time Bass fired his X26P.

- If, as she testified, Antrinet was momentarily struck by a single CEW probe, she would not have experienced any electrical effect because, as discussed, *supra*, a completed circuit – requiring two probes – is necessary for the target to experience any flow of electricity. This would be true even if the single probe actually lodged in her skin.

## 14. HUMAN FACTORS RESEARCH.

Action vs. Reaction.  Police officers are trained that action beats reaction.[231,232] By way of illustration, time and movement action/reaction research conducted through and by the Force Science Institute[233] has shown that even an average, untrained, individual can draw and fire a concealed handgun from his or her waistband in less than $^{23}/_{100}$ of a second, with some untrained individuals able to do so in $^{9}/_{100}$ of a second.[234,235] Other research shows that even novice shooters can fire at least three rounds in 1.5 seconds.[236]

In counterpoint, similar research shows that – under laboratory conditions – an average police officer, with his gun out and pointed at an identified target, with the officer's finger on the trigger, and being psychologically set, is able to react to a stimulus and pull the trigger of a handgun in between ¼ and ⅓ of a second.[237,238,239]

However, police trainers have long understood[240] that, in the field, officers' reaction times to all sorts of stimuli will be slowed by distractions in the environment, and the frequent need to multitask. Of course, before an officer can begin to react to a stimulus, he must first perceive the stimulus and the need to react. This can lead to

---

[231] Joyner, C. (2011). Advanced Concepts in Defensive Tactics: A Survival Guide for Law Enforcement. Boca Raton FL: CRC Press. 66-67.

[232] This aphorism is not unique to law enforcement; the same is true of any series of events wherein each reaction is dependent upon what happens first.

[233] Originally located at Minnesota State University-Mankato; The Force Science Institute training center is now headquartered in Des Plaines, Illinois.

[234] Lewinski, B. (2000, November/December). Why is the Suspect Shot in the Back? *The Police Marksman, 27*(6). 20-28.

[235] Lewinski, W. J., & Dysterheft, J., Bushey, J., & Dicks, N. (2015). Ambushes Leading Cause of Officer Fatalities – When Every Second Counts: Analysis of Officer Movement from Trained Ready Tactical Positions. *Law Enforcement Executive Forum. 15*(1). 1-15.

[236] Lewinski, W. J., & Redmann, C. (2009). New Developments in Understanding the Behavioral Science Factors in the "Stop Shooting" Response. *Law Enforcement Executive Forum. 9*(4). 35-54.

[237] Force Science Research Center, Force Science Institute, Des Plaines, Illinois.

[238] Lewinski, B. (2000, November/December). Why is the Suspect Shot in the Back? *The Police Marksman, 27*(6). 20-28.

[239] Lewinski, W. J., & Dysterheft, J., Bushey, J., & Dicks, N. (2015). Ambushes Leading Cause of Officer Fatalities – When Every Second Counts: Analysis of Officer Movement from Trained Ready Tactical Positions. *Law Enforcement Executive Forum. 15*(1). 1-15.

[240] Remsberg, C., Adams, R. J., & McTernan, T. M. (1980). *Street Survival: Tactics for Armed Encounters*. Evanston IL: Calibre Press. 126.

longer reaction times, depending on how quickly the officer perceives that need. This illustrates the very nature of the aphorism *action beats reaction*.

Reaction times are also often affected by the need to choose from among several available tactics, weapon options, or courses of action. This phenomenon is recognized by police trainers[241] as a manifestation of a rubric known as *Hick's Law*,[242] which states that, as one's options or choices (stimuli) increase, the time required to choose from among those options or stimuli increases proportionally with the number of stimuli.[243,244] This can also apply to the need to focus attention on more than one subject, or the distracting behavior of one or more individuals.

So, in short, a seemingly unarmed or non-threatening suspect can produce and use a concealed firearm or other weapon before an officer (who already has his gun out and pointed at the suspect, with his finger on the trigger) can react to the threat and/or fire at the suspect.

*In the instant case*.  Potential examples of Hick's Law can be seen in the instant case, when the deputies have to split their attention between three subjects and the loose dog(s), and other details.

Speed of a Subject.  Officers are trained to always be concerned about the movement of a subject, especially when they have not checked them for weapons, such as when an individual is also moving into an area that has also not been checked beforehand. Subjects can acquire and employ weapons very quickly in some scenarios, often before an officer realizes what is happening.

Additional human factors research has shown that an individual can point a handgun at an officer, and then turn away so quickly that, by the time the officer perceives the dangerous move and reacts by pulling the trigger of his own handgun, the individual will have completely turned away and presented his back to the officer. The average time for such an individual pointing a handgun at an officer, to then turn away to a squared back posture is $^{14}\!/_{100}$ of a second, with some individuals completing the maneuver in even less time.[245,246] This sometimes results in an officer firing in defense of his own life, and the suspect sustaining gunshot wounds to his side or back, or in other suspect wound patterns that might seem inappropriate.

This general concept holds true even when the individual is seated, as if in a vehicle. Research with a seated subject, with a handgun in his right hand, and the weapon held

---

[241] Siddle, B. K. (2004). *PPCT Defensive Tactics Instructor Manual – United States edition*. Belleville IL: PPCT Management Systems. 1-9.

[242] Sometimes referred to as the *Hick-Hyman Law*, after British and American psychologists William Edmund Hick and Ray Hyman.

[243] Jennett, S. (Ed.). (2008). Churchill Livingstone's Dictionary of Sport and Exercise Science and Medicine. New York: Elsevier Limited.

[244] VandenBos, G. (Ed.). (2015). *APA Dictionary of Psychology* (2nd ed.). Washington DC: American Psychological Association, 493-4.

[245] Lewinski, B. (2000, November/December). Why is the Suspect Shot in the Back? *The Police Marksman, 27*(6). 20-28.

[246] Lewinski, W. J., & Dysterheft, J., Bushey, J., & Dicks, N. (2015). Ambushes Leading Cause of Officer Fatalities – When Every Second Counts: Analysis of Officer Movement from Trained Ready Tactical Positions. *Law Enforcement Executive Forum. 15*(1). 1-15.

CLT-HOWARD-001001

down to the subject's right, as if it were concealed alongside or below the subject's right thigh, indicates that the subject can bring the weapon up and discharge a round through the driver's window in approximately $^{25}/_{100}$ of a second (on average). The fastest time recorded by several research subjects in the same study was $^{15}/_{100}$ of a second. This is almost twice as fast as the average officer can pull the trigger of his own weapon, even set with his finger on the trigger and ready to fire.[247,248]

Other research reports that prone subjects – with their hands hidden beneath their body – can produce and fire a weapon from under their body in between ⅓ and ½ of a second.[249] Still other research illustrates that a typical individual in their early 20s can run 15 feet, and slash or stab an officer with a blade instrument in approximately 1 second.[250,251,252]

<u>In the instant case</u>.  The fact that Darious had not been checked for weapons, coupled with Darious' movement to enter the house – ostensibly to retrieve dog food – and his refusal to allow the deputies to accompany him, created a dangerous situation for the deputies. The danger was increased during those moments when Darious was closer to Deputy Sumrall, and particularly when Antrinet reportedly pushed in close to the deputies as they were arresting Darious.

## 15. COGNITION AND PERFORMANCE DURING STRESSFUL EVENTS.

Because of the tense, uncertain, and rapidly evolving, nature of the incident during the morning of September 27, 2017, an additional discussion of underlying issues is in order.[253]

<u>The Effect of Tense, Uncertain, and Rapidly Evolving Events</u>.  While the phrase *"tense, uncertain, and rapidly evolving"*[254] is most often considered when discussing the justification for an officer's use of force, these same three dimensions are factors that impact the perception of officers and other individuals under stress, e.g., while

---

[247] Lewinski, B. (2000, November/December). Why is the Suspect Shot in the Back? *The Police Marksman, 27*(6). 20-28.

[248] Lewinski, W. J., & Dysterheft, J., Bushey, J., & Dicks, N. (2015). Ambushes Leading Cause of Officer Fatalities – When Every Second Counts: Analysis of Officer Movement from Trained Ready Tactical Positions. *Law Enforcement Executive Forum. 15*(1). 1-15.

[249] Lewinski, W. J., Seefeldt, D., Redman, C., Gonin, M., Sargent, S., Dysterheft, J., & Thiem, P. (2016). The Speed of a Prone Subject. *Law Enforcement Executive Forum. 16*(1). 70-83.

[250] Lewinski, W. J., & Dysterheft, J., Bushey, J., & Dicks, N. (2015). Ambushes Leading Cause of Officer Fatalities – When Every Second Counts: Analysis of Officer Movement from Trained Ready Tactical Positions. *Law Enforcement Executive Forum. 15*(1). 1-15.

[251] Lewinski, W. J., Dysterheft, J. L., Seefeldt, D. A., & Pettitt, R. W. (2013). The influence of officer positioning on movement during a threatening traffic stop scenario. *Law Enforcement Executive Forum*, *13*(1), 98-109.

[252] Lewinski, W. J., Hudson, B, & Dysterheft, J. L. (2014). Police officer reaction time to start and stop shooting: The influence of decision-making and pattern recognition. *Law Enforcement Executive Forum*, *14*(2), 1-16.

[253] This discussion of underlying issues is intended to assist the reader with understanding some of the concepts that inform my opinions in this matter. They are a reflection of my applicable skills and/or knowledge, as gained through my experience, education, and/or training.

[254] *Graham v. Connor*, 490 U.S. 386, 396-7 (1989).

CLT-HOWARD-001002

being attacked, while waiting for the arrival of an ambulance or other emergency vehicle, or while watching or participating in an altercation or other high stress event.

Officers are trained, and know, that the more tense a situation is perceived to be; the greater the uncertainty of events or outcomes; and the more rapidly a situation seems to be unfolding – implying an increasing lack of control, or safety – the more an individual's perception of time and events can be distorted. Different stimuli and shifting situational factors impact how particular events are perceived. Despite their training, it is not uncommon for officers to experience many of the same effects as victims, witnesses, and other parties, in believing that events take much longer to occur than they actually do, or that they occur more quickly.[255] In some cases, events seem to telescope in officers' minds, causing them to not enumerate some details of a stressful encounter when reporting or memorializing an incident.

This effect has long been well known among police trainers, as well as other emergency service professionals. It is often referred to as time distortion, or tachy-psyche effect.[256,257,258] Trainers and researchers recognize it as a normal, human reaction to stress, and a form of body alarm response, or alarm reaction.[259] Body alarm response is often colloquially referred to as fight-flight-freeze, or the fight-or-flight survival response.[260]

These time distortion effects are often seen when witnesses under- or overestimate how long an incident lasted, how long it took for an EMS vehicle to reach an injured party, or how long it took a particular individual to cover a certain distance or perform a certain task, even when documented evidence to the contrary illustrates the correct distances or time frames.[261]

_In the instant case_. The possible effects of tachypsychia can be seen in this incident, and may be reflected in plaintiffs' statements regarding lengthy TASER CEW activations.

A Note Regarding Variations in Deputy Bass' Accounts of Events.  There is some variation in the accounts of Deputy Bass, regarding the specific events at the Elks Lake Road residence. This variation does not necessarily imply discrepancy or

---

[255] _Psychological time_, VandenBos, G. (Ed.). (2015). *APA Dictionary of Psychology* (2nd ed.). Washington DC: American Psychological Association, 859.

[256] Tachy-psyche effect, sometimes referred to as *tachypsychia,* is a neurological condition wherein a person's sense of time is distorted. Police trainers and other emergency services personnel know it as one of the most common effects of high-stress encounters and events.

[257] Nugent, Pam M.S. "Tachypsychia". *PsychologyDictionary.org*. April 13, 2013, https://psychologydictionary.org/tachypsychia/. Accessed by Steve Ashley on May 28, 2018.

[258] VandenBos, G. (Ed.). (2015). *APA Dictionary of Psychology* (2nd ed.). Washington DC: American Psychological Association, 1063.

[259] As defined by *The American Heritage Medical Dictionary,* 2nd ed. (2007). *"The initial stage in the body's response to stressful stimuli, characterized by adaptive physiological changes, such as increased hormonal activity and increased heart rate."*

[260] Other common manifestations of body alarm response are well known to law enforcement trainers and officers, and can include tunnel vision, auditory exclusion, loss of fine motor skills, and inaccurate memory of details.

[261] _Time sense_, VandenBos, G. (Ed.). (2015). *APA Dictionary of Psychology* (2nd ed.). Washington DC: American Psychological Association, 1090.

CLT-HOWARD-001003

subterfuge; criminal justice trainers and managers have long understood that some variation is to be expected.

Without reviewing every variation here, several general statements are relevant:

- It is common for reports and recitations of details to become more fully developed during successive telling. This is often due to the nature of the questioning, and the time, energy, and motivation available to the reporting or testifying person.

- This phenomenon often results in details being stated out of order, or skipped altogether, until the questioner or the individual themselves discover the problem, and correct it.

- Accounts of the same event can be framed differently – sometimes even accounts by the same individual – based on the purpose of the report, statement, interview, or testimony. Internal Affairs detectives are often seeking different information than criminal investigators; probation officers are seeking different information for a pre-sentence report than a plaintiff's attorney taking a deposition. Depending on the nature and purpose of the accounting, different details are often pursued for different purposes. Comparing such statements can lead to an impression that they are different for some nefarious, conspiratorial reason.

In the final analysis, and as discussed in more detail herein, all accounts of any given occurrence derive from individuals that see events from different, unique perspectives,[262] or whose perspective shifts over time. Variances in the details of a stressful event, are not only likely, they are expected.

*In the instant case.* Deputy Bass' initial reports were brief and succinct. Later, during questioning at his deposition, he recalled additional details, and could not recall others. However, the core elements of his initial report remained unchanged in any meaningful way.

Situational Awareness and Perceptual Narrowing.  Body alarm response can affect an officer's – or anyone's – situational awareness.[263] Situational awareness is a term police and military trainers use to describe a personal safety trait, wherein individuals attempt to maintain awareness of all that is occurring around them, regardless of where their focus is.[264]

In the law enforcement profession, officers are trained that, while perfect situational awareness is something to strive for, it is not really attainable, especially under high levels of stress. It is more often the case that an officer's attention – or that of another person – will be narrowed, to a greater or lesser degree, on the focus of his or her

---

[262] *Byther ex rel. Byther v. City of Mobile*, 398 F. Supp. 2d 1222, 1237 (S.D. Ala. 2005).

[263] Situational awareness has long been recognized in the military, medical, research, and law enforcement fields. It is one of the cornerstones of risk management.

[264] See, generally, Felter, B.A. (1988). *Police Defensive Handgun Use and Encounter Tactics*. New Jersey: Prentice-Hall.

CLT-HOWARD-001004

attention, based upon the individual's perception of need or danger. This is commonly referred to in law enforcement as perceptual narrowing.[265]

Hence, an officer moving toward – or a citizen running away from – an emergency situation will sometimes pass other individuals without fully seeing them or even being aware of their existence.[266] The officer or other individual may develop tunnel vision on a specific item or threat – such as a weapon in the hand of an adversary – to the exclusion of things occurring in his peripheral vision.[267]

It is also common for individuals caught up in extremely stressful occurrences to experience another type of perceptual narrowing, an effect known as auditory exclusion.[268] When perceptual narrowing occurs, it's not uncommon for persons standing quite close to extremely loud sounds to be totally unaware of them, because they are so focused on the object of their concern, or on a particular goal, such as escape. This frequently manifests as the failure to hear yelling or screaming; or even normal conversation, when one is focused intently on another stimulus. Police officers often experience such auditory exclusion at the end of a traffic pursuit, during a shooting or other use of force, or when struggling with an arrestee, wherein they find themselves confronting a dangerous individual, or while they are standing close to vehicle sirens that are still blaring.[269]

Witnesses and suspects experience these effects as well. Officers know that it is common that witnesses to stressful events will often report very minute details about one specific aspect of a scene, a vehicle, or a weapon. Yet, those same witnesses will often be unable to relate even the most obvious elements of the same scene. They were so tunneled in on a very narrow focus, fixated on details, that macro elements of the same scene or event went completely unnoticed by them. Different people see the same scene from their own, unique, perspective.

Conversely, other witnesses or officers may remember events differently, or may not remember some details of the event at all. One example of this is well known to law enforcement professionals; frightened[270] or startled people often make mistakes in eyewitness identifications.

_In the instant case_. Possible examples of these effects can be seen in the variation between the accounts of the individuals at the scene.

## 16. RISK MANAGEMENT IN LAW ENFORCEMENT FORCE AND CONTROL.

Risk management can be defined as the weighing of alternatives based upon an informed assessment of an acceptable balance of risk versus reward. When viewed from that perspective, all of criminal justice is engaged in daily risk management.

---

[265] Artwohl, A. (2002, October). Perceptual and Memory Distortion During Officer-Involved Shootings. _FBI Law Enforcement Bulletin, 71_(10), 18-24.

[266] For a true-life, law enforcement example of this, see Chabris, C., & Simons, D. (2010). _the invisible gorilla: And Other Ways Our Intuitions Deceive Us_. New York: Crown.

[267] Klinger, D. (2004). Into the Kill Zone: A Cop's Eye View of Deadly Force. San Francisco: Josey-Bass.

[268] Auditory exclusion is sometimes referred to in the literature as _tunnel hearing_.

[269] Ross, D. L., & Siddle, B. K. (2003). An Analysis of the Effects of Survival Stress in Police Use-of-Force Encounters. _Law Enforcement Executive Forum, 3_(2).

[270] Wise, J. (2009). Extreme Fear: The Science of Your Mind in Danger. New York: Palgrave.

However, there is no part of law enforcement that is more sensitive to an acceptable balance of risk versus reward, than the use of force and control by police officers.

<u>Managing Force and/or Control Options</u>. Typically, once a police officer recognizes the need to take enforcement action or gain control of a situation, he – given time to do so – weighs the various alternatives available to him, and decides upon a course of action that is multi-dimensional in nature. However, one aspect of this decision-making process is particularly sensitive to a desirable outcome; the officer's selection of a force or control tool, technique, weapon, procedure, or methodology.

Ideally, the alternative selected should be effective in the short-term and generally safe to use (preferably for all concerned). It should also be acceptable to those that will evaluate the outcome of the officer's actions.

Many force or control alternatives that appear safest to use are the least effective in the short-term, and many of the alternatives that are the most effective in the short-term are the least acceptable to those who would pass judgment on the outcome. Many of the options that an officer has for the use of control or force may appear – at least outwardly – to be inhumane and excessive, although research has shown that they may, in fact, be among the safer alternatives in terms of the potential for long lasting or significant injury to the subject of the force or control, as well as to third parties and officers.[271,272,273]

This real-life risk management dilemma can be summed up succinctly, as *"the use of force [and control] is never pretty."*[274] Today, members of the public are exposed to police use of force and control as they have never been before. Officers must still make their risk management decision, however, as they undertake to use force and control in assisting a victim, managing a situation, pursuing a suspect, making an arrest, or protecting themselves and others.

When officers decide to use force or control, based on what they know and perceive at that moment, they are making a risk management decision.[275] They are balancing their perceived need for the application of force or control against their perceived negative outcome of not using that force or control. Often the decision is of lesser significance, with a fairly mild likely outcome. At other times, the decision the officer makes can – quite literally – result in life or death. Often, the life or death dependent upon the decision of the officer is his own, or that of the person he is trying to assist or control.

[271] Ho, J. D., Dawes, D. M., Lundin, E. J., & Miner, J. R. (2009). 127: Comparison of Acidosis Markers Associated with Law Enforcement Applications of Force. *Annals of Emergency Medicine, 54*(3), S40.

[272] Lundin, E. J., Dawes, D. M., Ho, J. D., Ryan, F.J., & Miner, J. R. (2009). 315: Catecholamines in Simulated Arrest Scenarios. *Annals of Emergency Medicine, 54*(3), S98-S99.

[273] Ho, J., Dawes, D., Nelson, R., Lundin, E., Ryan, F., Overton, K., Zeiders, A., & Miner, J. (2010). Acidosis and Catecholamine Evaluation Following Simulated Law Enforcement ''Use of Force'' Encounters. *Academic Emergency Medicine, 17*(7):E60-E68.

[274] Joyner, C. (2011). Advanced Concepts in Defensive Tactics: A Survival Guide for Law Enforcement. Boca Raton FL: CRC Press. 9.

[275] See, generally. Head, G. L. (1987). *Essentials of the Risk Management Process, Vol. 1 & 2*. Malvern PA: Insurance Institute.

CLT-HOWARD-001006

*In the instant case.* Unfortunately, sometimes the risk management decision is made for – instead of by – officers. In a situation like that reported on Elks Lake Road on September 27, 2017, events are compressed into a shorter period, resulting in less decision-making time. Darious Leggett's escalating aggressive resistance, coupled with Antrinet Leggett's physical interference, left deputies with few options, and very little time to choose. Still, Deputy Bass attempted lower levels of control – including verbal commands and warnings – before resorting to the use of his TASER CEW.[276]

<u>Managing Risk Through Likely Outcomes</u>. Another key element in an officer's decision-making process regarding escalation and de-escalation of force and control is his knowledge of the likely outcome of his actions. Officers are trained to base their decisions on what they understand the likely outcome to be, not whatever could possibly happen. In a world where circumstances can combine in unexpected and unpredictable ways, yielding an infinite number of possible results, it is impossible for officers to base their decisions on the avoidance of any possibility of a negative, unanticipated outcome.[277]

Instead, officers learn, from both their formal training and their experiences as officers, what the likely results of a particular action are. They are trained to then base their decisions on those likely outcomes.

Many of the same concerns attach to an officer's perception of the threat posed by the actions of other individuals. Officers are aware of the likelihood of injury posed by a subject's perceived weapons and actions, but they are also mindful of the dearth of information they possess regarding a particular subject's capabilities, purpose, and intent, as well as the unpredictability of a mentally detached or substance-influenced subject. For that reason, when considering an unknown subject's risk factors,[278] officers find themselves shifting their likelihood analysis further toward possible outcomes.

This understanding of likely outcomes facilitates law enforcement risk management in its purest form. It allows officers to make reasonable decisions regarding how to respond to perceived resistance by a suspect, while also reducing the potential for injury to themselves and others. They are trained – and know – that, in their wisdom, the courts do not expect them to be perfect, only to be reasonable in their decision-making.[279,280] *"Officers are not required to use the least intrusive means available; they simply must act within the range of reasonable conduct."*[281] To hold them to any other standard would be to prevent them from ever taking action in the face of resistance or the need to control someone in order to help them.

*In the instant case.* In this case, Deputy Bass had minimal time to consider options and outcomes. Attempting to wait in order to further discern a demonstrably aggressive and apparently escalating Darious Leggett's intent would leave himself

---

[276] Deposition transcript of Blake Smith, dated 04/27/2020, p. 17.

[277] This reflects another central tenet of risk management: *One cannot manage away all risk*.

[278] Deputy Bass knew Darious Leggett, Deputy Sumrall did not.

[279] *Illinois v. Rodriguez*, 497 U.S. 177, 185 (1990).

[280] *Dickerson v. McClellan*, 101 F3d 1151, 1160 (6 Cir. 1996).

[281] *Brooks v. City of Seattle*, 509 F.3d 1018, 1025 (9 Cir. 2010).

CLT-HOWARD-001007

and others in the area, at risk. Once the Leggetts aggressively escalated their resistance, Deputy Bass had minimal time to reassess the situation, and immediately moved to take control of Darious, first with warnings, then with his TASER CEW. Deputy Blake Bass' use of force actions were consistent with typical law enforcement training.

## 17. UStE OF FORCE AND CONTROL – GENERAL CONSIDERATIONS.

Perspective of a Reasonable Officer on the Scene. Officers are trained – and know – that in determining whether or not a particular use of force or control was appropriate, and consistent with what other officers are likely to do under similar circumstances, one must view the event from the perspective of *"a reasonable officer on the scene."*[282] *"Perspective also is crucial to the analysis: '[t]he only perspective that counts is that of a reasonable officer on the scene at the time the events unfolded.'"*[283]

*The Rashomon Effect.* In order to reach a satisfactory outcome to an encounter, officers bring their training, experience, skill sets, and education, with them as they begin an interaction with other individuals. When that interaction morphs into a situation wherein force or control may be necessary, an officer bases his decision-making on what he brought to the event, along with whatever information and sensory input he can absorb from his unique perspective in the moment.

Each officer's – and indeed each person's – perspective is different, and is constantly evolving as an event unfolds. Another person or another officer – even one located just a few feet (or even inches) away – is likely to see the event differently, based not only on their physical relationship to the event, but also on their own unique set of filters;[284] education, experience, training, or emotional attachment. This tendency to perceive events differently due to a difference in perspective is known as the Rashomon Effect, or the Rashomon Principle.[285,286,287]

If asked for a value judgment, individuals are likely to have very different assessments of the need or justification for certain actions, based on their own unique perspective. However – particularly in use of force situations – officers are trained that an officer's actions *"must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."*[288,289]

---

[282] *Graham*, 396.

[283] *Jean-Baptiste v. Gutierrez,* 627 F.3d 816 (11 Cir. 2010), citing *Garczynski v. Bradshaw,* 573 F.3d 1158, 1166 (11 Cir. 2009).

[284] Green, M., et al. (2008). *Forensic Vision with Application to Highway Safety (3rd ed.)*. Tucson: Lawyers & Judges Publishing.

[285] Heider, K. G. (1988). The Rashomon Effect: When Ethnographers Disagree. *American Anthropologist, New Series, 90*(1), 73-81.

[286] This is also referred to as the *Kurosawa Effect*, after the 1950 movie, *Rashomon*, by Akira Kurosawa.

[287] Klinger, D. (2004). *Into the Kill Zone: A Cop's Eye View of Deadly Force*. San Francisco: Josey-Bass, p. 13.

[288] *Graham*, 396.

[289] Even a video camera will not capture things from an officer's perspective, and with the perceptual context the officer has in the moment. The camera may capture some – or arguably, even most – of the

Officers understand that *"[T]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect."*[290]

Often the facts of a particular encounter give rise to some debate regarding whether an officer's use of force in a specific situation met the criteria suggested by his or her department's particular procedural guideline. In such cases, it's important to remember that, in fact, since at least 1979, the courts have taken the position that *"The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application."*[291,292]

*In the instant case.* Whether an officer made correct or appropriate decisions during an encounter is often debated *ad nauseam*, after the fact, and with the luxury of time, by individuals who did not see rapidly evolving events through the eyes – and from the perspective – of that officer. However – as is often the case – during the rapidly evolving events of September 27, 2017, Deputy Bass and Deputy Sumrall had very little time to react to what they knew to be an aggressive, resistant, individual, in a rapidly escalating situation.

## 18. ANALYSIS.

Analysis Context. The following analyses of officer actions in the incident described, *supra*, are undertaken through application of commonly understood training and procedural criteria as they are presented and utilized throughout the law enforcement community. Utilization of specific terminology – including any legal terminology – is intended to clarify the relationship between this analysis and a broader criminal justice training, policy, and procedural context.[293,294] In effect, this analysis is cast as a contextual application of typical law enforcement training.

Use of Force by Officers – Generally. Officers are trained – and know – that if, when acting in their governmental capacity, they intentionally terminate someone's freedom of movement, they are presumed to have effected a seizure,[295] and that their

---

*what* that is in front of the lens. However, it's unlikely that any camera can really capture the *why* that controls the officer's perception of the need to take a certain course of action; in this case, deciding on a particular level of force, or selection of a particular implement or technique for effecting control of the situation.

[290] *Long v. Slaton*, 508 F.3d 576, 581 (11 Cir. 2007).

[291] *Graham*, 396, citing *Bell v. Wolfish*, 441 U.S., 559.

[292] *Bell v. Wolfish*, 441 U.S. 520, 559 (1979).

[293] As stated, *supra*, use of such terminology is not intended to subvert or usurp the function of the Court, or to inappropriately influence the role of the jury or other trier of fact.

[294] Any discussion of case law reflects what I, as well as many – perhaps most – other law enforcement use of force trainers, have been researching, analyzing, and teaching, for many years. As is common practice throughout the law enforcement community, when this material is taught to officers, it is framed from an informed lay-person's perspective, with the goal of having officers understand the practical application of the criteria that courts will generally hold them to, based on existing case law. This methodology is widely utilized in the law enforcement training community, and is geared to inculcate in officers a deeper appreciation and understanding of the rationale applied when use of force and/or control incidents are reviewed for justification.

[295] *Brower v. County of Inyo*, 489 U.S. 593, 597 (1989).

CLT-HOWARD-001009

use of force during a stop or an arrest is also a seizure,[296] and is therefore evaluated from the perspective of the Fourth Amendment[297] to the United States Constitution.[298] Officers are also trained, and know, that the United States Supreme Court outlined a Constitutional construct for reviewing government use of force, in the 1989 case, *Graham v. Connor*.[299]

Use of Force Under *Graham v. Connor*. Reasonable law enforcement officers are trained – and know – that whether or not a particular use of force application was objectively reasonable[300] under the Fourth Amendment is based upon an analysis of that use of force in light of three factors, among others:[301]

- *"whether the suspect poses an immediate threat to the safety of the officers or others";*

- *"whether he is actively resisting arrest or attempting to evade arrest by flight";*

- *"the severity of the crime at issue".*[302]

Reasonable officers are trained – and know – that in applying these criteria, the U. S. Supreme Court reiterated its earlier statement in *Bell v. Wolfish,*[303] that the *"test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application."*[304] Reasonable officers are also trained – and know – that this analysis is properly conducted *"from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight"*[305] and is properly analyzed in light of the *"totality of the circumstances"*[306] facing the officer. Reasonable officers are further trained – and know – that, when reviewing the above (and other) factors, courts will consider the degree to which a given situation is *"tense, uncertain, and rapidly evolving"*[307] when assessing the reasonableness of a particular use of force.

---

[296] *Tennessee v. Garner,* 471 U.S. 1 (1985).

[297] U.S. Const. amend. IV.

[298] *Graham,* 388.

[299] *Graham v. Connor,* 490 U.S. 386 (1989).

[300] See generally, *Graham v. Connor,* 490 U.S. 386 (1989).

[301] Officers are trained that, while the *Graham* Court did not specify a particular hierarchy of importance for these factors, the Ninth Circuit – and other courts – have; perhaps most notably in the case *Chew v. Gates,* 27 F.3d 1432 (9 Cir. 1994), cert. denied, (U.S. Feb. 21,1995)(No. 94-980). This ordering of factors is commonly taught and emphasized in law enforcement use of force training, as well as in procedural guidelines. Thus, these factors are listed here in the order of importance seemingly considered by *Graham's* progeny.

[302] *Graham,* 396.

[303] *Bell v. Wolfish,* 441 U.S. 520 (1979).

[304] *Graham,* 396, citing *Bell v. Wolfish,* 441 U.S. 520, 559 (1979).

[305] *Graham,* 396.

[306] *Graham,* 396, citing *Tennessee v. Garner,* 471 U.S. 1, 8-9 (1985).

[307] *Graham,* 396-7.

CLT-HOWARD-001010

<u>Application of the *Graham* Factors to Deputy Bass' and Deputy Sumrall's Use of Force</u>.  With respect to the individual *Graham* factors, and without reiterating all the incident information discussed, *supra*:

- *Immediacy of the threat*.  The immediate threat posed by Darious Leggett was that he was behaving aggressively and appeared to be escalating. The immediate threat posed by Antrinet Leggett was that she was physically attempting to foil deputies' attempts to arrest her son Darious, by interposing herself between the deputies and Darious.

- *Actively resisting arrest*. Darious Leggett actively and aggressively resisted arrest.

- *Attempting to evade arrest by flight*. While Darious continued to pull away from deputies[308] while resisting handcuffing, it does not appear that he was attempting to flee.

  Still, even if Darious was not attempting to escape or evade arrest by flight, it was not illogical for Sumrall to believe he was, due to his continued resistance and pulling away. Sumrall described Darious' actions as, *"He actually tried to get away from me, as in run, I guess. Run is not the right word, but he resisted."*[309]

  And – as stated by the Fifth Circuit in *Rockwell* – *"… neither the Supreme Court nor this Court has ever held that **all** of the Graham factors must be present for an officer's actions to be reasonable; indeed, in the typical case, it is sufficient that the officer reasonably believed that the suspect posed a threat to the safety of the officer or others."*[310] [emphasis in original]

- *Severity of the crime at issue*. The severity of Darious Leggett's crime was relatively minor, in that Sumrall and Bass believed that the dog(s) were being neglected. Eventually, when Sumrall determined to take enforcement action and arrest Darious, Darious reportedly escalated the severity of the encounter by resisting and the failing to comply with commands to submit to handcuffing. Antrinet Leggett reportedly further escalated the encounter by physically interfering as discussed, *supra*.

- *Tense, uncertain and rapidly evolving*. Finally, regarding Deputy Sumrall's and Deputy Bass' altercation with the Leggetts, the situation was tense, uncertain, and rapidly evolving. Consider that:

  – *The situation was tense*, in that, as the incident began, Sumrall was faced with an unknown individual who appeared to be behaving aggressively, and was apparently escalating.

  – *The situation was uncertain*, in that Sumrall did not know why Darious was acting as he did. He did know that he (Darious) was actively and aggressively resisting Sumrall's attempts to take him into custody. Sumrall

---

[308] Deposition transcript of Chey Sumrall, dated 04/27/2020, p. 32.

[309] Deposition transcript of Chey Sumrall, dated 04/27/2020, p. 32.

[310] *Rockwell v. Brown*, 664 F.3d 985, 992 (5 Cir. 2011).

CLT-HOWARD-001011

and Bass also knew that Antrinet Leggett was actively interfering with the arrest of her son.

–   *The situation was rapidly evolving*, in that, once the incident began, the entire use of force unfolded very quickly: One moment, Sumrall and Bass were beginning their attempted investigation of the dog complaint; a few moments later, they were confronted with an increasingly resistant individual, at least one loose and threatening dog, and a woman physically attempting to prevent the arrest of their suspect.

<u>Consideration of Time and the Selection of Options</u>. Although officers may sometimes have various courses of action open to them, and multiple use of force or control options for dealing with an individual, they often do not have time to study a situation in order to make a fully informed decision regarding which option to choose.

Officers may approach a given situation with limited information, or without adequate time to analyze circumstances in detail. In those cases, officers often need to *"make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving."*[311] In such a moment, officers will choose force or control options based on their perception of need or danger, and predicated on their assessment of the likely outcome of the option's use. This decision is sometimes complicated by the relative ineffectiveness – or even the inadvisability – of different options, given the circumstances facing the officer.[312,313]

Perhaps the most critical dimension that affects an officer's choice of force or control option is that of time. Officers are trained that time often equals safety, and that – generally speaking – one of the clearest manifestations of time-as-safety is that of distance. Principally, this is reflected in officers' understanding that, the closer you are to an adversary, the less time you will have to react to a sudden attack. This concept is referred to as *reactionary gap*.[314] Officers are trained to create distance, if time and the environment allows. When they cannot do so, officers are acculturated to be hyper-sensitive to threat cues presented by the individual, or by the environment, including the urgency of any expeditious resolution. Additionally, when they cannot create distance, officers are actually trained to close the distance quickly, to – in effect – shorten their adversaries' reaction time. Plainly stated; if an officer can't move back safely, they are trained to move in quickly. This maneuver is referred to as *penetrating the gap*.[315]

---

[311] See generally, *Graham v. Connor*, 490 U.S. 386, 397 (1989).

[312] Many force and control options fail under differing conditions. Even TASER electrical weapons – one of the most effective, non-lethal options officers have – do not work to control resistive behavior every time they are deployed. Some studies have indicated that their effectiveness rate can be as low as 50-60 percent, given circumstances at the time of their deployment.

[313] Mesloh, C., Wolf, R., Henych, M., & Thompson, F. (2008). Less Lethal Weapons for Law Enforcement: A Performance-Based Analysis. *Law Enforcement Executive Forum. 8*(1).

[314] Reactionary gap has been defined as a range of distances, based upon the context of the encounter. Distances of 6 – 8 feet are frequently cited as the minimum acceptable for safety; although, depending on the weapon or tactics chosen by an adversary, ranges of 21 feet and beyond are not uncommon.

[315] Siddle, B. K. (2005). *PPCT Defensive Tactics Student Manual – Michigan edition*. Belleville IL: PPCT Management Systems.

CLT-HOWARD-001012

*In the instant case*. As the incident at the residence began to unfold, Deputies Bass and Sumrall had to adjust very quickly. Because Sumrall had determined the need to investigate the welfare of the dogs – and to do so, that he needed to talk with Darious – he, of necessity, moved in closer to Darious. Once Sumrall determined to arrest Darious, he was naturally in close proximity to Darious. In effect, when Darious began physically resisting, Sumrall was caught inside the reactionary gap, at a point that law enforcement use of force trainers have long referred to as the *inside position*.[316]

The Importance of Perspective. When officers are engaged in a physical control situation, it is they who are in the best position to assess the level of resistance or difficulty they are encountering. An individual reviewing an officer's actions after the fact and conducting a detailed analysis, is sometimes tempted to apply his own reasoning, criticisms, and conclusions – *ipse dixit* – to the actions of that officer. It is easy to fall into this hindsight trap, yet the courts have steadfastly cautioned against it.[317]

The twin luxuries of time and hindsight may make such an application seem logical and appropriate. However, officers are usually closest to the action – often in direct, physical, contact with the subject – and their perspective is likely to be different than that of a dispassionate reviewer or even a close-by observer.

When engaged in a physical control situation, officers combine what knowledge they already have (or know that they don't have), with the information and feedback gained in the midst of the moment.[318] In fact, they view events through the prism of context. Context is key, particularly as it relates to vision. Vision is highly context dependent.[319] Someone else may see part or all – relatively speaking – of a series of events, but because their context is different, their perspective will often yield a different evaluation of the circumstances and outcome.

When an officer views a sequence of events through his highly personalized prism of context, the result is each officer's unique perspective regarding the totality of the circumstances they are dealing with.

In the aftermath of an incident, it is common for a subject or witness to allege that officers were not threatened, that there was no intent to harm officers, that the witness saw no aggressive behavior on the part of an individual, or that officers' actions were unnecessary. However, the intent of a subject is not something an arresting, controlling, or pursuing, officer can know. Officers base their responses to perceived resistance on the behavior of subjects, and what that behavior conveys as a subject's likely intent, as officers perceive it in the moment. Officers learn through both training and experience to react to pattern-recognition of threat or movement cues, as

---

[316] Siddle, B. K. (2004). *PPCT Defensive Tactics Instructor Manual – United States edition*. Belleville IL: PPCT Management Systems.

[317] *Penley v. Eslinger*, 605 F.3d 843 (11 Cir. 2010).

[318] Artwohl, A., & Christensen, L. W. (1997). Deadly Force Encounters: What Cops Need to Know to Mentally and Physically Prepare for and Survive a Gunfight. Boulder CO: Paladin Press.

[319] Green, M., et al. (2008). *Forensic Vision with Application to Highway Safety (3rd ed.)*. Tucson: Lawyers & Judges Publishing.

CLT-HOWARD-001013

they manifest in an individual's observed behavior.[320] Those cues provide the basis for an officer's perception of resistance or lack of control, and thus, danger.[321]

The Necessity for or Reasonableness of Force and Control. Officers are trained – and know – that they need not use the least amount of force necessary,[322,323] a quantity they can never effectively measure before the fact. Officers are trained – and know – that they are *"entitled to continue his use of force until a suspect thought to be armed is 'fully secured.'"*[324]

In fact, reasonable officers are trained, and know, that they *"…are not required to use the least intrusive degree of force possible. Rather […] the inquiry is whether the force that was used to effect a particular seizure was reasonable, viewing the facts from the perspective of a reasonable officer on the scene."*[325] And, they are trained that their use of force must be objectively reasonable under the totality of circumstances they encounter in a given situation.

*In the instant case.* The degree of escalating risk to Deputies Sumrall and Bass posed by Darious Leggett's profane, dogged, resistance and aggressive actions, Sumrall's lack of knowledge regarding who he was dealing with and what was happening, Darious' escalating behavior, the immediacy of the threat posed by Antrinet once she physically interfered with Sumrall, the presence and perceived threat posed by at least one loose and agitated dog, and Sumrall's concern for the well-being of himself and Bass, all clearly combined to present Deputies Sumrall and Bass with a *totality of the circumstances* worthy of consideration.

## 19. GENERALLY RECOGNIZED PREFERRED PRACTICES FOR THE USE OF FORCE.

The Difference Between Rules and Procedures.  Law enforcement agencies typically have sets of written guidelines; as discussed, *infra*, these documents take many forms. However, these types of documents typically fall within two broad categories of guidance; the first is a set of workplace rules that set forth requirements for conduct. Examples are regulations about grooming, timeliness, management of documents, and workplace propriety.

The second broad category for these documents is that of procedural guidelines. Usually these documents state routine methodologies for handling typical situations that arise in the day-to-day operations of the agency. Such documents establish general expectations regarding the handling of different types of calls, the methods used for collecting and preserving evidence, and other suggested courses of action.

---

[320] (2011). *Stress and Decision Making*. Federal Law Enforcement Training Center.

[321] The Fifth Circuit stated in Harris v. Serpas, 745 F.3d 767, 773 (2014) citing Rockwell, 664 F.3d at 991, "The relevant law, however, does not require the court to determine whether an officer was in actual, imminent danger of serious injury, but rather, whether "the officer reasonably believe[d] that the suspect pose[d] a threat of serious harm to the officer or to others.""

[322] As eloquently stated by Judge Tallman in his dissent, *Bryan v. MacPherson*, 630 F.3d 805, 818 (9 Cir. 2010).

[323] *Forrester v. City of San Diego*, 25 F.3d 804 (9 Cir. 1994).

[324] *Jean-Baptiste*, 821, citing *Crenshaw v. Lister*, 556 F.3d 1283, 1293 (11 Cir. 2009).

[325] *Forrester*, 808.

CLT-HOWARD-001014

The primary difference between these two types of documents is that one is a set of specific expectations that employees are expected to follow except in extraordinary circumstances. The other is a set of suggested protocols outlining general expectations to be followed unless employees encounter situations that require a different approach. In other words, rules are to be followed, while procedures are suggested courses of action. It's possible to step outside procedural guidelines – with practical, articulable, reasons. Such guidelines are not inviolate.

<u>Internal Department Rules and Procedures are Not Laws</u>.  In either case, officers are trained – and know – that documents such as these are internal documents; they are not laws. In fact, in many cases, such documents set a higher bar than do legal requirements such as statutes, case law, and the Constitution. Generally, these guidelines should be at least as restrictive as the law requires. However, many jurisdictions adopt stricter – sometimes far stricter – guidelines.

For that reason, courts have frequently held that a violation of a department procedural document does not constitute a violation of the law, or of a person's Constitutional rights.[326] That is a different analysis, to a different standard.

<u>Use of Sample or Model Documents</u>.  In order to assure that their documents comply with generally accepted preferred practices (which typically include meeting the minimum legal standard), agencies often rely upon sample guidelines published by outside entities. These sample guidelines serve as a starting point for policy development.

There are volumes of model policies, sample directives, and recommended guidelines, promulgated by many different entities across the country. These generic guidelines are provided in order to assist police chiefs and sheriffs in devising, developing – and maintaining – up-to-date operating procedures for their respective departments. Some of these guidelines are provided by legal advisors, insurance carriers, or risk management groups, while others emanate from associations and other non-governmental organizations. Some sets of guidelines are developed and sold by private companies.[327] While many elements of such documents are similar, all of these guidelines are voluntary in nature, as there is no mandated set of guidelines – what some might think of as *standards* – that all law enforcement agencies must adopt. They are also generic in content, as most are developed so as to be applicable to many different agencies, often in different states. For that reason, many are – by their very nature – limited in scope and applicability. [328]

---

[326] *Wren v. United States*, 517 U.S. 806, 815 (1996).

[327] One such company that develops policy sets for different states and individual departments is Operational Support Services (OSS) Law Enforcement Advisors, of Spring, Texas.

[328] From the January, 2017, IACP *National Consensus Policy on Use of Force* "*This National Consensus Policy on Use of Force is a collaborative effort among 11 of the most significant law enforcement leadership and labor organizations in the United States […]. The policy reflects the best thinking of all consensus organizations and **is solely intended to serve as a template for law enforcement agencies to compare and enhance their existing policies**. […]* Every effort has been made to ensure that this document incorporates the most current information and contemporary professional judgment on this issue. However, law enforcement administrators should be cautioned that **no "sample" policy can meet all the needs of any given law enforcement agency**. Each law enforcement agency operates in a

CLT-HOWARD-001015

While it's not uncommon for practitioners to consider – and often to refer to – these documents as standards, that is not the case. Indeed, it's common for promulgating organizations to specifically caution that no model policy or procedural guideline can meet all the needs of any given law enforcement agency, and that their documents do not constitute a *national standard*.[329]

One entity that is often cited as a purveyor of these generic guidelines is the International Association of Chiefs of Police (IACP). This international organization is a private, non-profit (501c3) entity.

<u>International Association of Chiefs of Police (IACP)</u>.  The IACP is a membership organization that, among other activities, promulgates "model" policies, training keys[330], and position papers. These address a wide range of law enforcement issues, with the goal of assisting their police executive members in developing guidelines for law enforcement operations. The model policies and recommended guidelines published by the IACP are generic and advisory only, and their adoption is voluntary in nature. The position papers and training keys provide more detailed discussion of many aspects of each issue, but are also advisory in nature.

The IACP *Model Policy on Use of Force*[331] has been updated and replaced, by a more expansive document, the *National Consensus Policy on Use of Force*.[332] When put to use during practical procedure development, this sample policy provides a basic framework; in no way could it be considered as meeting the definition of a standard, i.e., *"A type, model, or combination of elements accepted as correct or perfect."*[333]

<u>*In the instant case*</u>. In 2017, the Forrest County Sheriff's Office written procedure for the use of force[334] was generally in line with the National Consensus policy, but was much more developed and well-rounded. As such, the FCSO policy addressed issues that the consensus policy did not. Accordingly, even when the FCSO policy spoke to the same issues, it did so in greater detail, with more practical direction and guidance. Such an approach was – and is – consistent with many guidelines that are in wide-spread use in departments today.

---

unique environment of court rulings, state laws, local ordinances, regulations, judicial and administrative decisions, and collective bargaining agreements that must be considered, and should therefore consult its legal advisor before implementing any policy." [emphases added]

[329] An example (one of many) of such a cautionary approach is that taken by the International Association of Chiefs of Police (IACP), in their publication of model or sample policies. From the March, 2018, iteration of the IACP Model Policy on *Electronic Control Weapons*: *"Law enforcement administrators should be cautioned that no "model" policy can meet all the needs of any given law enforcement agency. Each law enforcement agency operates in a unique environment of court rulings, state laws, local ordinances, regulations, judicial and administrative decisions and collective bargaining agreements that must be considered, and should therefore consult its legal advisor before implementing any policy. **This document is not intended to be a national standard.**"* [emphasis added]

[330] IACP Training Keys are resource documents, similar in nature to "white papers" or position papers.

[331] *Use of Force - Model Policy.* International Association of Chiefs of Police (IACP). February 2006.

[332] *National Consensus Policy on Use of Force*. Provided by the International Association of Chiefs of Police (IACP), January, 2017.

[333] *Black's Law Dictionary* 1404, 6th ed. 1990.

[334] Forrest County Sheriff's Office, Policy # 5.01, *Use of Force & Deadly Force*, undated, CLT-HOWARD-000021 – CLT-HOWARD-000032.

CLT-HOWARD-001016

Some aspects of this more in-depth approach effectively put greater restrictions on Forrest County's use of force than the National Consensus policy called for as a recognized preferred practice, while other aspects provide similar controls, yet allow for flexibility of split-second decision making, under circumstances that are tense, uncertain, and rapidly evolving.

20. **DEPARTMENTAL PROCEDURAL GUIDELINES FOR FORCE AND CONTROL.**

Use of Force and Control Procedural Guidelines – Generally. Law enforcement agencies develop various directives and procedures in order to provide guidance for employees. Few of these guidelines take the form of hard-and-fast rules, due to the very nature of the work that officers do. Because most law enforcement officers work in the field, they are often away from the hands-on control of what most people would think of as a direct supervisor.

Additionally, the many different people officers interact with – and the situations they find themselves in daily – frequently present problems calling for unique and creative solutions. For that reason, aside from typical workplace regulations, most law enforcement documents and constructs of this type are implemented as guidelines or preferred practices, to allow for the flexibility and discretion that are usually required when officers are addressing the human condition in the real world.

Use of force and control procedures fall within this group of guidelines, yet they pose a difficulty that many such documents do not: Because of the nature of use of force and control, procedural guidelines addressing such issues should be relatively firm in setting forth a framework within which officers can conduct their force and control activities, while – at the same time – allowing for the aforementioned flexibility and discretion that officers need.

In fact, as discussed, *supra*, courts have long held that the reasonableness of officers' use of force *"is not capable of precise definition or mechanical application."*[335]

Forrest County's Use of Force and Control Procedural Guidelines. No published guideline or procedure can be perfect. However, as written, Forrest County's directives provide practical guidelines for officers to use when making decisions in the field, whether force- and control-related, or otherwise.

The FCSO documents and directives illustrate measures that have been put into place by Forrest County – and by extension, the sheriff's office, as an agency or department of the county – in order to prevent and address issues arising from allegations of excessive use of force. Having reviewed, formulated, and recommended, hundreds of similar documents, it is my professional opinion that – while the format and terminology of these documents may vary from those utilized in different agencies and jurisdictions – issues are addressed in a manner similar to methods used in other municipalities, and are framed in a manner that is consistent with generally recognized preferred practices.

Application of Procedural Guidelines in a Real-World Context. Procedural guidelines only provide a framework from which officers can approach the tactical, real-world, challenges of force and control. As with all procedural documents of this type, the

---

[335] *Graham*, 396, citing *Bell v. Wolfish*, 441 U.S. 520, 559 (1979).

application of such guidance is contingent upon the totality of circumstances that officers perceive, as they deal with individuals on a day-to-day basis. To adapt and paraphrase a construct familiar to most officers in another context, the question of whether a written guideline can be applied exactly to a given field situation *is not capable of precise definition or mechanical application.*

In a broader sense, the Forrest County Sheriff's Office has promulgated policies and procedural guidelines for the purpose of directing employees in their day-to-day law enforcement activities related to the use of force and control. These written directives compare well to many actual, in use, policy documents with which I am familiar, as well as various model, sample, and best practices, policies and guidelines that are utilized within the law enforcement field.

*In the instant case.* Within the context of the circumstances in which they found themselves, Deputy Bass' and Deputy Sumrall's actions during the incident in question were consistent with the FCSO use of force and control procedural guidelines.

## 21. REVIEW OF DEPARTMENTAL TRAINING OF DEPUTIES BASS AND SUMRALL.

Required Department Training. Each empowered FCSO Deputy is subject to the certification requirements of the Mississippi Board on Law Enforcement Officer Standards and Training (BLEOST) in order to be licensed as a police officer.[336] The Forrest County Sheriff's Office mandates that all sworn officers complete a minimum of 20 hours of training each year.[337] Additionally, the FCSO policy requires that department members meet mandatory and in-service training requirements.[338,339]

Deputy Sheriff Blake Bass' Training. While I may not have all of Deputy Bass' training records, I do have records regarding his basic police academy training,[340,341]

---

[336] Mississippi Board on Law Enforcement Officer Standards and Training, Professional Certification Policy and Procedures, 31 Miss. Code R. § 301-7.4, *Full-Time Basic Training Curriculum.*

[337] Forrest County Sheriff's Office, Policy # 2.09, *Training & Proficiency Testing*, undated, CLT-HOWARD-000594 – CLT-HOWARD-000596.

[338] Forrest County Sheriff's Office, Policy # 2.09, *Training & Proficiency Testing*, undated, p. 1.

[339] In-service training is training that police officers receive once they are regularly employed by a law enforcement agency. The topics chosen for in-service training – as well as the length of the training itself – vary from agency to agency. In essence, in-service training is similar to continuing education that is required by many professions. The State of Mississippi requires that officers meet certain training requirements in order to maintain their licensure as Mississippi Law Enforcement Officers.

[340] *Basic Law Enforcement Training Academy*, by Southern Regional Public Safety Institute, Class 2017-02, [480 hours], dated 05/15/2017, CLT-HOWARD-000141

[341] The BLEOST academy requirement when Bass attended was 480 hours, as reflected on his certificate.

as well as other records indicating his specialized training in use of force.[342,343,344,345,346]

Deputy Bass completed TASER Certification Training on 02/21/2017, and was subjected to a live TASER exposure.[347]

I also note that many of the courses documented for Deputy Bass will have significant overlap. Thus, it is typical that firearms training courses will discuss force and control issues, and vice-versa. Most courses will discuss some elements of legal issues.

Deputy Sheriff Chey Sumrall's Training. I may not have all of Deputy Sumrall's training records. However, I do have records regarding his completion of the Auxiliary/Reserve Officer Basic Course,[348] and I also have records regarding his basic police academy training,[349,350] as well as other records indicating his specialized training in use of force.[351,352,353,354,355]

I also note that many of the courses documented for Deputy Sumrall will have significant overlap. Thus, it is typical that firearms training courses will discuss force and control issues, and vice-versa. Most courses will discuss some elements of legal issues.

Use of Force Training Rubrics and Memory. Law enforcement officers are entrusted with the power to deny someone their freedom in order to enforce laws, preserve the peace, and to make the world safer for everyone. Use of this power frequently entails

---

[342] *Chemical Sprays Course*, by Southern Regional Public Safety Institute, [unknown hours], dated 05/24/2017, CLT-HOWARD-000139.

[343] *Active Shooter Course*, by Southern Regional Public Safety Institute, [16 hours], dated 06/06/2017, CLT-HOWARD-000140.

[344] *Basic Police Handgun/Shotgun Course*, by National Rifle Association, [unknown hours], dated 05/04/2017, CLT-HOWARD-000142.

[345] *Strategic Self Defense & Grappling Tactics,* by Vanguard-1, [16 hours], dated 04/21/2017, CLT-HOWARD-000143.

[346] *Strategic Self Defense & Grappling Tactics,* by Vanguard-2, [24 hours], dated 05/24/2017, CLT-HOWARD-000144.

[347] Forrest County Sheriff's Office memorandum from Chris Selman to Attorney Will Allen, re: Blake Bass Taser [sic] Certification, dated 01/23/2020.

[348] *Auxiliary/Reserve Officer Basic Course*, by Sandersville Regional Law Enforcement Officers Training Academy, [Class 2014-01], dated 09/30/2014, CLT-HOWARD-000257.

[349] *Basic Law Enforcement Training Professional Certificate*, by State of Mississippi BLEOST, [Full-Time], dated 12/16/2016, CLT-HOWARD-000213 – CLT-HOWARD-000214.

[350] The BLEOST academy requirement when Sumrall attended was 480 hours.

[351] *Defensive Tactics Course*, by Sandersville Regional Law Enforcement Officers Training Academy, [40 hours], dated 09/30/2014, CLT-HOWARD-000266.

[352] *Firearms Course*, by Sandersville Regional Law Enforcement Officers Training Academy, [16 hours], dated 09/30/2014, CLT-HOWARD-000267.

[353] *Impact Weapons Course*, by Sandersville Regional Law Enforcement Officers Training Academy, [8 hours], dated 09/30/2014, CLT-HOWARD-000268.

[354] *Officer Survival Course,* by Sandersville Regional Law Enforcement Officers Training Academy, [40 hours], dated 09/30/2014, CLT-HOWARD-000270.

[355] *OC Spray Course,* by Sandersville Regional Law Enforcement Officers Training Academy, [8 hours], dated 09/30/2014, CLT-HOWARD-000272.

CLT-HOWARD-001019

stopping someone from doing what they are doing, or from doing what they want to do, and that sometimes meets with resistance. Law enforcement officers are provided with various tools – both tangible and intangible – to use in overcoming that resistance. The use of those tools to overcome resistance – in other words, to change behavior, at least in the short term – is what officers refer to as use of force.

An officer's decision regarding the level of force to be used is often impacted – as it was in the instant case – by the amount of time available for making the decision. When there is very little time in which to make a conscious decision, officers rely on their training and experience to guide their reaction to a perceived threat, whether that be to themselves or to someone else. In effect, officers utilize their training as a mechanism for pre-thinking and pre-planning for various scenarios. In this way, officers can shorten the time required for decision making. When the product of an officer's training is filtered through his or her experiences, the officer is left with a programmed defense mechanism which allows for a much quicker – although still controlled – response to the perception of threatening behavior on the part of someone the officer interacts with.

Officers and trainers know and understand this concept of training and conditioning,[356] especially as it impacts the safety of the public and officers, as well as suspects.

Applicability of Training to this Incident.  Perhaps one of the best measures of the quality and quantity of training is the degree to which that training is applied in the field, during situations that allow for little reaction time, and when officers must rely on their training to shorten their reaction time to a perceived threat.

In this incident, FCSO Deputy Sheriffs Bass and Sumrall used non-lethal force in response to what they perceived to be an escalating and dangerous situation[357] involving Darious Leggett. The deputies' reactions to Leggett's actions were based on information they had at the moment the force was used, as well as their training and experience. Bass and Sumrall were each the *"officer on the scene"*,[358] applying what they had learned and been trained to do when encountering a situation that forced them to make a split-second judgment under circumstances that were tense, uncertain, and rapidly evolving.

*Discussion.* My review of the record as a whole leads me to conclude that the actions reportedly taken by Deputy Blake Bass and Deputy Chey Sumrall do not suggest a lack of proper training. On the contrary, various documents indicate that Bass and Sumrall met or exceeded recommended training preferred practices that I am familiar with, through my education, research, training, and experience, and that are in wide use in the law enforcement community.

---

[356] This conditioning is commonly known in the law enforcement community as *programmed memory*, or *programmed muscle memory*.

[357] Forrest County Sheriff's Office, Policy # 5.01, *Use of Force & Deadly Force*, undated, CLT-HOWARD-000021 – CLT-HOWARD-000032.

[358] *Graham*, 396.

CLT-HOWARD-001020

22. **OPINIONS.**

Based on the items outlined above, as well as my general understanding of the case, I hold the following opinions, each to a reasonable – or higher – degree of professional certainty. These opinions are the result of my case review and research, and are the product of my skill and knowledge, as gained through my years of experience, education, and/or training. These opinions are in addition to any statements of opinion I may have included, *supra*.

1. It is my opinion that <u>the use of force and control as reported by Deputy Sheriffs Blake Bass and Chey Sumrall, was based upon their perception that Darious Leggett had become increasingly agitated and aggressive, had refused to comply with commands, and that he then physically resisted deputies' attempts to gain compliance</u> and control.

2. It is my opinion that <u>the use of force and control as reported by Deputy Sheriffs Bass and Sumrall in arresting Antrinet Leggett was based upon her physically assaultive interference</u> in the arrest of her son.

3. It is my opinion that other trained and experienced officers are likely to logically conclude that <u>the reported actions of Darious Leggett – in the circumstances as described – posed a threat or risk of serious injury or death to Deputies Bass and Sumrall and/or others in the area</u>.

4. Further, it is my opinion that other officers who do so conclude, would likely determine that <u>it was necessary to use force and control methods</u> in order for Deputies Bass and Sumrall to reduce the likelihood of serious injury or death to themselves <u>and that it would be logical and appropriate for them to reach that conclusion, considering their training and experience</u>.

5. It is also my opinion that it is logical and appropriate to conclude that <u>many of those officers</u>, when faced with the same – or a substantially similar – situation as that reported by Deputies Bass and Sumrall, <u>would likely act in the same, or a similar, way as they did</u>.

6. It is my opinion that, if similarly trained and experienced, and faced with the same or similar reported circumstances, <u>other reasonable officers would believe that the conduct and actions of Deputies Bass and Sumrall were lawful</u> in using what force and control methods they did in their attempt to arrest and control Darious Leggett and Antrinet Leggett.

7. It is my opinion that <u>Deputy Bass' and Deputy Sumrall's perceptions regarding the use of force and control were consistent with known human factors research</u>.

8. It is my opinion that, within the context of the circumstances in which they found themselves, Deputy Bass' and Deputy Sumrall's actions during the incident in question were consistent with the FCSO use of force and control procedural guidelines.

9. It is my opinion that the actions reportedly taken by Deputy Blake Bass and Deputy Chey Sumrall do not suggest a lack of proper training. It is my opinion that Bass and Sumrall met or exceeded recommended training preferred practices

that I am familiar with, through my education, research, training, and experience, and that are in wide use in the law enforcement community.

23. <u>Compensation for Study and Testimony</u>.

<u>Compensation for Study, Analysis, Testimony, and Travel</u>. In addition to reasonable and customary reimbursement for expenses, I am compensated at a rate of $150.00 per hour for study, review, research, analysis, and report preparation. I am compensated at a rate of $200.00 per hour for testimony. My rate of compensation for travel is $75.00 per hour.[359]

As is my usual practice, my fees are not dependent upon my findings, or on the outcome of any legal action, mediation, arbitration, or the amount or terms of any settlement of any underlying cause, nor upon any contractual arrangement between defense or plaintiff's counsel and any other person or party.

<u>Compensation as of this Writing</u>. As of this writing, I have not received any compensation for my services in this matter.

24. <u>Exhibits</u>.

The following exhibits are attached, and are to be considered part of this report.[360]

- <u>Exhibit I</u> is a list of documents and materials that I have reviewed or considered during the completion of this report.

- <u>Exhibit II</u> is my Curriculum Vitae, which includes a list of publications that I have authored or coauthored in the last ten years.

- <u>Exhibit III</u> is a listing of cases in which I have testified as an expert at deposition, hearing, or trial, in the last four years.

- <u>Exhibit IV</u> is my complete Fee Schedule.

_____          _____
      May 1, 2020
         Date                        Steven D. Ashley, MSc, MLS, ARM/P, AFSB, CCI, IICI
                                              Monroe, Michigan

---

[359] My detailed Fee Schedule is attached to, and is incorporated into, this report as <u>Exhibit IV</u>.

[360] In the electronic version of this report, each exhibit can be accessed directly by clicking on the underlined exhibit number.

CLT-HOWARD-001022

# EXHIBIT I – DOCUMENT LIST

**Last Reviewed/Updated May 1, 2020**

The following items were considered, reviewed, recalled, or referenced, by me during my analysis of this case and the development of this report. Some were provided by counsel, while others are the product of my research and/or consideration.

## DOCUMENTS

1.  Notice of Removal, Case 2:19-cv-00084-KS-MTP, Document 1, filed 05/28/2019, with attached Exhibit A:

    1.1.  Plaintiffs' Forrest County Circuit Court Complaint, Case Number W19-0106, dated 05/14/2019. [Removed to Federal Court, Case Number 2:19-cv-00084-KS-MTP, Document 1-2, filed 05/28/2019.

2.  Forrest County Sheriff's Office reports, including:

    2.1.  Forrest County Sheriff's Office, [scan transmittal sheet], Case Number 201711423, undated, CLT-HOWARD-000001.

    2.2.  Forrest County Sheriff's Office, Custody Report of Antrinette [sic] Leggett, by [Deputy] Bass, for arrest dated 09/27/2017, CLT-HOWARD-000002.

    2.3.  Forrest County Detention Center, Facility Admission Report for Antrinette [sic] Leggett, Booking Number 2012170552, dated 09/27/2017, CLT-HOWARD-000003.

    2.4.  Forrest County Sheriff's Office, arrestee information of Antrinette [sic] Leggett, Darious Leggett, and [Suspect] Selena Howard, Case Number 201711423, dated 09/27/2017, CLT-HOWARD-000004 – CLT-HOWARD-000005.

    2.5.  Forrest County Sheriff's Office, Narrative Report of Deputy Blake Bass, Case Number 201711423, dated 09/28/2017 [sic], CLT-HOWARD-000006.

    2.6.  Forrest County Sheriff's Office, Victim sheet, Case Number 201711423, undated, CLT-HOWARD-000007.

    2.7.  DA Office, Criminal Affidavit for Disorderly Conduct of Antrinette [sic] Leggett, filing date 09/27/2017, CLT-HOWARD-000008.

    2.8.  DA Office, Criminal Affidavit for Resisting Arrest of Antrinette [sic] Leggett, filing date 09/27/2017, CLT-HOWARD-000009.

    2.9.  DA Office, Criminal Affidavit for Resisting Arrest of Darious Leggett, filing date 09/27/2017, CLT-HOWARD-000010.

    2.10.  DA Office, Criminal Affidavit for Disorderly Conduct of Darious Leggett, filing date 09/27/2017, CLT-HOWARD-000011.

    2.11.  DA Office, Criminal Affidavit for Animal Cruelty of Selena Howard, filing date 09/27/2017, CLT-HOWARD-000012.

CLT-HOWARD-001023

3. Forrest County Sheriff's Office, M26 Advanced TASER [sic] Use Report of Blake Bass, incident date 09/27/2017, CLT-HOWARD-000017 – CLT-HOWARD-000018.

4. Forrest County Sheriff's Office, Policy # 5.01, *Use of Force & Deadly Force*, undated, CLT-HOWARD-000021 – CLT-HOWARD-000032.

5. Forrest County Sheriff's Office, Policy # 2.09, *Training & Proficiency Testing*, undated, CLT-HOWARD-000594 – CLT-HOWARD-000596.

6. [Forrest County] Public Information Report for date(s) 9/25/2017 to 9/28/2017, date printed 10/11/2019, CLT-HOWARD-000033 – CLT-HOWARD-000040.

7. [Forrest County] Personnel File of Blake Tanner Bass [partially redacted], various dates, CLT-HOWARD-000043 – CLT-HOWARD-000147.

8. [Forrest County] Personnel File of Chey Dallas Sumrall [partially redacted], various dates, CLT-HOWARD-000148 – CLT-HOWARD-000272.

9. TASER X26P Data Download, Serial Number X12006NRK, [Deputy Bass], download date 02/11/2020, CLT-HOWARD-000273 – CLT-HOWARD-000572.

10. Forrest County Sheriff's Office, Law Enforcement Policies and Procedures, undated, CLT-HOWARD-000573 – CLT-HOWARD-000897.

11. [Forrest County] Blotter Report for date(s) 9/27/2017 to 9/27/2017, date printed 02/13/2020, CLT-HOWARD-000898 – CLT-HOWARD-000912.

12. TASER X26 Data Download, Serial Number X00-616611, [Deputy Sumrall], download date 02/13/2020, CLT-HOWARD-000913 – CLT-HOWARD-000934.

13. Audio files:

    13.1. Audio file *audio.wav*, undated, [length 00:01:06].

    13.2. Audio file *audio (1).wav*, undated, [length 00:01:06].

    13.3. Audio file *audio.wav (2)*, undated, [length 00:12:46].

    13.4. Audio file *911 call S. Howard.wav* [duplicate], undated, [length 00:12:46].

    13.5. Audio file *audio.wav* [duplicate with console record], dated 09/27/2017, [length 00:01:06].

    13.6. Audio file *audio.wav* [duplicate with console record], dated 09/27/2017, [length 00:12:46].

14. Video file *video-bass taser [sic] training.MOV*, file undated, [length 00:00:27].

15. Forrest County Sheriff's Office memorandum from Chris Selman to Attorney Will Allen, re: Blake Bass Taser [sic] Certification, dated 01/23/2020.

16. Email correspondence from Counsel, following her interview with Defendant Bass, dated 02/06/2020.

17. "Weather for Hattiesburg-Muni Station at Bobby L. Chain Airport, Hattiesburg, MS for September 27, 2017". Weather Underground, 27 September 2017, https://www.wunderground.com/history/daily/us/ms/Hattiesburg/KHBG/date/2017-9-27. Accessed and retrieved by Steve Ashley on 17 January 2020.

18. "Weather for Hattiesburg-Muni Station at Bobby L. Chain Airport, Hattiesburg, MS for September 26, 2017". Weather Underground, 26 September 2017, https://www.wunderground.com/history/daily/us/ms/Hattiesburg/KHBG/date/2017-9-26. Accessed and retrieved by Steve Ashley on 17 January 2020.

19. "Weather for Hattiesburg-Muni Station at Bobby L. Chain Airport, Hattiesburg, MS for September 25, 2017". Weather Underground, 25 September 2017, https://www.wunderground.com/history/daily/us/ms/Hattiesburg/KHBG/date/2017-9-25. Accessed and retrieved by Steve Ashley on 17 January 2020.

20. "Sunrise and sunset times in Hattiesburg for September 2017". https://www.timeanddate.com/sun/usa/hattiesburg?month=9&year=2017. Accessed and retrieved by Steve Ashley on 17 January 2020.

21. Deposition transcript of Blake Smith, dated 04/27/2020.

22. Deposition transcript of Chey Sumrall, dated 04/27/2020.

23. Deposition transcript of Darious Leggett, dated 04/27/2020, with attached exhibits.

   23.1. Exhibit 1, [Forrest County] Blotter Report for date(s) 9/27/2017 to 9/27/2017, date printed 02/13/2020, CLT-HOWARD-000898 – CLT-HOWARD-000912.

   23.2. Exhibit 2 [Collectively labeled Exhibit 1 and Exhibit 2]:

      23.2.1.1. Justice Court Affidavit of Deputy Chey Sumrall, regarding Darious Leggett, dated 09/27/2017, CLT-HOWARD-000945.

      23.2.1.2. Justice Court Affidavit of Deputy Blake Bass, regarding Antrinette [sic] Leggett, dated 09/27/2017, CLT-HOWARD-000946.

      23.2.1.3. Justice Court Affidavit of Deputy Blake Bass, regarding Selena Howard, dated 09/27/2017, CLT-HOWARD-000947.

   23.3. Exhibit 3 [Collectively labeled Exhibit 3]:

      23.3.1.1. Forrest County Sheriff's Office, [scan transmittal sheet], Case Number 201711423, undated, CLT-HOWARD-000001.

      23.3.1.2. Forrest County Sheriff's Office, Custody Report of Antrinette [sic] Leggett, by [Deputy] Bass, for arrest dated 09/27/2017, CLT-HOWARD-000002.

      23.3.1.3. Forrest County Detention Center, Facility Admission Report for Antrinette [sic] Leggett, Booking Number 2012170552, dated 09/27/2017, CLT-HOWARD-000003.

      23.3.1.4. Forrest County Sheriff's Office, arrestee information of Antrinette [sic] Leggett, Darious Leggett, and [Suspect] Selena Howard, Case Number 201711423, dated 09/27/2017, CLT-HOWARD-000004 – CLT-HOWARD-000005.

      23.3.1.5. Forrest County Sheriff's Office, Narrative Report of Deputy Blake Bass, Case Number 201711423, dated 09/28/2017 [sic], CLT-HOWARD-000006.

CLT-HOWARD-001025

23.3.1.6.   Forrest County Sheriff's Office, Victim sheet, Case Number 201711423, undated, CLT-HOWARD-000007.

24.   Deposition transcript of Selena Howard, dated 04/27/2020.

25.   Deposition transcript of Antrinet Leggett, dated 04/27/2020, with attached exhibits [collectively labeled Exhibit 1 and Exhibit 2]:

25.1.   Justice Court Affidavit of Deputy Chey Sumrall, regarding Darious Leggett, dated 09/27/2017, CLT-HOWARD-000945.

25.2.   Justice Court Affidavit of Deputy Blake Bass, regarding Antrinette [sic] Leggett, dated 09/27/2017, CLT-HOWARD-000946.

25.3.   Justice Court Affidavit of Deputy Blake Bass, regarding Selena Howard, dated 09/27/2017, CLT-HOWARD-000947.

26.   Justice Court Affidavit of Deputy Chey Sumrall, regarding Darious Leggett, dated 09/27/2017, CLT-HOWARD-000945, with attached exhibits:

27.   Justice Court Affidavit of Deputy Blake Bass, regarding Antrinette [sic] Leggett, dated 09/27/2017, CLT-HOWARD-000946.

28.   Justice Court Affidavit of Deputy Blake Bass, regarding Selena Howard, dated 09/27/2017, CLT-HOWARD-000947.

29.   Various Google Maps and Satellite view captures, accessed by Steve Ashley on 01/2020.

30.   Various Google Maps and Satellite view captures, accessed by Steve Ashley on 04/2020.

31.   Mississippi Board on Law Enforcement Officer Standards and Training, Professional Certification Policy and Procedures, 31 Miss. Code R. § 301-7.4, *Full-Time Basic Training Curriculum.*

32.   Defendants' Designation of Expert Witness, case 2:19-cv-00084-KS-MTP, (Notice of Service, Document 17), date filed 01/17/2020.

33.   Additional PACER Documents, case 2:19-cv-00084-KS-MTP.

33.1.   Forrest County, Chey Sumrall and Blake Bass's Answer to Plaintiffs' Complaint, Document 3, filed 06/03/2019.

33.2.   Plaintiffs' Initial Disclosures, [Notice of Service, Document 7], dated 08/01/2019.

33.1.   Case Management Order, Document 8, filed 08/09/2019.

33.2.   Forrest County, Mississippi, Chey Sumrall, and Blake Bass' Unopposed Motion for Extension of Time to Designate Experts, Document 16, filed 01/10/2020.

33.3.   Notice of Service [of Defendants' Designation of Experts], Document 17, filed 01/17/2020.

CLT-HOWARD-001026

## REFERENCES

Artwohl, A. (2002, October). Perceptual and Memory Distortion During Officer-Involved Shootings. *FBI Law Enforcement Bulletin, 71*(10):18-24.

Artwohl, A., & Christensen, L. W. (1997). *Deadly Force Encounters: What Cops Need to Know to Mentally and Physically Prepare for and Survive a Gunfight*. Boulder CO: Paladin Press.

Beason, C.W., Jauchem, J.R., Clark III, C.D., Parker, J.E., & Fines, D.A. Pulse Variations of a Conducted Energy Weapon (Similar to the TASER® X26 Device): Effects on Muscle Contraction and Threshold for Ventricular Fibrillation. *Journal of Forensic Sciences, 54*(5):1113-1118.

*Black's Law Dictionary* 1404, 6th ed. 1990.

Bozeman, W., Hauda II, W., Heck J., Graham, D., Martin, B., & Winslow, J. (2009). Safety and Injury Profile of Conducted Electrical Weapons Used by Law Enforcement Officer Against Criminal Suspects. *Annals of Emergency Medicine, 53*(4): 480-9.

Bozeman, W.P., Stopyra, J.P., Klinger, D.A., Et al. (2017). Injuries Associated with Police Use of Force. *Journal of Trauma and Acute Care Surgery, 84*(3):466-472.

Chabris, C., & Simons, D. (2010). *the invisible gorilla: And Other Ways Our Intuitions Deceive Us*. New York: Crown.

Chiles, B. D., Nerheim, M. H., Brave, M. A., Panescu, D., & Kroll, M. W. (2018). Electrical Weapon Charge Delivery with Arcing. *40th Annual International Conference of the IEEE Engineering in Medicine and Biology Society.* Honolulu HI. pp. 2234-2239.

Criscione, J., & Kroll, M. (2014). Incapacitation recovery times from a conductive electrical weapon exposure. *Forensic Science, Medicine, and Pathology, 10*(2):203-7.

Dawes, D., Ho, J., Kroll, M., & Miner, J. (2009). Electrical Characteristics of an Electronic Control Device Under a Physiologic Load: A Brief Report. *Pacing and Clinical Electrophysiology, 33*(3):330-6.

*Electronic Control Weapons - Model Policy.* International Association of Chiefs of Police (IACP). March 2018.

Fed. R. Evid. 702.

Felter, B. A. (1988). *Police Defensive Handgun Use and Encounter Tactics*. New Jersey: Prentice-Hall.

Gall, J., & Payne-James, J. (2016). *Current Practice in Forensic Medicine, Vol. 2*. West Sussex UK: John Wiley & Sons.

Green, M., et al. (2008). *Forensic Vision with Application to Highway Safety (3rd ed.)*. Tucson: Lawyers & Judges Publishing.

Head, G. L. (1987). *Essentials of the Risk Management Process, Vol. 1 & 2*. Malvern PA: Insurance Institute.

Heider, K. G. (1988). The Rashomon Effect: When Ethnographers Disagree. *American Anthropologist, New Series, 90*(1):73-81.

Ho, J., Dawes, D., & Kroll, M. (Eds.). (2012). *Atlas of Conducted Electrical Weapon Wounds and Forensic Analysis*. New York: Springer.

Ho, J. D., Dawes, D. M., Lundin, E. J., & Miner, J. R. (2009). 127: Comparison of Acidosis Markers Associated with Law Enforcement Applications of Force. *Annals of Emergency Medicine, 54*(3):S40.

Ho, J., Dawes, D., Miner, J., Kunz, S., Nelson, R., & Sweeney, J. (2012). Conducted electrical weapon incapacitation during a goal-directed task as a function of probe spread. *Forensic Science, Medicine, and Pathology, 8*(4):358-366.

Ho, J., Dawes, D., Nelson, R., Lundin, E., Ryan, F., Overton, K., Zeiders, A., & Miner, J. (2010). Acidosis and Catecholamine Evaluation Following Simulated Law Enforcement ''Use of Force'' Encounters. *Academic Emergency Medicine, 17*(7):E60-E68.

Jennett, S. (Ed.). (2008). *Churchill Livingstone's Dictionary of Sport and Exercise Science and Medicine*. New York: Elsevier Limited.

Joyner, C. (2011). *Advanced Concepts in Defensive Tactics: A Survival Guide for Law Enforcement*. Boca Raton FL: CRC Press.

Klinger, D. (2004). *Into the Kill Zone: A Cop's Eye View of Deadly Force*. San Francisco: Josey-Bass.

Kroll, M., Brave, M., Pratt, H., Witte, K., Kunz, S., & Luceri, R. (2019). Benefits, Risks, and Myths of TASER Handheld Electrical Weapons. *Human Factors and Mechanical Engineering for Defense and Safety, 3*(7).

Lewinski, B. (2000, November/December). Why is the Suspect Shot in the Back? *The Police Marksman, 27*(6):20-8.

Lewinski, W. J., Hudson, B., & Dysterheft, J. L. (2014). Police officer reaction time to start and stop shooting: The influence of decision-making and pattern recognition. *Law Enforcement Executive Forum*, *14*(2):1-16.

Lewinski, W. J., & Dysterheft, J., Bushey, J., & Dicks, N. (2015). Ambushes Leading Cause of Officer Fatalities – When Every Second Counts: Analysis of Officer Movement from Trained Ready Tactical Positions. *Law Enforcement Executive Forum. 15*(1):1-15.

Lewinski, W. J., Dysterheft, J. L., Seefeldt, D. A., & Pettitt, R. W. (2013). The influence of officer positioning on movement during a threatening traffic stop scenario. *Law Enforcement Executive Forum*, *13*(1):98-109.

Lewinski, W. J., & Redmann, C. (2009). New Developments in Understanding the Behavioral Science Factors in the "Stop Shooting" Response. *Law Enforcement Executive Forum. 9*(4):35-54.

Lewinski, W. J., Seefeldt, D., Redman, C., Gonin, M., Sargent, S., Dysterheft, J., & Thiem, P. (2016). The Speed of a Prone Subject. *Law Enforcement Executive Forum. 16*(1):70-83.

Lundin, E. J., Dawes, D. M., Ho, J. D., Ryan, F.J., & Miner, J. R. (2009). 315: Catecholamines in Simulated Arrest Scenarios. *Annals of Emergency Medicine, 54*(3):S98-S99.

Mesloh, C., Wolf, R., Henych, M., & Thompson, F. (2008). Less Lethal Weapons for Law Enforcement: A Performance-Based Analysis. *Law Enforcement Executive Forum. 8*(1):133-149.

*National Consensus Policy on Use of Force*. As provided by the International Association of Chiefs of Police (IACP). January 2017.

National Weather Service. *Definitions of Twilight*. https://www.weather.gov/fsd/twilight. Accessed by Steve Ashley on April 29, 2020.

(2019) NIST Special Publication 330 (SP 330), *The International System of Units (SI)*.

(2008) NIST Special Publication 811 (SP 811), *Guide for the Use of the International System of Units (SI)*.

Nugent, Pam M.S. "Tachypsychia". *PsychologyDictionary.org*. April 13, 2013, https://psychologydictionary.org/tachypsychia/. Accessed by Steve Ashley on May 28, 2018.

Remsberg, C., Adams, R. J., & McTernan, T. M. (1980). *Street Survival: Tactics for Armed Encounters*. Evanston IL: Calibre Press.

Ross, D. L., & Siddle, B. K. (2003). An Analysis of the Effects of Survival Stress in Police Use-of-Force Encounters. *Law Enforcement Executive Forum, 3*(2):9-26.

Siddle, B. K. (2005). *PPCT Defensive Tactics Student Manual – Michigan edition*. Belleville IL: PPCT Management Systems.

Siddle, B. K. (2004). *PPCT Defensive Tactics Instructor Manual – United States edition*. Belleville IL: PPCT Management Systems.

Spitz, S. (Ed.). (2007). *American Heritage Medical Dictionary* (2nd ed.). Boston: Houghton Mifflin Company.

Stark, M. M. (Ed.). (2020). *Clinical Forensic Medicine: A Physician's Guide (4th ed.)*. Switzerland: Springer Nature.

(2011). *Stress and Decision Making*. Federal Law Enforcement Training Center.

Sweeney, J. D. (2009). Theoretical Comparisons of Nerve and Muscle Activation by Neuromuscular Incapacitation Devices. Conference proceedings: 31st Annual International Conference of the IEEE Engineering in Medicine and Biology Society. *IEEE Engineering in Medicine and Biology Society. Conference, 2009*. 3188-90.

TASER International/AXON Training Documentation:

- Version 21 TASER CEW Instructor Certification Course, effective 01/01/2019.
- Version 20 TASER CEW Instructor Certification Course, effective 01/01/2016.

(2011). *TASER X26E User Manual, MMU0004 Rev C*. TASER International.

(2015). *TASER X26P User Manual, MMU0042 Rev B*. TASER International.

U.S. Const. amend. IV.

*Use of Force - Model Policy*. International Association of Chiefs of Police (IACP). February 2006.

CLT-HOWARD-001029

VandenBos, G. (Ed.). (2015). *APA Dictionary of Psychology* (2nd ed.). Washington DC: American Psychological Association.

Wise, J. (2009). *Extreme Fear: The Science of Your Mind in Danger*. New York: Palgrave.

## TABLE OF CASES

*Bell v. Wolfish,* 441 U.S. 520 (1979).

*Brooks v. City of Seattle,* 599 F.3d 1018 (9 Cir. 2010).

*Brower v. County of Inyo*, 489 U.S. 593, 597 (1989).

*Bryan v. MacPherson,* 630 F.3d 805 (9 Cir. 2010).

*Byther ex rel. Byther v. City of Mobile*, 398 F. Supp. 2d 1222, 1237 (S.D. Ala. 2005).

*Chew v. Gates*, 27 F.3d 1432 (9 Cir. 1994), cert. denied, (U.S. Feb. 21,1995) (No. 94-980).

*Crenshaw v. Lister*, 556 F.3d 1283 (11 Cir. 2009).

*Dickerson v. McClellan*, 101 F3d 1151, 1160 (6 Cir. 1996).

*Forrester v. City of San Diego,* 25 F.3d 804 (9 Cir. 1994).

*Garczynski v. Bradshaw*, 573 F.3d. 1158 (11 Cir. 2009).

*Graham v. Connor,* 490 U.S. 386 (1989).

*Harris v. Serpas*, 745 F.3d 767, 773 (2014).

*Illinois v. Rodriguez,* 497 U.S. 177 (1990).

*Jean-Baptiste v. Gutierrez*, 627 F.3d 816 (11 Cir. 2010).

*Kumho Tire Co., et al., v. Carmichael, et al.,* 526 U.S. 137 (1999).

*Long v. Slaton*, 508 F.3d 576, 581 (11 Cir. 2007).

*Penley v. Eslinger*, 605 F.3d 843 (11 Cir. 2010).

*Rockwell v. Brown*, 664 F.3d 985 (5 Cir. 2011).

*Tennessee v. Garner*, 471 U.S. 1 (1985).

*Whren v. United States*, 517 U.S. 806, 815 (1996).

CLT-HOWARD-001031

## EXHIBIT II – CURRICULUM VITAE

# STEVEN D. ASHLEY

15 Custer Court
Monroe, Michigan 48161

Voice: 517.548.2275          Cell: 248.467.1541          Facsimile: 734.749.1321
E-Mail: Steve@PoliceRisk.com          Web Site: www.PoliceRisk.com

Last Reviewed/Updated May 1, 2020

## CV INDEX

Special Qualifications ........................................................................................................... 79

Formal Education ................................................................................................................. 81

Current Employment ........................................................................................................... 81

Employment History ........................................................................................................... 82

Expert Case Consultation .................................................................................................... 84

Membership Associations & Volunteer Activities ............................................................. 84

Instructor / Armorer Certifications Completed/Earned ...................................................... 85

Certificate Instructor Program Completed/Earned ............................................................. 88

Career Certifications Completed/Earned ............................................................................ 88

Awards and Recognition ..................................................................................................... 89

Publications ......................................................................................................................... 89

Guest Lecturer ..................................................................................................................... 90

Training Videos & Multimedia Productions ....................................................................... 95

Book Chapter ....................................................................................................................... 95

## SPECIAL QUALIFICATIONS

- 15 Years as a full-time, sworn, law enforcement officer and manager.
- 12 Years as a full-time risk management professional, specializing in law enforcement, criminal justice, security, and corrections risk management.
- Over 40 years as a criminal justice trainer in the areas of high-risk activity, training, and training management.
- Completed over 6,000 hours of law enforcement, emergency management, risk management, and public safety related training.
- Personally delivered over 150,000 man hours of training to over 16,500 law enforcement and corrections officers and managers, more than 30,000 man-hours of which was instructor- or Master-level training.
- Earned and received certification as a Master Use of Force Instructor, Advanced Force Science Specialist, Master Force and Control Instructor, Certified Force Science Analyst, Master Excited Delirium/Agitated Chaotic Event Instructor, and TASER Senior Master Instructor.

CLT-HOWARD-001032

- Instructor Graduate of the _Law of Self Defense Instructor Program_, Law of Self Defense Institute.
- 10 years as Police Academy Use of Force/Driver Training Coordinator.
- Earned and received state approval as lead police academy Firearms Instructor.
- Earned and received state approval as lead police academy Driving Instructor.
- Designed and developed many training programs, presentations, and curricula.
- 15 years management experience spanning both the public and private sectors.
- Personally conducted on-site risk management reviews of more than 400 law enforcement agencies and jails in more than seven states, examining all aspects of law enforcement and corrections management, practices, and operations.
- Personal critical reviews of more than 500 law enforcement and corrections Policy and Procedure Manuals, from agencies across the United States.
- Advisory Board Member (§ 1701) for the OSS Academy, a Texas state-licensed education provider, approved by the Texas Commission on Law Enforcement[361] to provide required in-service training as well as other courses.
- Subject Matter Expert for the Michigan Law Enforcement Officers Training Council,[362] in the development of the _Michigan Emergency Vehicle Operations Instructor Manual_.
- Subject Matter Expert and Content Review Specialist for the Michigan Law Enforcement Officers Training Council, in the development of the _Michigan Law Enforcement Driver Training Reference Guide_.
- Subject Matter Expert for the Mississippi Department of Public Safety, Standards and Training Division, in the development of the _Mississippi Detention Officer Course_.
- Subject Matter Expert for the Mississippi Department of Public Safety, Public Safety Planning Division, in the development of the _Mississippi Model Law Enforcement Policies & Procedures_ program.
- Subject Matter Expert for the Mississippi Department of Public Safety, Public Safety Planning Division, in the development of the _Mississippi Model Jail Policies & Procedures_ program.
- Subject Matter Expert for the Michigan Law Enforcement Officers Training Council, in the development of the _Michigan Law Enforcement Officer-Subject Control Continuum_.
- Subject Matter Expert for the Illuminating Engineering Society of North America, _Security Lighting Committee_ and _Security Lighting Committee on Lighting and Crime_.
- Published author and frequent guest lecturer on the subjects of management of high-risk police and corrections activity, use of force, pursuit driving and vehicle

---

[361] TCOLE, i.e., the Texas Commission on Law Enforcement, was formerly known as TCLEOSE, i.e., the Texas Commission on Law Enforcement Officer Standards and Education.

[362] Originally known by the initialism MLEOTC; now renamed as the Michigan Commission on Law Enforcement Standards, i.e., MCOLES.

CLT-HOWARD-001033

operations, law enforcement and corrections procedures and practices, training, training management, risk management, and other public safety related topics.
- Author, columnist, and contributor to criminal justice publications, including Law Officer, PoliceMag.com, Law and Order, Police and Security News, The ASLET Trainer, Law Enforcement Technology, Police Magazine, Answering the Call, The ILEETA Review, The ILEETA Chronicle, and Officer.com.

## FORMAL EDUCATION

| | |
|---|---|
| Associate in Risk Management / Public Entities, Insurance Institute of America | 2000 |
| Master of Liberal Studies in Technology [CJ], Eastern Michigan University | 2000 |
| Associate in Risk Management, Insurance Institute of America | 1991 |
| Master of Science in Criminal Justice [Management], Michigan State University | 1988 |
| School of Police Staff and Command, Northwestern University | 1987 |
| Bachelor of Arts in Communications, Michigan State University | 1982 |
| Police Officer Certification, Southeast Regional Criminal Justice Training Center | 1976 |

## CURRENT EMPLOYMENT

### 2013 to Present – Concordia University, Ann Arbor, Michigan

*Adjunct Professor.* Justice & Public Policy, Haab School of Business. Teaching various law enforcement, corrections, criminal justice, risk management, and public policy subjects to undergraduate and graduate students at a traditional, brick-and-mortar university. Actively assist with program and curriculum development.

### 2005 to Present – OSS - Law Enforcement Advisors®, Spring, Texas

*Law Enforcement Advisor®.* Contracted law enforcement advisor and risk manager, providing services, assessments, and consultation to other law enforcement and corrections professionals, adjusters, and legal professionals.

*OSS Academy® - TCOLE Advisory Board Member* of the *OSS Academy*, which is a Texas state-licensed education provider. In addition to serving on the Board, I am an instructor, course developer, and Quality Assurance Specialist. Curriculum includes both instructor-led training and E-learning for law enforcement, corrections, security, telecommunications, and public-sector risk managers.

### 1993 to Present – CIRMAT, Inc., Monroe, Michigan

*Owner.* Specializing in law enforcement and corrections risk management and consulting services, and training of criminal justice trainers and managers. Case consultation services specializing in police and corrections high-risk activity, with primary emphasis in management of force/control, motor vehicle operations, and arrest procedures.

## EMPLOYMENT HISTORY

### 2004 to 2013 – Northrop-Grumman Corporation, Galloway, New Jersey

*Instructional Technologist*. Deliver training on security procedures to transportation security personnel at airports across the United States. Train and certify Screeners in the use of equipment and techniques for screening checked baggage. Certified to train on equipment currently in use by Transportation Security Administration Baggage Screeners.

### 2001 to 2009 – Police Policy Studies Council, Spofford, New Hampshire

*Staff member and co-owner*. Served as a police use of force, motor vehicle operations, and arrest techniques, trainer and consultant. Developed and delivered training programs to police, corrections, and other municipal executives and trainers. Consulted in police use of force cases, police driving, arrest tactics, and general law enforcement procedures.

### 1986 to 2008 – Washtenaw Community College, Ann Arbor, Michigan

*Force management, firearms, use-of-force, and police driving instructor*. Appointed as Police Academy Use of Force/Driver Training Coordinator from 1996 to 2005. Chief Firearms Instructor and Chief Driving Instructor. Responsible for conceptualizing, planning, developing, and delivering, many training programs at both the academy and in-service levels, for police, corrections, security, and Natural Resources officers, including instructor training in various use of force disciplines, as well as police driving.

### 2002 to 2003 – AIS, Inc., Renton, Washington

*Master Instructor*. Last assignment was as a subcontractor with Boeing Corporation, conducting baggage screener training throughout the United States. One of only 35 (out of 1,600) training staff that were transitioned to Boeing from AIS, for the purpose of fulfilling the federal "bridge" contract for baggage screener training.

Initially employed under a U.S. Government contract for the Transportation Security Administration. Certified as one of only 30 BST Master Instructors, with responsibility for training and supervising baggage screeners and baggage screener trainers throughout the United States. Certified to train on screening machines in use by federal transportation security baggage screeners.

### 2000 to 2003 – Legal Defense Manual, East Lansing, Michigan

*Co-Owner* and *Executive Editor*. Responsible for writing articles, as well as editing and publishing a publication which focused on legal and managerial issues in law enforcement and corrections.

### 1999 to 2001 – American Risk Pooling Consultants, Inc., Southfield, Michigan

*Manager of Loss Control Development* and *Director of Law Enforcement Risk Control*. Direct responsibility for management of two company subsidiaries located in Iowa and Ohio, providing direction and supervision to loss control employees. Conducted specialized field loss control assessments of public safety agencies, jails, and other municipal practices and facilities. Created, developed and coordinated a law enforcement advisory committee of criminal justice executives, attorneys,

trainers, and risk management specialists, for the purpose of developing recommended procedural guidelines – i.e., policies – for law enforcement and corrections entities associated with municipal insurance pools and programs.

## 1992 to 2002 – Smith & Wesson Academy, Springfield, Massachusetts

*Adjunct Faculty*. Develop and present training programs geared toward use of force management skills. Develop curricula and present training in advanced use of force and firearms skills for police, security, and corrections trainers and training managers.

## 1991 to 1998 – Meadowbrook Insurance Group, Southfield, Michigan

*Public Entity Loss Control Manager*. Direct management responsibility for loss control staff members, and coordination of Public Entity oriented loss control programs for insurance coverage pools and individual public and private clients in six states. Planned and structured delivery of services to approximately 50 client corporations, developed and assisted with the presentation of new marketing approaches, assured coordinated communications between internal company units, and with external customers and fellow contractors. Conducted specialized field loss control assessments of municipalities, public safety agencies, and jails. Other responsibilities included development of service plans and budgeting for multiple programs, coordination of personnel and resources to fulfill diverse client needs, and allocation/utilization of resources.

Formerly, *Director of Law Enforcement Risk Control*. Responsibilities included day-to-day, hands-on management, development of service plans, coordination, budget management, and frequent interaction with both internal company units and clients. Primary responsibility for the design and implementation of a risk control program for approximately 900 law enforcement and corrections agencies in five states. Conducted many on-site risk assessments of public safety agencies, jails, and other municipal facilities and practices. Created, developed and coordinated a law enforcement advisory committee of criminal justice executives, attorneys, trainers, and risk management specialists, for the purpose of developing recommended procedural guidelines – i.e., policies – for law enforcement and corrections entities associated with municipal insurance pools and programs.

## 1989 to 1991 – Governmental Risk Managers, Inc., Plymouth, Michigan

*Risk Control Manager*. Direct responsibility for planning, implementation, and delivery of risk control services to two public entity insurance pools that collectively represented approximately 1,200 governmental jurisdictions. Responsibilities included day-to-day hands-on management, development of service plans, budgeting, coordination of service delivery, marketing assistance, assessment of results, and resource allocation. Conducted specialized field loss control assessments of municipalities, public safety agencies, and jails.

Previously served as a *Risk Control Consultant*, specializing in general liability, administration, personnel practices, training, law enforcement and corrections risk management, and program development. Conducted many specialized field loss control assessments of municipalities, public safety agencies, and jails. Assumed responsibility for coordination of a law enforcement advisory committee of criminal

CLT-HOWARD-001036

justice executives, attorneys, trainers, and risk management specialists, for the purpose of continuing development of recommended procedural guidelines – i.e., policies – for law enforcement and corrections entities associated with municipal insurance pools and programs.

**1978 to 1989 – Livingston County Sheriff Department, Howell, Michigan**

Served as a road patrol deputy sheriff on all three shifts, and as afternoon shift commander. Final five-year assignment was as _Staff Services Administrator_, with department-wide responsibility for training all law enforcement and corrections staff; community service/crime prevention programs for Michigan's fastest growing county; departmental policy research, development, and implementation; and departmental county-wide emergency management.

**1974 to 1978 – Various police employment as a Patrol Officer and Sergeant,**

at smaller departments, including Fowlerville, Pinckney, Webberville, and Perry, Michigan. My duties included patrol, investigations, training, and supervision of other officers and volunteers.

## EXPERT CASE CONSULTATION

I have provided expert consultation and review in more than 170 cases since 1994, approximately 75% of which have been defense cases. During the same years, I have testified as an expert – at deposition, hearing, or trial – 49 times in 42 cases, approximately 65% of which have been defense cases.

## MEMBERSHIP ASSOCIATIONS & VOLUNTEER ACTIVITIES

- Alpha Phi Sigma, National Criminal Justice Honor Society
- American Civil Liberties Union – Former Member
- American Jail Association – Professional Member
- American MENSA
- American Red Cross – Livingston County Chapter, Board of Directors – Past Member
- American Society of Law Enforcement Trainers (ASLET) – Charter Member (former Region 5 Director; formerly Michigan State Director)
- American Society of Safety Engineers – Former Professional Member
- American Society for Testing and Materials, International (ASTM) – Voting Member
- Concerns of Police Survivors (COPS) – Family/Survivor Member
- Concordia University Criminal Justice Alliance – Faculty Member/Co-Advisor
- Concordia University Justice & Public Policy – Advisory Council
- Concordia University School of Business – Advisory Council
- Illuminating Engineering Society of North America – Professional Member
- International Association of Chiefs of Police (IACP) – Academic Member

- International Association of Correctional Training Personnel (IACTP) – Professional Member
- International Association of Directors of Law Enforcement Standards and Training (IADLEST)
- International Association of Law Enforcement Emergency Vehicle Response Trainers (ALERT)
- International Association of Law Enforcement Firearms Instructors (IALEFI)
- International Foundation for Protection Officers – Professional Member
- International Law Enforcement Educators and Trainers Association (ILEETA) – Advisory Board, Managing Editor Emeritus, and Founding Member
- Lakewood Research Training Group – Former Member
- Law Enforcement & Emergency Services Video Association, International (LEVA)
- Michigan Association of Chiefs of Police (MACP) – Active Member
- Michigan Commission on Law Enforcement Standards – Former Member, Training Advisory Committee (Ad-Hoc)
- Michigan News Broadcasters Association – Former Member
- Michigan Sheriffs' Association – Professional Member
- Mississippi Department of Public Safety, Public Safety Planning Division – Subject Matter Expert
- Mississippi Department of Public Safety, Standards & Training Division – Subject Matter Expert
- MSU Alumni Association – Life Member
- National Law Enforcement Academy Resource Network (NLEARN) – Member
- National Rifle Association (NRA) – Benefactor (Life) Member
- Northwestern University Traffic Institute Alumni Association
- OSS Academy – TCOLE Advisory Board Member (§ 1701)
- Phi Kappa Phi Academic Honor Society
- Police Marksman Association – Life Member
- Society for Police and Criminal Psychology – Professional Member

## INSTRUCTOR / ARMORER CERTIFICATIONS COMPLETED/EARNED

- Advanced Driving Techniques Instructor, General Motors Corporation
- Advanced Firearms Instructor, Washtenaw Community College
- Advanced Officer Survival Instructor, Washtenaw Community College
- Aerosol Chemical Munitions Instructor, AERKO International
- Aerosol Chemical Weapon Instructor-Trainer, AERKO International
- AXON/Evidence.com Instructor, TASER International
- Baggage Screener Training Master Instructor, Advanced Interactive Systems
- Below 100 Officer Safety Instructor, Law Officer Initiative

CLT-HOWARD-001038

- Certified Baggage Screener Trainer, Transportation Security Administration
- Certified Field Training Officer, MLEOTC
- Chemical Agents Decontamination Instructor, National Association of Tactical / Medical Response
- Chemical Munitions Instructor, Smith and Wesson Academy
- Civilian Safety Awareness Program Instructor, SABRE
- Defensive Driving Instructor, National Safety Council
- Defensive Tactics Instructor, PPCT Management Systems
- Driving Instructor, Federal Law Enforcement Training Center
- Emergency Vehicle Operations Instructor – EVO (MLEOTC), Lead Academy Instructor Certified
- Excited Delirium/Agitated Chaotic Event Master Instructor, Institute for the Prevention of In-Custody Deaths
- FATS Instructor Trainer, FATS, Inc.
- Firearms Instructor, Federal Law Enforcement Training Center
- Firearms Instructor, National Rifle Association
- Firearms Instructor / Range Officer, Lansing Community College
- Firearms Instructor (MLEOTC), Academy Instructor Certified
- Firearms Instructor (MLEOTC), Lead Academy Instructor Certified
- Firearms Program Management, Smith and Wesson Academy
- Firearms Retention/Disarming Techniques Instructor, Defensive Tactics Institute
- First Aid Instructor, American Red Cross
- Flashlight Defensive Tactics Instructor, Defensive Tactics Institute
- Glock Armorer, Glock, Inc., Macomb Community College
- Handcuffing & Restraint Techniques Instructor, Defensive Tactics Institute
- Identification, Prevention, Management and Investigation of Sudden and In Custody Death Instructor [3 awards], Institute for the Prevention of In Custody Deaths
- Impact Weapons Instructor, PPCT Management Systems
- Interactive Training Instructor, Smith & Wesson Academy
- International Certified Instructor – Charter Member (IICI), International Association of Directors of Law Enforcement Standards and Training
- Kubotan Techniques Instructor, Defensive Tactics Institute
- Law Enforcement Rifle Instructor, Smith & Wesson Academy
- Management of Aggressive Behavior (MOAB) for Public Safety Instructor, PPCI, Inc.
- Metal-Tec 1400 Instructor, Metal-Tec, Inc.
- Michigan Traffic Radar Instructor, Michigan State University
- Mossberg Field Armorer, O.F. Mossberg & Sons, Inc.

- Nationally Certified Instructor – Charter Member (INCI), International Association of Directors of Law Enforcement Standards and Training
- OCAT Aerosol Weapon Instructor-Trainer, National Criminal Justice Training Council
- Officer Survival Instructor, PPCT Management Systems
- Oleoresin Capsicum Law Enforcement and Corrections Instructor, MSI-Mace, Inc.
- Police Narcan Instructor, Gendarme Consulting Group
- Police Drivers' Training Instructor, Saint Publications
- Police Precision Driving Instructor, Macomb Community College
- Police Precision Driving Instructor (MLEOTC), Academy Certified
- Police Pursuit Driving Policy Instructor, National Highway Traffic Safety Administration
- Radiological Monitoring Instructor, Federal Emergency Management Agency
- Re-Creating Stress Instructor, Mission Critical Concepts, LLC
- Refuse to be a Victim® Instructor, National Rifle Association
- Remington Armorer, Remington Arms Co.
- Remington Shotgun Maintenance Armorer, Remington Arms Co. / Washtenaw Community College
- Revolver Armorer, Smith and Wesson Academy
- Sabre OC Aerosol Projector Instructor, Security Equipment Corporation
- Safariland Use of Force Instructor, Safariland Training Group
- Semi-Automatic Pistol Instructor, Smith and Wesson Academy
- Sexual Harassment, Assault, Rape Prevention (SHARP) Instructor, PPCT Management Systems
- Shotgun Instructor, Smith and Wesson Academy
- Sig-Sauer Armorer, SigArms, Inc.
- SkidCar™ System Instructor, SkidCar, Incorporated
- Springfield Armory XD Armorer, Team One Network / Northeast Wisconsin Technical College
- Stinger Instructor, Stinger Systems
- Stinger S-200 Intermediate Instructor, Stinger Systems
- Stop Stick Controlled Tire Deflation Device Instructor, StopTech, Ltd.
- Stop Stick Controlled Tire Deflation Device Instructor-Trainer, StopTech, Ltd.
- Tactical OC Instructor, Defensive Tactics Institute
- TASER Armorer, TASER International
- TASER Electronic Control Device Instructor, TASER International
- TASER Master Instructor, TASER International
- TASER Senior Master Instructor, TASER International
- TASER Technician, TASER International

CLT-HOWARD-001040

- Use of Force By-the-Numbers® Instructor, Institute for the Prevention of In-Custody Deaths
- Use of Force Instructor, Michigan Municipal Risk Management Authority
- Use of Force Instructor, National Criminal Justice Training Council
- Wrap Restraint System Instructor, Safe Restraints, Inc.

## CERTIFICATE INSTRUCTOR PROGRAM COMPLETED/EARNED

- Law of Self Defense Instructor Program, Law of Self Defense Institute

## CAREER CERTIFICATIONS COMPLETED/EARNED

- Advanced Force Science Specialist, Force Science Institute
- Advanced Police Officer Training Certification [4 awards], Michigan Law Enforcement Officers Training Council (now MCOLES)
- Associate in Risk Management, Insurance Institute of America
- Associate in Risk Management for Public Entities, Insurance Institute of America
- Certified Breathalyzer Operator, Michigan State Police
- Certified Force Science Analyst, Force Science Institute
- Certified Law Enforcement Instructor, Arkansas Commission on Law Enforcement Standards and Training
- Certified Litigation Specialist [2 awards], Americans for Effective Law Enforcement (AELE)
- Certified TASER Technician/Armorer, TASER International
- Emergency Medical Technician, State of Michigan
- Evidence Collection and Analysis, AXON Enterprise
- Excited Delirium/Agitated Chaotic Event Master Instructor, Institute for the Prevention of In-Custody Deaths
- IADLEST International Certified Instructor – Charter Member (IICI), International Association of Directors of Law Enforcement Standards and Training
- IADLEST Nationally Certified Instructor – Charter Member (INCI), International Association of Directors of Law Enforcement Standards and Training
- Master Force & Control Instructor, Smith & Wesson Academy
- Master Use of Force Instructor, Police Policy Studies Council
- OSHA Compliance Assurance Certification
- Police Management Development Certification [3 awards], Michigan Law Enforcement Officers Training Council (now MCOLES)
- Police Officer Certification, Michigan Law Enforcement Officers Training Council (now MCOLES)

CLT-HOWARD-001041

- Police Supervisor Development Certification, Michigan Law Enforcement Officers Training Council (now MCOLES)
- Qualified Accident & Illness Prevention Service Provider, Commonwealth of Pennsylvania, Bureau of Worker's Compensation
- TASER Senior Master Instructor, TASER International (now AXON)
- Texas Loss Control Representative, Texas Department of Insurance

## AWARDS AND RECOGNITION

- Citation for Bravery, Pinckney Police Department
- Life Saving Citation, Livingston County Sheriff Department
- Outstanding Academic Achievement – 1998, Eastern Michigan University
- Outstanding Academic Achievement – 1999, Eastern Michigan University
- Most Competent Instructor – Corrections Officers Academy, Washtenaw Community College

## PUBLICATIONS (IN THE PAST TEN YEARS)

Risk Management for Trainers: A Continuing Series on Applied Risk Reduction, The ILEETA Chronicle, Volume 4, Number 1, December, 2009

No Money is No Excuse: Cutting Training Budgets Due to Lack of Funding is No Excuse, Officer.com Online Magazine, February, 2009

Weapons, Weapons Everywhere: The World is Full of Weapons, So Choose Wisely, Officer.com Online Magazine, February, 2009

Watch Your Mouth! Someone Might Make You Eat Your Words, Officer.com Online Magazine, January, 2009

Your Pen is Trying to Kill You, Officer.com Online Magazine, January, 2009

Avoid PowerPointlessness: From Preparation through Delivery, The ILEETA Chronicle, Volume 3, Number 1, December, 2008

Officer Down! Thankfully We're Hearing that Less, Officer.com Online Magazine, December, 2008

Risk Management for Trainers: A Continuing Series on Applied Risk Reduction, The ILEETA Chronicle, Volume 3, Number 1, December, 2008

Resistance is Futile, Officer.com Online Magazine, December, 2008

Training: How Much is Enough? Officer.com Online Magazine, November, 2008

Write Your Report! Officer.com Online Magazine, November, 2008

Explain it to me Like I'm a Six-Year Old, Officer.com Online Magazine, October, 2008

Stay Alert for Falsehoods: A Little Knowledge is a Dangerous Thing, Officer.com Online Magazine, September, 2008

TASER C2 – Go Prepared in Style, New American Truth, September, 2008

We've Got a Real Problem in Police Work, Officer.com Online Magazine, August, 2008

Duty Gear is Good – Except When It's Not, Officer.com Online Magazine, August, 2008

CLT-HOWARD-001042

<u>When Bad Things Happen to Good Agencies: Risk Management = More than Just Training and Policies</u>, Officer.com Online Magazine, July, 2008

<u>Not Training is Dumb: You Have to Train, or You're Gonna' get Hurt!</u> Officer.com Online Magazine, June, 2008

<u>The Customers are Always Right, Even When They're Wrong</u>, PoliceMag.com Training Channel, June, 2008

<u>Technology is a Double-Edged Sword</u>, Officer.com Online Magazine, June, 2008

<u>Familiarity Breeds Complacency</u>, Officer.com Online Magazine, May, 2008

<u>The Technology Crutch</u>, Officer.com Online Magazine, May, 2008

<u>The Meaning of Training Certification</u>, PoliceMag.com Training Channel, April, 2008

<u>Don't Stick Your Head in the Sand: It's Called Risk Management for a Reason</u>, Officer.com Online Magazine, April, 2008

<u>Teach with Less Talk, More Action</u>, PoliceMag.com Training Channel, April, 2008

<u>Combined Skills Training</u>, PoliceMag.com Training Channel, April, 2008

<u>What a Great Idea!</u> Officer.com Online Magazine, April, 2008

<u>Work Safer, Get Sued Less!</u> PoliceMag.com Training Channel, March, 2008

<u>Get Off the Couch – Join ILEETA!</u> Officer.com Online Magazine, March, 2008

<u>Where Trainers Go to be Trained</u>, PoliceMag.com Training Channel, March, 2008

<u>Training Videos are Great – When They Work</u>, Officer.com Online Magazine, March, 2008

<u>What is a Trainer?</u> PoliceMag.com Training Channel, February, 2008

<u>Train More? Train Less?</u> Officer.com Online Magazine, February, 2008

<u>Danny, We Hardly Knew Ye</u>, The ILEETA Review, February, 2008

<u>Solving Problems with PowerPoint and Video</u>, PoliceMag.com Training Channel, February, 2008

<u>What's Wrong with Using Electronic Control Devices</u>? Officer.com Online Magazine, February, 2008

<u>Projector Blues</u>, PoliceMag.com Training Channel, February, 2008

<u>Policies are NOT Rules</u>, Officer.com Online Magazine, January, 2008

<u>Why We Don't Need Firearms Instructors</u>, PoliceMag.com Training Channel, January, 2008

<u>Aerosol Spray Weapon Refresher</u>, Officer.com Online Magazine, January, 2008

<u>SWAT & EOD Tactical Vehicle</u>, Tactical Weapons, January, 2008

## GUEST LECTURER

*<u>After Using Force, Now What? Surviving the Onslaught</u>*, International Law Enforcement Educators and Trainers Association (ILEETA), March, 2019

*<u>Protecting the Protectors Instructor Course</u>*, International Law Enforcement Educators and Trainers Association (ILEETA), March, 2018

*<u>Protecting the Protectors: The Role of the Trainer</u>*, International Law Enforcement Educators and Trainers Association (ILEETA), March, 2017

CLT-HOWARD-001043

*Survive & Succeed: Saving Your Officers and Your Department*, International Law Enforcement Educators and Trainers Association (ILEETA), April, 2015

*Stay Safe: It's Time to Sweat the Small Stuff*, International Law Enforcement Educators and Trainers Association (ILEETA), March, 2014

*Post-Traumatic Stress Disorder in Criminal Justice*, CMI 2013 Client Education Day, November, 2013

*Protect Your People: Because Nobody Else Will*, International Law Enforcement Educators and Trainers Association (ILEETA), April, 2013

*TASERs and the Law*, National Rifle Association – Michigan Consumer Weekend, February, 2013

*Keep Your People Safe: On the Street, In the Jail, and In Court*, International Law Enforcement Educators and Trainers Association (ILEETA), April, 2012

*Managing the Risks of Interjurisdictional Police Pursuits*, Richmond Regional Multijurisdictional Pursuit Project, Policy Training Symposium, September, 2011

*Using Force: Words and Plans and Goals, Oh My!* The 2011 Use of Force Summit, The Performance Institute, July, 2011

*Force Continuums, Training Priorities, and Smart Use of Force*, The 2011 Use of Force Summit, The Performance Institute, July, 2011

*TASER, TASER, TASER!* The 2011 Use of Force Summit, The Performance Institute, July, 2011

*Avoiding and Managing Arrest-Related Deaths*, The 2011 Use of Force Summit, The Performance Institute, July, 2011

*TASER Download & Data Collection Practices*, 2011 TASER Master Instructor School, TASER International, June, 2011

*Police Use of Force: TASERs and Other Options*, Bancorp South Municipal Insurance Risk Control Program, Gulfport, Mississippi, May, 2011

*Smart Use of Force: In the Jail and On the Street*, International Law Enforcement Educators and Trainers Association (ILEETA), April, 2011

*Defining Use of Force for Law Enforcement Professionals*, The 2010 Conference on The Use of Force in Law Enforcement, The Performance Institute, June, 2010

*Current Shifts in the use of Use of Force Continuums*, The 2010 Conference on The Use of Force in Law Enforcement, The Performance Institute, June, 2010

*Arrest-Related Death and the Use of Force*, The 2010 Conference on The Use of Force in Law Enforcement, The Performance Institute, June, 2010

*Considerations for TASERs and Other Non-Lethal Devices*, The 2010 Conference on The Use of Force in Law Enforcement, The Performance Institute, June, 2010

*Addressing Allegations of Police Misconduct*, The 2010 Conference on The Use of Force in Law Enforcement, The Performance Institute, June, 2010

*Smart Use of Force*, International Law Enforcement Educators and Trainers Association (ILEETA), April, 2010

*Defining Use of Force for Law Enforcement Professionals*, The 2010 Conference on The Use of Force in Law Enforcement, The Performance Institute, January, 2010

CLT-HOWARD-001044

*The Ramifications of In-Custody Death After the Use of Force*, The 2010 Conference on The Use of Force in Law Enforcement, The Performance Institute, January, 2010

*The Great Debate: TASERs and Other Non-Lethal Devices – Are They Helping or Hurting?* The 2010 Conference on The Use of Force in Law Enforcement, The Performance Institute, January, 2010

*Examining the Current Usage of, and Shifts in, the Use of Force Model*, The 2010 Conference on The Use of Force in Law Enforcement, The Performance Institute, January, 2010

*Evidence.com, AXON, and TASER Download & Data Collection Practices*, 2009 TASER Master Instructor School, TASER International, July, 2009

*Live Long and Prosper: The Trainer as Risk Manager*, International Law Enforcement Educators and Trainers Association (ILEETA), April, 2009

*Liability in the Use of Force*, The 2008 National Summit on Use of Force in Law Enforcement, The Performance Institute, August, 2008

*TASER's and Other "Less Lethal" Options*, The 2008 National Summit on Use of Force in Law Enforcement, The Performance Institute, August, 2008

*Defining Use of Force*, The 2008 National Summit on Use of Force in Law Enforcement, The Performance Institute, August, 2008

*TASER Download & Data Collection Practices*, 2008 TASER Master Instructor School, TASER International, June, 2008

*Work Safer – Get Sued Less: Managing High Risk Activity*, International Law Enforcement Educators and Trainers Association (ILEETA), April, 2008

*Managing the Risks of Non-Deadly Force*, Detroit Police Department, Command & Legal Lecture Series, City of Detroit Law Department, March, 2008

*Assessing and Managing the Risk of Less Lethal Options*, The 2007 National Summit on Use of Force in Law Enforcement, The Performance Institute, November, 2007

*TASER Usage – Risks & Rewards*, The 2007 National Summit on Use of Force in Law Enforcement, The Performance Institute, November, 2007

*Defining Force for Ourselves*, The 2007 National Summit on Use of Force in Law Enforcement, The Performance Institute, November, 2007

*Work Safer – Get Sued Less!* 2007 Michigan NAFTO Conference, National Association of Field Training Officers, October, 2007

*Risk Management: Avoiding "Self-Inflicted Wounds"*, 2007 TASER International Conference, TASER International, July, 2007

*PowerPoint for the Law Enforcement Trainer*, 2007 TASER Master Instructor School, TASER International, July, 2007

*TASER Usage – Risks & Rewards*, The 2007 National Summit on Use of Force in Law Enforcement, The Performance Institute, May, 2007

*Defining Force for Ourselves*, The 2007 National Summit on Use of Force in Law Enforcement, The Performance Institute, May, 2007

*Enhancing Safety & Reducing Liability: The Trainer is the Key*, International Law Enforcement Educators and Trainers Association (ILEETA), April, 2007

*Motor Vehicle Pursuits: High Risk Issues for Trainers*, International Law Enforcement Educators and Trainers Association (ILEETA), April, 2006

*Enhancing Safety & Reducing Liability: The Role of the Trainer*, American Society of Law Enforcement Trainers, 19th Annual International Training Conference, January, 2006

*How to Set Up Your Own Website*, International Law Enforcement Educators and Trainers Association (ILEETA), April, 2005

*Get on the Web!! Set Up Your Own Trainer's Website*, International Law Enforcement Educators and Trainers Association (ILEETA), April, 2004

*Managing Police Pursuit Risk*, Richmond Regional Multijurisdictional Pursuit Project, Training Symposium, December, 2003

*Managing the Risks of Pursuit: Reducing Liability and the Potential for Officer Injuries*, Association of Professional Law Enforcement Emergency Vehicle Response Trainers (ALERT, International), Annual Training Conference, September, 2003

*Dealing with High Risk Activity: Keeping Officers Safer While Reducing Liability*, National Criminal Justice Training Council Annual Conference, April, 2003

*Risk Management and Civil Liability*, Kellogg Community College, October, 2002

*Protecting Officers in High Risk Situations: Enhancing Safety and Reducing Liability*, Wyoming Chiefs and Sheriffs Association, April, 2001

*Protecting Officers in High Risk Situations: The Role of the Trainer in Enhancing Safety and Reducing Liability*, American Society of Law Enforcement Trainers, 14th Annual International Training Conference, January, 2001

*Managing High Risk Emergency Services Activity,* Iowa League of Cities/ICAP, Annual Training Conference, June, 2000

*Managing High Risk Law Enforcement Activity: Use of Force, Pursuit, and Officer Safety*, American Society of Law Enforcement Trainers, 13th Annual International Training Conference, January, 2000

*Managing the Risks of Volunteers,* Public Risk Management Association (PRIMA), Annual Training Conference, June, 1999

*Force & Control: Risk Management Issues for Instructors*, American Society of Law Enforcement Trainers, 12th Annual International Training Conference, January, 1999

*Civil Liability for Emergency Telecommunicators*, Association of Public Safety Communication Officers - Michigan Chapter, Fall Training Conference, September, 1998

*Supplemental Police Manpower: Necessary Evil or True Benefit?* Public Risk Management Association (PRIMA), Annual Training Conference, June, 1998

*Law Enforcement Training: A Systematic Approach*, Public Risk Management Association (PRIMA), Annual Training Conference, June, 1998

*Managing Risk in the Municipal Arena*, 1998 Michigan Municipal Clerks Institute, East Lansing, Michigan, April, 1998

*Getting a Grip: The Management of High Risk Police Activities*, Michigan Association of Chiefs of Police, Winter Training Conference, February, 1998

CLT-HOWARD-001046

_Managing Force: Enhancing Safety & Reducing Risk_, American Society of Law Enforcement Trainers, 11th Annual International Training Conference, January, 1998

_Law Enforcement Use of Force in the 21st Century_, Illinois Risk Management Association, November, 1997

_Use of Force: Managing Risk & Safety_, PPCT Management Systems International Training Conference, August, 1997

_Use of Force Management: Special Issues for Managers_, Oklahoma Department of Corrections, July, 1997

_Control Challenges in the School Environment_, Central Michigan University, Law Enforcement & School Liaison Program Institute, June, 1997

_Managing High Risk Law Enforcement Activity_, Michigan Association of Chiefs of Police, Summer Training Conference, June, 1997

_Law Enforcement Post Incident Damage Control_, Public Risk Management Association (PRIMA), Annual Training Conference, May, 1997

_Pursuit Management: Implementing a Control Continuum_, American Society of Law Enforcement Trainers, 10th Annual International Training Conference, January, 1997

_Instructor Challenges in Use of Force Management_, American Society of Law Enforcement Trainers, 10th Annual International Training Conference, January, 1997

_The Risks of Crossing the Border: Managing Interjurisdictional Exposures_, Public Risk Management Association (PRIMA), Annual Training Conference, June, 1996

_Aerosol Weapons: Reducing Your Risks_, Michigan Association of Chiefs of Police, Mid-Winter Training Conference, February, 1996

_Pursuit Management: Implementing a Control Continuum_, American Society of Law Enforcement Trainers, 9th Annual International Training Conference, January, 1996

_Critical Incident Policy Management_, Minnesota Sheriff's Association Training Conference, December, 1995

_Use of Force Management for Supervisors_, Upper Peninsula Law Enforcement Development Center, November, 1995

_Vehicle Operations Management_, International Association of Chiefs of Police Training Conference, October, 1995

_Total Control Management_, PPCT Management Systems International Training Conference, August, 1995

_Police Administration and Risk Control_, Ohio Municipal League Joint Self Insurance Pool, Annual Training Conference, June, 1995

_Effective Risk Manager/Law Enforcement Executive Relationships_, Public Risk Management Association (PRIMA), Annual Training Conference, June, 1995

_Pursuit Management: Implementing a Control Continuum_, Michigan Association of Chiefs of Police, Mid-Winter Training Conference, February, 1995

*Managing the Use of Force*, American Society of Law Enforcement Trainers, 8th Annual International Training Conference, January, 1995

*Fundamentals of Risk Management*, Wyoming Chiefs and Sheriffs Annual Conference, Wyoming Law Enforcement Academy, April, 1994

*Implementing Defensible Control Continuums*, Law Enforcement Officers Regional Training Consortium, Flint, Michigan, March, 1994

*Deadly Force: The Importance of Management*, Northern Michigan Law Enforcement Training Consortium, March, 1994

*Interjurisdictional Liability*, Michigan Association of Chiefs of Police, Mid-Winter Training Conference, February, 1994

*Risk Control: Managing the Use of Force*, American Society of Law Enforcement Trainers, 7th Annual International Training Conference, January, 1994

*Managing Force in a Correctional Setting*, Minnesota Counties Insurance Trust, November, 1993

*Cross-Jurisdictional Liability Issues*, Northern Michigan Association of Chiefs of Police, Annual Meeting, October, 1993

*Managing the Use of Force*, PPCT Management Systems International Training Conference, August, 1993

*Managing Effective Police Training: Doing More with What You Have*, Law Enforcement Officers Regional Training Consortium, May, 1993

*Managing Effective Police Training*, Michigan Association of Chiefs of Police, Mid-Winter Training Conference, February, 1993

*Contemporary Use of Force Issues*, Michigan Association of Chiefs of Police, Mid-Winter Training Conference, February, 1992

*Reducing Motor Vehicle Related Losses*, Michigan Association of Chiefs of Police, Mid-Winter Training Conference, February, 1991

## TRAINING VIDEOS & MULTIMEDIA PRODUCTIONS

*Police Pursuit Driving*, 30-minute video. Performance Dimensions, Inc., Twin Lakes, Wisconsin, 1998.

*Precision Driving Decision System*, 3-part training video. Governmental Risk Managers, 1991.

## BOOK CHAPTER

*Plan to Train or Plan to Fail,* W.I.N. 2: Insights into Training and Leading Warriors, Edited by Brian R. Willis, Warrior Spirit Books, Calgary, Alberta CA, 2009.

| May 1, 2020 | *Steven D. Ashley* |
|---|---|
| DATE | STEVEN D. ASHLEY, MSc, MLS, ARM/P, AFSS, INCI, IICI |
| | MONROE, MICHIGAN |

# EXHIBIT III – PRIOR TESTIMONY

**Last Reviewed/Updated May 1, 2020**

## LAW ENFORCEMENT & CRIMINAL COURTS

During 15 years of active duty law enforcement service, I offered testimony, depositions, and affidavits, in State District Courts, State Circuit Courts, State Probate and Juvenile Courts, and various other Hearings and Tribunals, in cases too numerous to list.

## EXPERT COURT TESTIMONY (WITHIN THE PAST FOUR YEARS)

While I have provided expert consultation and review in more than 170 cases, I have testified and/or been deposed 49 times in 42 cases since 1994. The following are cases in which I have testified at deposition, hearing, or trial, in the past four years.

2019 – D'Marco Craft and Michaele Jackson, Plaintiffs, v. Richard Billingslea, Hakeem J. Patterson, Yossif Mana, Antoine Hill, Glenn Bines, David Mays, II, Naim Brown, Michael Bailey, Randall Craig, Bryan Moore, and the City of Detroit, a political subdivision of the State of Michigan, Defendants. United States District Court for the Eastern District of Michigan, Southern Division. Case Number 2:17-cv-12752-MKM. I was deposed as an expert witness on behalf of Defendant Richard Billingslea. This was a police excessive use of force/false arrest case.

2019 – Kelvion Walker, Plaintiff, v. Amy Wilburn, Defendant. United States District Court for the Northern District of Texas, Dallas Division. Civil Action Number 3:13-cv-04896-D. I was deposed and later testified at trial as an expert witness on behalf of the Defendant. This was a police shooting/excessive use of force case.

2019 – Cassandra Luster, individually, and A/N/F of _____ a minor child, Damon Luster, Desmond Luster, Jr.; Beverly Diana Luster, individually, and as Administrator of the Estate of Desmond Luster, Sr., Plaintiffs, v. The City of Dallas, et al., Defendants. United States District Court for the Northern District of Texas, Dallas Division. Civil Action Number 3:16-cv-00396-B. I was deposed and later testified at trial as an expert witness on behalf of the Defendants. This was a police excessive use of force/deadly force case.

2018 – Syndel Kabchef, Plaintiff, v. Pickens County Sheriff Donnie Craig, Individually and in his capacity as Sheriff of Pickens County and Deputy Sheriff Rick Hales, individually and in his official capacity as a Pickens County Deputy Sheriff, Defendants, Quik Trip Corporation, Defendant by Counterclaim. Superior Court of Pickens County, State of Georgia. Civil Action File Number 2017 SUCV 76. I was deposed as an expert witness on behalf of the Defendant Quik Trip Corporation and the Plaintiff, Syndel Kabchef. This was a police emergency vehicle operations/collision case.

2018 – Christopher Cantu, as the Administrator of the Estate of Robert Earl Lawrence, Plaintiff, v. City of Dothan, Alabama, Greg Benton, Chris Summerlin, and

CLT-HOWARD-001049

Adrianne Woodruff, Defendants. United States District Court for the Middle District of Alabama, Southern Division. Case Number 1:16-cv-01003-MHT. I was deposed as an expert witness on behalf of the Defendants. This was a police excessive use of force/deadly force case.

2017 – Collette L. Flanagan, individually, and on behalf of the Estate of Clinton Allen, Deceased; and Ronderaline S. Allen, individually, Plaintiffs, v. The City of Dallas, Texas; and Clark Staller, Defendants. United States District Court for the Northern District of Texas, Dallas Division. Case Number 3:13-cv-04231-M. I was deposed and later testified at trial as an expert witness on behalf of the defense. This was a police excessive use of force/deadly force case.

2017 – A.M., A Minor, by his parents and natural guardians, Audley Muschette and Judith Muschette, Plaintiff, v. American School for the Deaf, Town of West Hartford, Paul W. Gionfriddo in his individual and official capacities, Chris Hammond in his individual and official capacities, Elwin Espinoza in his individual and official capacities, Defendants. United States District Court for the District of Connecticut. Case Number 3:13-cv-01337-WWE. I was deposed as an expert witness on behalf of the Plaintiff. This was a police excessive use of force/police practices case.

2016 – Lameco M. Williams, Plaintiff, v. City of Birmingham, a Municipal Corporation; Nathan Elmore, an individual; Jeffrey Sanders, an individual; Ashley Knighten, an individual; Jacob McDonald, an individual; Lane Harper, an individual; Arthur Wilder, an individual; Christopher Hayes, an individual; Curtis Mitchell, an individual; Cedric Stevens, an individual; A.C. Roper, an individual, Defendants. United States District Court for the Northern District of Alabama, Southern Division. Case Number 2:15-cv-00949-AKK. I was deposed as an expert witness on behalf of the defendants. This was a police excessive use of force case.

2015 – Cris Christenson, Plaintiff, v. City of Joplin, Missouri; Corporal Shawn Dodson; Officer Steven Feken; Officer John Watkins; Freeman Health System; Defendants. United States District Court for the Western District of Missouri. Case Number 3:13-cv-05073-DPR. I was deposed as an expert witness on behalf of the Plaintiff. This was a police false arrest/excessive use of force case.

2015 – City of Romulus / Michigan Police Officers Labor Council (POLC) – Turner Discipline. Unknown Case Number. A Labor Arbitration Hearing. I testified as an expert witness on behalf of the City of Romulus (Michigan) against a Romulus (Michigan) Police Officer who was demoted and accused of excessive force in a police TASER case.

2015 – Katherine Thomas, individually, and as the administrator of the estate of Christopher Jerome Thomas; Plaintiff, v. Darren Moody, in his individual capacity; and City of Dothan, Alabama; Defendants. United States District Court for the Middle District of Alabama, Southern Division. Case Number

CLT-HOWARD-001050

1:13-cv-920-WHA-SRW. I was deposed as an expert witness on behalf of the Defendant. This was a police pursuit/shooting/excessive use of force case.


_____
May 1, 2020
<sub>DATE</sub>

_____
STEVEN D. ASHLEY, MSc, MLS, ARM/P, AFSS, IXCI, IICI
MONROE, MICHIGAN

# EXHIBIT IV – FEE SCHEDULE

**Last Reviewed/Updated May 1, 2020**

## ALL AMOUNTS ARE IN ADDITION TO EXPENSES

| | |
|---|---|
| Initial Telephone Consultation | No Charge |
| Advance Retainer (Non-Refundable, Billed Against on Hourly Basis) | Waived/Billed |
| Review of Records and Analysis | $150/hour |
| Preparation of Report, Including Research | $150/hour |
| Meetings with Counsel, Site Visits, etc. | $150/hour |
| Deposition (minimum of 6 hours per day) | $200/hour |
| Trial or Hearing (minimum of 6 hours per day) | $200/hour |
| Travel Time, Portal to Portal (maximum of 12 hours per day) | $75/hour |
| Expedite Fee (requested with 7 to 14-day notice) | $500.00 |
| Expedite Fee (requested with less than 7 days' notice) | $1,000.00 |
| Cancellation of Deposition/Hearing/Trial – 7 days or less notice | $1,500.00 |
| Cancellation of Deposition/Hearing/Trial – 8 to 14-day notice | $1,000.00 |
| Cancellation of Deposition/Hearing/Trial – more than 14 days' notice | No Charge |

**PLEASE NOTE:**

Should you engage my services, I will provide services to you as an independent professional. Payment to me for the services I provide is not dependent upon my findings, or upon the outcome of any legal action, mediation, or arbitration; or the amount or terms of any settlement of the underlying legal cause, nor upon any contractual arrangement or other agreement between plaintiff and/or defense counsel and any other person or party.

You may not identify me as either a testifying or non-testifying expert until such time as any engagement fee has been paid or specific arrangements have been made and agreed to – in writing – by me.

All amounts (including any retainer) are in addition to expenses, which include those items that are customary, including – but not limited to – business class airfare, hotel, rental vehicle (full-size), meals, parking fees, and mileage (at the current IRS rate).

Should you engage my services, my relationship is with you. You are responsible for all payments as outlined in this Fee Schedule, regardless of any arrangement you may have with any party or parties you represent, including deposition fees originating from opposing counsel. If engaged, I will issue bills on a monthly basis, or whatever other interval I deem appropriate. Bills are due on receipt, and shall be considered delinquent if unpaid more than thirty (30) days after their date of issuance. Interest shall accrue to any delinquent balance at the maximum rate permitted by law, not to exceed 1.5 per cent per month.

| | |
|---|---|
| May 1, 2020 | *Steven D. Ashley* |
| DATE | STEVEN D. ASHLEY, MSc, MLS, ARM/P, AFSS, ENCI, IICI |
| | MONROE, MICHIGAN |

CLT-HOWARD-001052