IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

SELENA HOWARD; DARIOUS LEGGETT; and
ANTRINET LEGGETT                                                    PLAINTIFFS

V.                                              CIVIL ACTION NO.:  2:19-cv-84-KS-MTP

FORREST COUNTY;
CHEY SUMRALL, individually and
In his official capacity; BLAKE BASS,
Individually and in his official capacity                          DEFENDANTS

FORREST COUNTY, MISSISSIPPI, CHEY SUMRALL, AND
BLAKE BASS' MEMORANDUM OF AUTHORITIES
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Come now, Forrest County, Mississippi, Chey Sumrall ("Dep. Sumrall"), and

Blake Bass ("Dep. Bass")[1], by and through counsel, and respectfully submit their

Memorandum of Authorities in Support of Motion for Summary Judgment. In support

of the same, the moving defendants would show unto the Court as follows:

**INTRODUCTION**

Plaintiffs' claims arise out of an incident that occurred September 27, 2017, when

officers conducted a welfare check on Plaintiffs' dogs. *CM/ECF Doc. No.* 2, *Compl.*  at ¶¶

9-10.   The encounter between the parties allegedly resulted in Darious Leggett and

Antrinet Leggett being Tased and arrested. *CM/ECF Doc. No.* 2, *Compl.*  at ¶¶ 26-27.

---

[1] Dep. Bass changed his name to "Blake Smith" in January of 2020. *Blake Bass Depo.*, p. 4:11-16. To avoid any confusion, Defendants will refer to Blake Smith as "Dep. Bass" in the instant motion.

Plaintiffs' assert claims under Section 1983 for unlawful seizure, false imprisonment, use of excessive force, equal protection, fabrication/misrepresentation of evidence, and a First Amendment violation. Plaintiffs additionally assert claims for racial discrimination under Sections 1981, 1985, and 1988.

For all the reasons outlined herein, movants are entitled to summary judgment and a dismissal of all claims against them.

## FACTUAL BACKGROUND

On September 27, 2017, Deputy Sumrall and Deputy Bass were at a gas station, a short distance from Plaintiffs' residence, when they met with county worker, Haley Ryals. *Dep. Sumrall Depo*., p. 8:13-25-9:1-10. The officers were informed by Ms. Ryals that there was a dog tied to a tree on a property with no food or water. *Id*. at 9:24-25-10:1-5. The officers drove from the gas station to the Plaintiffs' residence at 1348 Elks Lake Road and, upon exiting their vehicle, immediately saw a dog tied to a tree without food or water, consistent with the complaint from Ms. Ryals. *Id*. at 12:17-20, 16:5-10; *Dep. Bass Depo*., p. 7:11-12, 10:12-15; *Incident Report*.

The officers observed the dog and it looked "very thin," to the point where its ribs could be seen. Dep. Bass Depo., p. 29:25-30:1-2; Dep. Sumrall Depo., p. 30:10-15. The dog only had one (1) bowl nearby which contained no food or water, despite the weather being hot[2]. *Dep. Sumrall Depo*., p. 16:5-11, 30:10-25; *Dep. Bass Depo*. p. 28:23-25-29:1-2, 25-30:1-8. Selena Howard ("Howard"), the lease holder of the residence, admits Plaintiffs

---

[2] At the time, there were two (2) dogs on the property, however Dep. Sumrall did not see the second dog in a wired cage until he was on the porch of the residence later in the encounter. *Chey Sumrall Depo*., p. 16:12-23.

were "going through a hard time" and they were only feeding the dogs once a day as well as giving them "what we were eating." *S. Howard Depo.*, p. 13:5-9. Additionally, the dog had a "cut" on its neck from the collar which Leggett asserts is because "it grew too fast." *Id*. at 13:13-25; *D. Leggett Depo.*, p. 26:21-25-27:1-7.

According to Plaintiffs, that morning they were returning from dropping Howard's sister off at college when deputies pulled into the driveway. *S. Howard Depo.*, p 5:7-11. *A. Leggett Depo.*, p. 16:7-14, 17:8-16. Dep. Sumrall and Dep. Bass made contact with Howard and Antrinet Leggett ("Antrinet") who were on the porch of the residence. *Id.* The officers stopped near the porch steps on the ground and spoke with them. *A. Leggett Depo.*, p. 18:8-12; *D. Leggett Depo.*, p. 21:7-10.

Darious Leggett ("Darious") walked outside of the residence a few moments later with an "irate" demeanor. *Dep. Sumrall Depo.*, p. 16:8-11. Darious asked the officers why they were on the property and deputies stated they were there for the dogs. *D. Leggett Depo.*, p. 20:8-15. Darious then walked off the porch towards the officers to engage with them. *Id.* at 21:4-10. Darious and the deputies moved to where the dog was chained to a tree and Dep. Sumrall asked Darious to show him if the dog had any food, as the bowls were empty[3]. *A. Leggett Depo.*, p. 19:17-21-20:1-9; *D. Leggett Depo.*, p. 22:19-25-23:1-7; *S. Howard Depo.*, p 18:1-12.

---

[3] Howard states that she could not hear what the deputies were telling Darious when they were by the dog as it was two and a half (2 ½) car lengths away, however, later states that she heard Dep. Sumrall tell Darious to "[G]et the GD dog food." *Selena Howard Depo.*, p. 20:1-7. Additionally, Antrinet was standing by Selena during this time period, and states she heard deputies ask Darious to show them the food. *Antrinet Leggett Depo.*, p. 20:1-24. Yet, later she states that she could not hear the conversation. *Id*.

Darious volunteered to show Dep. Sumrall the food he had in the residence. *Dep. Sumrall Depo.*, p. 18:14-22. Darious and Dep. Sumrall walked onto the porch and Darious entered the residence for thirty to forty-five (30-45) seconds before exiting[4]. *Id*; *A. Leggett Depo.*, 21:2-5; *D. Leggett Depo.*, p. 1-6, 24. Darious brought an empty food container outside to show Dep. Sumrall. *Id.*; *see also*, *Dep. Bass Depo.*, p. 12:5-10.

At that point, based on Dep. Sumrall's observations, he made the decision to arrest Darious for animal neglect. *Dep. Sumrall Depo.*, p. 19-7-14, 31:5-15. Dep. Sumrall asked Darious to turn around and put his hands behind his back. *Dep. Bass Depo.*, p. 14:1-21; *Dep. Sumrall Depo.*, 19:7-11, 24:8-15; *D. Leggett Depo.*, p. 29:2-4. Darious resisted by not giving Dep. Sumrall his hands and became verbally aggressive by cussing and yelling at the deputies. *Id*.

Eventually, Darious fell or jumped off the porch to the ground and deputies followed at which point, Antrinet came down off the porch and attempted to intervene to prevent the deputies from arresting Darious. *D. Leggett Depo.*, p. 30, 32:2-25; *S. Howard Depo.*, p. 24:19-25. Antrinet got "in the middle" of the deputies and Darious requesting the officers "[p]lease stop, please leave." *Id*. Parties note that the situation was "heated" as Darious and the officers were yelling in each other's faces. *A. Leggett Depo.* p. 29:14-24; *Dep. Sumrall Depo.*, p. 32:24-25. Deputies issued verbal commands to Antrinet to "back up." *Dep. Sumrall Depo.*, p. 24:10-15; *Dep. Bass Depo.*, p. 15:18-25, 17:7-14, 32:7-25-33:1-16; *D. Leggett Depo.*, p. 32:2-25; *Incident Report*. Antrinet specifically refused to comply with

---

[4] Dep. Sumrall admits he did try to enter the home, but did not after Darious told him to stop. *Chey Sumrall Depo.*, p. 18:23-25-19:13, 31:21-25-32:1; *Darious Leggett Depo.*, p. 24:1-6.

Dep. Bass' commands to move out of the way. *Dep. Bass Depo..*, 24:13-16. All the while, Dep. Sumrall continued to struggle to get Darious' hands behind his back and continued to issue verbal commands for Darious to stop resisting, however Darious refused and eventually swung at Dep. Sumrall. *Id.*

Due to the increased level of hostility, incompliance with verbal commands, and resistance to arrest, Dep. Bass deployed his TASER cartridge and tased Darious. *Id.* Dep. Bass was approximately five (5) feet away from Darious at the time of the deployment of the probes. *Use of Force Report.* The two (2) probes were approximately 5 inches apart. *Id.* Darious believes he was tased once for approximately twenty (20) seconds, however, Forrest County TASERs are equipped with a battery that immediately shuts off after five (5) seconds stimulation[5]. *Ashley Report*, p. 33.

At some point prior to Darious being tased, one of the deputies allegedly tased Antrinet. According to Antrinet, Dep. Bass tased her by shooting his TASER prongs at her hand while she was on the phone. *A. Leggett Depo.*, p. 30-34. Dep. Bass then took her phone from her hand, turned around, tased Darious, and then placed her under arrest. *Id.*

According to Darious and Howard, Dep. Sumrall attempted to arrest Antrinet while she was on the phone; however, she fell and hit her head on the lawn mower. *Id.* At that point, Dep. Sumrall allegedly shot his TASER prongs at hand. *D. Leggett Depo.*, p. 33-34, 35:19-24; *S. Howard Depo.*, p. 25:15-24. The prongs allegedly never stuck in

---

[5] Dep. Bass' X26P TASER was equipped with Automatic-Shutdown Performance Power Magazine that automatically stops the electric cycle after five (5) seconds even if the trigger is held down for more time. *Expert Report*, p. 33.

Antrinet's hand, nevertheless she contends she did get tased and felt electricity. *Id*. at 35:11-25-36:1-7; *S. Howard Depo..*, 31:18-22.

Dep. Sumrall denies that he deployed his TASER cartridge on that day or that he had any involvement with Antrinet's arrest. *Dep. Sumrall Depo..*, 21:21-25-22:1-22. Instead, Dep. Bass arrested Antrinet after tasing Darious, for failing to comply with lawful orders during the arrest of Darious. *Dep. Bass Depo..*, 23-24; *Justice Court Affidavits*; *Arrest Report*. Antrinet was then taken to a patrol car by Dep. Bass. *A. Leggett Depo..*, at 34:9-23.

Notably, in the process of Antrinet's arrest, the unchained dogs began growling and snapping at Dep. Bass. *Dep. Sumrall Depo..*, 21:21-25-22:1-22. In an effort to deter the dogs, Dep. Sumrall sparked his TASER at them. *Id*; *D. Leggett Depo..*, p. 46:1-24.

Howard was on the phone with dispatch during this entire incident and did not participate at any point. *S. Howard Depo..*, p. 27:15-23, 31:1-6; 35:7-19. Antrinet was arrested and booked into the Forrest County Jail for disorderly conduct for interfering with law enforcement during the arrest of Darious and resisting arrest. *Arrest Report*; *Justice Court Affidavits*. Darious was taken to the hospital and post-arrested for disorderly conduct and resisting arrest. *Arrest Report*; *Justice Court Affidavits*. Darious was never taken to jail. *S. Howard Depo..*, 42:1-6. Howard was post-arrested for simple cruelty to animals. *Id*.

## STANDARD OF REVIEW

"A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The United States Supreme Court has explained that the language of Fed. R. Civ. P. 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing to establish the existence of an essential element to that party's case and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant "bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record in the case which it believes demonstrate the absence of a genuine issue of material fact...." *Harris v. Mississippi Valley State Univ.*, 899 F. Supp. 1561 (N.D. Miss. 1995)(citing *Celotex*, 477 U.S. at 324).

Once a properly supported Motion for Summary Judgment is presented, the nonmoving party must rebut it with "significant probative" evidence. *Ferguson v. National Broadcasting Co., Inc.*, 584 F.2d 111, 114 (5th Cir. 1978).  In other words, "the nonmoving litigant is required to bring forward 'significant probative evidence' demonstrating the existence of a triable issue of fact." *In Municipal Bond Reporting Antitrust Lit.*, 672 F.2d 436, 440 (5th Cir. 1982).  The non-moving party cannot rely on mere denial of material facts or unsworn allegations in the pleadings or arguments and assertions in briefs or legal memoranda; rather, the non-movant "must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim." *Johnson v. Deep E. Tex. Reg 7 Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004).  Here, the movant is entitled to summary judgment as a matter of law.

## CLAIMS

Plaintiffs allege claims for unlawful seizure, false imprisonment, use of excessive force, equal protection, fabrication/misrepresentation of evidence, and a First Amendment violation. Plaintiffs additionally allege claims of racial discrimination.

## ARGUMENT

### I.   QUALIFIED IMMUNITY

Dep. Sumrall and Dep. Bass are shielded from liability by qualified immunity. As you know, law enforcement officials, "like other public officials acting within the scope of their official duties, are shielded from claims of civil liability by qualified immunity." *Morris v. Dillard Dept. Stores, Inc.*, 277 F.3d 743, 753 (5th Cir. 2001). A law enforcement officer is entitled to the cloak of qualified immunity unless it is shown that "he violated a clearly established constitutional right." *Mangieri v. Clifton*, 29 F.3d 1012 (5th Cir. 1994). Qualified immunity provides "ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

In assessing a claim of qualified immunity, courts apply a two-part analysis. "[A] plaintiff seeking to overcome qualified immunity must show: '(1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct.'" *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013)(quoting *Ashcroft v. al-Kidd,* 563 U.S. 731, 735 (2011)).

The threshold question is "whether Plaintiffs' allegations establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 736 (2002). If "no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries

concerning qualified immunity." *Saucier v. Katz*, 533 U.S. 194 (2001); *see also, Pearson v. Callahan*, 555 U.S. 223 (2009)(holding that "order of battle" outlined in *Saucier* is not mandatory in every instance). However, "if a violation could be made out, the next sequential step is to ask whether the right was clearly established." *Id*. at 201. The "relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Saucier*, 533 U.S. at 202. To find that the law was clearly established, "[the court] must be able to point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *Morgan v. Swanson*, 659 F.3d 359, 371–72 (5th Cir. 2011)(en banc)(citations omitted).

### A. Unlawful Seizure/False Arrest.

Plaintiffs allege that deputies unlawfully seized them without reasonable suspicion or probable cause. Here, Plaintiffs' Complaint is devoid as to how or when they were illegally seized. To the extent that Plaintiffs are making a claim for being unlawfully seized by the deputies regarding the animal welfare check the same fails.

### 1. Animal Welfare Detainment.

A seizure occurs "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).The *Terry* stop and frisk rule is a "narrow exception" where police officers may "briefly detain a person for investigative purposes if they can point to 'specific and articulable facts' that give rise to reasonable suspicion

that a particular person has committed, is committing, or is about to commit a crime." *Lincoln*, 874 F.3d at 842. Reasonable suspicion has been described as "a particularized and objective basis for suspecting the person stopped of criminal activity." *United States v. Ardoin*, 454 F. App'x 385, 387 (5th Cir. 2011); *quoting, Ornelas v. United States*, 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). "In assessing the validity of a stop, the court considers 'the totality of the circumstances—the whole picture.'" *Ardoin*, 454 F. App'x at 387; *quoting, United States v. Sokolow*, 490 U.S. 1, 7–8, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). Furthermore, Courts have found that reasonable suspicion can be "based on information provided by a confidential informant, if the information possesses an indicia of reliability." *United States v. Roch*, 5 F.3d 894, 898 (5th Cir.1993).

Here, Dep. Sumrall and Dep. Bass both stated that they received information from Ms. Ryals that a dog was tied to a tree without food or water[6]. *Dep. Sumrall Depo.*, p. 9:24-25-10:1-5. Ms. Ryals was a county worker who was a volunteer firefighter and did maintenance for the County. *Id*. at 8:22-25. Based on deputies' familiarity with Ms. Ryals, they deemed her a credible informant. Deputies left the convenience store and drove down the highway before turning on the "driveway" towards Plaintiffs' residence *Id*. at 11:20-25,12:17-20, 16:5-10; *Dep. Bass Depo.*., p. 7:11-12, 10:12-15. As stated by Plaintiffs, their driveway is actually a dirt gravel road and their residence sits back approximately one hundred and fifty yards (150 yards) from the main highway. *D. Leggett Depo.*, p. 12:21-25:1-13; *see also, Dep. Sumrall Depo.*, p. 13:8-14. Their "driveway" was frequently used as

---

[6] Dep. Sumrall admits that Haley Ryals received the information from another county worker who mowed the lawn of the cemetery behind the Plaintiffs' residence. *Chey Sumrall Depo.*, p. 8:13-25, 9:22-25-10:1-5.

a road by citizens to get to the graveyard behind the house. *Id*.; *S. Howard Depo.*, p. 11:11-15.

Immediately upon stopping on the driveway and exiting their vehicles, deputies observed the dog tied to a tree without food or water which was consistent with the complaint from Ms. Ryals. *Dep. Sumrall Depo.*, p. 12:17-20, 16:5-11, 30:10-25; *Dep. Bass Depo.,* p. 7:11-12, 10:12-15, 28:23-25-29:1-2, 25-30:1-8; *Incident Report*. Additionally, Dep. Sumrall and Dep. Bass noted that the dog looked "very thin," to the point where its ribs could be seen[7]. *Id*. Based on the tip from Ms. Ryals and the condition of the animal in plain view of the deputies, there was sufficient reasonable suspicion necessary to conduct an investigatory detainment of Plaintiffs.[8]

### 2.   <u>False Arrest.</u>

To the extent Plaintiffs' unreasonable suspicion claim is premised on Plaintiffs' alleged false arrest, deputies need only have probable cause to affect an arrest without a warrant.

To prevail on his Section 1983 false arrest claim, a plaintiff must show that there was a lack of probable cause for the arrest. *See Haggerty v. Texas S. Univ.*, 391 F.3d 653, 655

---

[7] Plaintiffs have not made a Fourth Amendment unreasonable search claim; however, the dog's condition clearly falls under the plain view doctrine. *United States v. Waldrop*, 404 F.3d 365, 369 (5th Cir.2005).

[8] Furthermore, Plaintiffs state that *they* went outside to speak with deputies. *Selena Howard Depo.*, p. 16: 1-5. Deputies did not knock on the door or enter the porch. Instead, when deputies stated they were there in regards to the dogs, Darious responded "what do we need to help you with." *Id*. at 18:1-6. Based on Darious' actions, this could easily be described as a consensual encounter at this moment. *United States v. Mendieta-Garza*, 254 F. App'x 307, 310–11 (5th Cir. 2007); *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). The Fourth Amendment is only triggered when the officer, by means of physical force or show of authority, has in some way restrained the liberty of [the] citizen." *United States v. Mask*, 330 F.3d 330, 336 (5th Cir.2003)(quoting *Terry v. Ohio*, 392 U.S. 1, 19, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Regardless, Deputies had a specific and articulable basis to question Plaintiffs about the dogs based on their observations.

(5th Cir. 2004*); see also, Brown v. Lyford*, 243 F.3d 185, 189 (5th Cir.2001) ("The 'constitutional torts' of false arrest ... and false imprisonment ... require a showing of no probable cause.").  Probable cause exists when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009)(quoting *Resendiz v. Miller*, 203 F.3d 902, 903 (5th Cir. 2000). Notably, "even law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity." *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 206 (5th Cir. 2009)(citing *Mendenhall*, 213 F.3d at 230); *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3039–40, 97 L.Ed.2d 523 (1987)("... it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable").

First, Howard admits that she was not arrested and there is no record evidence of the same, thus any false arrest claims against her should be dismissed[9]. *S. Howard Depo.*, p. 41:22.

Next, Darious was placed under arrest for animal neglect. Dep. Sumrall states that he observed the dog tied to a tree was thin, had no food or water on a hot day, and it had no shelter. *Dep. Sumrall Depo.*, p. 18:14-22, 30-31; *Dep. Bass Depo.*, p. 30:1-8. In fact, there

---

[9] Howard was post-arrested with a citation for cruelty to animals. *Justice Court Affidavits*; *Incident Report*.

was no dog food at all for the animals on the property. *Id*. The dog also had a lesion on its neck from "outgrowing it's collar." *S. Howard Depo.*, p. 13:13-25; *D. Leggett Depo.*, p. 26:21-25-27:1-7. Furthermore, deputies had knowledge that the dog had been seen tied to the tree without food or water on another occasion based on the tip by Ms. Ryals. *Dep. Sumrall Depo.*, p. 9:24-25-10:1-5. For all these reasons, Dep. Sumrall reasonably believed he had probable cause to arrest Darious for animal neglect. *Id*. at 19:12-14; *see* Miss. Code Ann. § 97-41-1.

In addition, once Dep. Sumrall placed Darious under arrest he resisted[10]. *Dep. Sumrall Depo.*, p. 32:4-12. Dep. Sumrall states that Darious would not give him his hands and began acting aggressive. *Id*. at 32:17-19; 24:8-15; *Dep. Bass Depo.*, p. 14:1-11, 15:2-3, 17:7-9,32:17-23; *Incident Report*; *Justice Court Affidavit*. Furthermore, Darious would not comply with Dep. Sumrall or Dep. Bass' verbal commands to stop resisting. *Dep. Sumrall Depo.*, p. 28:15-21; *Dep. Bass Depo.*, p. 14:1-11. Based on all the following factors, there was enough probable cause to arrest Darious for the crimes of disorderly conduct and resisting arrest.[11] *Incident Report*; *Justice Court Affidavits*; *see also*, Miss. Code Ann. §§ 97-35-7, 97-9-73.

Finally, it is unrefuted that Antrinet tried to intervene and prevent Darious from being arrested, despite instructions from deputies to desist. *D. Leggett Depo.*, 32:4-6,20-25. *Dep. Bass Depo.*, 24:13-16. As officers attempted to get Darious' hands behind his back,

---

[10] Darious denies that he was told he was being placed under arrest yet states he asked Dep. Sumrall "What are you arresting me for? Tell me why I'm arrested.", clearly evincing that he knew he was being arrested. *Darious Leggett Depo.*, p. 30:1-6.

[11] Darious was not brought to jail, but was instead post-arrested for disorderly conduct and resisting arrest. *Incident Report*; *Justice Court Affidavits*.

Antrinet got "in the middle" of the deputies in spite of them issuing verbal commands for her to "back up." *Dep. Sumrall Depo.*, p. 24:10-15; *Dep. Bass Depo.*, p. 15:18-25, 17:7-14, 32:7-25-33:1-16. Additionally, when Dep. Bass went to arrest her for disorderly conduct, she resisted. *Dep. Bass Depo.*, p:28:4-9, 31:18-25-32:1, 33:10-15; *Incident Report; Justice Court Affidavit*. Based on all the facts, there was clearly probable cause to arrest Antrinet for disorderly conduct and resisting arrest[12]. *Id*; *see also*, Miss. Code Ann. §§ 97-35-7, 97-9-73.

Even if the court could not conclude that probable cause existed, Plaintiffs have failed to meet the second prong of qualified immunity. That is, would a reasonable officer in the same position as Dep. Sumrall and Dep. Bass, have believed there was a fair probability the Plaintiffs had committed an offense. *United States v. Watson*, 273 F.3d 599, 602 (5th Cir.2001)(explaining that probable cause's "fair probability" requires more than a bare suspicion but less than a preponderance of evidence); *citing from, Granger v. Slade*, 361 F. Supp. 2d 588, 596 (S.D. Miss. 2005).

Looking at the totality of the circumstances, Dep. Sumrall and Dep. Bass clearly had probable cause to reasonably believe a crime was being committed. Thus, Plaintiffs' unreasonable seizure claim must be dismissed.

**B.  False Imprisonment**

Plaintiffs additionally make a false imprisonment claim stating they were unlawfully imprisoned. *Compl*. ¶¶ 61-66. Much like a false arrest claim, to succeed on a false imprisonment claim, Plaintiffs must demonstrate an absence of probable cause.

---

[12] Antrinet was the only Plaintiff to be booked into the Forrest County Jail. *Arrest Report*.

*Haggerty v. Tex. S. Univ.*, 391 F.3d 653, 655–56 (5th Cir. 2004). As stated above, deputies had adequate probable cause to detain and arrest Plaintiffs. *See* Sec A(2). Thus, Plaintiffs' Fourth Amendment claim for false imprisonment should be dismissed.

### C.  Excessive Force

Plaintiffs assert a Fourth Amendment claim alleging deputies used excessive force on them. Compl. ¶¶ 68-71. Since Plaintiffs' excessive force claim arises out of their detention the federal right at issue is the Fourth Amendment right against unreasonable seizures. *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The inquiry into whether this right was violated requires a balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tennessee v. Garner*, 471 U.S. 1, 8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985); *Graham*, 490 U.S. at 396, 109 S.Ct. 1865). Excessive force claims are necessarily fact-intensive; whether the force used is "excessive" or "unreasonable" depends on "the facts and circumstances of each particular case." *Id*.

The reasonableness of the force used "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. To prevail on their excessive force claims at trial, Plaintiffs would be required to establish that the Decedent suffered: "(1) an injury; (2) which resulted directly and only from a use of force that was clearly excessive; and (3) the excessiveness of which was clearly unreasonable." *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir.2009); *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir.2009).

There are two (2) reasonableness inquiries that courts should look at in determining qualified immunity: (1) was the officer's use of force objectively reasonable in light of Fourth Amendment standards and; (2) was the right was clearly established such that a reasonable officer would know that the particular level of force used was excessive. *Hogan v. Cunningham*, 722 F.3d 725, 735 (5th Cir. 2013). The force may be excessive, however "the degree of force used in a given situation may not have been clear to a reasonable officer at the scene." *Id*.

### 1.  Selena Howard

First, to the extent that Howard is alleging an excessive force claim, the same must be dismissed as the record is void if any evidence that any force was used against her. *Ashley Report; Use of Force Report; see generally, S. Howard Depo.*.

### 2.  Darious Leggett

Darious Leggett alleges Dep. Bass used excessive force on him by tasing him in the genitals. To determine whether the use was excessive, we must look at the force used and if it was reasonable. Here, Dep. Sumrall notes that Darious demeanor was hostile from the beginning of the encounter. *Dep. Sumrall Depo.*, 28:2-10.  Once Dep. Sumrall decided to place Darious under arrest, the situation became "heated" as Darious was in Dep. Sumrall's face yelling and cursing. *A. Leggett Depo.* p. 29:14-24; *Dep. Sumrall Depo.*, p. 32:24-25. Darious would not give Dep. Sumrall his hands to effectuate the arrest and continued to pull away. *Dep. Sumrall Depo.*, p. 32:4-12. Notably, immediately prior to Darious being placed under arrest, he had just exited his home and was unaccompanied

16

inside the home for a total of thirty-forty (34) seconds. *Id*. at 18:14-22. Deputies had no idea whether Darious had armed himself with a weapon while in the home.

Additionally, Darious jumped or fell off the porch which moved the location of the arrest from the porch to the ground, which created more chaos. *Id*. at 32:13-16; *S. Howard Depo*., p. 24:10-17. All the while: (1) dogs were barking at deputies and acting "protective"; (2) Howard was screaming on the phone with dispatch; and (3) Antrinet began to intervene with Dep. Sumrall and Dep. Bass attempting to arrest Darious. *Id*. at 322-12,20-25; *Dep. Bass Depo*., p. 15:16-20, 24:13-16; *S. Howard Depo*., p. 26:4-9; *Incident Report*; *Justice Court Affidavits*; *D. Leggett Depo*., p. 46:1-4, 17-24; *Ashley Report, CLT-HOWARD-000980*. Officers verbally commanded Antrinet to "back up" and move out the way, which she failed to comply with. *Id*.

Dep. Sumrall continued to struggle to get Darious' hands behind his back and he and Dep. Bass issued verbal commands demanding Darious comply. *Dep. Sumrall Depo*., p. 24:10-15; *Dep. Bass Depo*., p. 15:18-25, 17:7-14, 32:7-25-33:1-16; *Incident Report; Justice Court Affidavits*. Dep. Bass testified that Darious attempted to "swing" at Dep. Sumrall. *Id*. Due to the increased level of hostility, incompliance with verbal commands, and resistance to arrest, Dep. Bass deployed his TASER and tased Darious. *Id*.

Based on all these factors, it was not unreasonable for Dep. Bass to deploy his TASER in order to gain compliance from Darious. Notably, the two (2) deputies had to split their attention between Darious, Antrinet, Howard, and the dogs. Dep. Bass states that his intent was "to protect Chey" while Dep. Sumrall attempted to arrest Darious. *Dep. Bass Depo*., p. 15:18-24.

Furthermore, the use of force was not excessive. Dep. Bass was approximately five (5) feet away from Darious at the time of the deployment of the probes, which is an ideal distance. *Use of Force Report*; *Ashley Report*, CLT-HOWARD-000998. The two (2) probes were approximately five (5) inches apart. *Id*. Darious believes he was tased once for approximately twenty (20) seconds, however Forrest County TASERs are equipped with a battery that immediately shuts the electrical circuit off after five (5) seconds. *Ashley Report*, CLT-HOWARD000986. This special battery is referred to as an Automatic-shutdown Performance Power Magazine or APPM, and is utilized by Forrest County specifically to prevent excessive use of force. *Id*. Therefore, even if Dep. Bass held down the trigger, the electrical cycle still stopped after five (5) seconds. *Id*. Thus, Dep. Bass' use of force on Darious was not unreasonable given the circumstances and was not excessive.

### 3. <u>Antrinet Leggett</u>

Finally, Antrinet alleges that her phone was slapped out of her hand and she was subsequently tased in her hand. *Compl*. ¶ 25. It is unclear who Plaintiffs believe allegedly tased Antrinet. According to Antrinet, she states that Dep. Bass tased her by shooting prongs at her hand while she was on the phone. *A. Leggett Depo.*, p. 30-34. Dep. Bass then allegedly took the phone from her hand, turned around, tased Darious and then placed her under arrest. *D. Leggett Depo.*, p. 33-34, 35:19-24; *S. Howard Depo.*, p. 25:15-24.

According to Darious and Howard, Dep. Sumrall attempted to arrest Antrinet while she was on the phone. They allege Dep. Sumrall instead pushed her and he then shot his TASER at her hand. *Id*. The prongs that were allegedly deployed from the taser

never stuck in Antrinet's hand, however, they allegedly scratched it and she believes she felt "electricity" upon contact. *Id*. at 35:11-25-36:1-7; *S. Howard Depo*., 31:18-22.

Though it is unclear which, deputy allegedly "shot" the prongs at Antrinet, the record evinces that neither could have. First, Dep. Sumrall denies that he deployed his TASER cartridge on that day. *Dep. Sumrall Depo*., 21:21-25-22:1-22. Dep. Sumrall notes that he instead "sparked" the TASER to deter the dogs from biting. *Id*. This spark creates a popping noise that gets the dogs to stop biting or barking. *Id*. Additionally, there is nothing in the record to indicate that Dep. Sumrall used his TASER cartridge on any of the Plaintiffs. There is no indication in the contemporaneously filed incident report, nor is there a use of force report filled out by Dep. Sumrall to request another CEW cartridge for his TASER. *Use of Force Report; Ashley Report, CLT-HOWARD-000998-999; Incident Report.* In fact, Dep. Sumrall wholly denies that he dealt with Antrinet at all, but was instead arresting Darious during that time. *Dep. Sumrall Depo*. p. 24:3-7.

Furthermore, it is clear from the record that Dep. Bass was the arresting officer for Antrinet. *Incident Report; Justice Court Affidavits*. Yet, Dep. Bass could not have deployed his TASER cartridge twice, as he would have needed two (2) cartridges. *Use of Force Report; Ashley Report, CLT-HOWARD-000998-999*. Each cartridge is catalogued by number and there is only one (1) Taser Report filled out with one (1) cartridge used[13]. *Id*. This report additionally shows that Dep. Bass had to ask for another CEW cartridge for his

---

[13] The precise cartridge number used was logged in Dep. Bass' Taser Report - #C4104PHR7. *Use of Force Report.*

TASER from the Forrest County Sheriff's Department as his prior one had been used on Darious. *Use of Force Report; Ashley Report, CLT-HOWARD-000998-999.*

Once Dep. Bass deployed his cartridge, he could only use the TASER in drive-stun mode. *Use of Force Report; Ashley Report, CLT-HOWARD-000998-999.* As the Plaintiffs note, the alleged cut on Antrinet's hand was from TASER prongs. Simply put, Dep. Bass could not have tased Antrinet with a cartridge as Plaintiffs allege.

Instead, Dep. Bass attempted to arrest Antrinet, for failing to comply with lawful orders during the arrest of Darious. *Dep. Bass Depo.*, 23-24; *Justice Court Affidavits*; *Arrest Report.* Dep. Bass also notes that he picked up his TASER once he tased Darious and began to "spark" it to deter the dogs. *Dep. Bass Depo.*, 31:1-14.  There is no record evidence that Antrinet was tased or even if she was the use of force was not unreasonable under the circumstances.

**D. First Amendment.**

Plaintiffs make a First Amendment claim against Deputies alleging that Darious was arrested in retaliation for telling Dep. Sumrall not to enter his home. *Compl.* ¶¶ 55-56. Plaintiffs additionally state that Antrinet was placed under arrest for threatening to report the deputies' conduct. *Id.*

The First Amendment of the United States Constitution prohibits not only direct limits on individual speech but also adverse governmental action against an individual in retaliation for the exercise of protected speech activities. *Colson v. Grohman*, 174 F.3d 498, 508 (5th Cir.1999); *see also,* U.S. Const. amend I.  If an official takes adverse action against someone based on that forbidden motive, and "non-retaliatory grounds are in

fact insufficient to provoke the adverse consequences," the injured person may generally seek relief by bringing a First Amendment claim. *Hartman v. Moore*, 547 U.S. 250, 256, 126 S.Ct. 1695, 164 L.Ed.2d 441 (2006).

To prevail on such a claim, a plaintiff must establish a "causal connection" between the government defendant's "retaliatory animus" and the Plaintiffs' "subsequent injury." *Hartman*, 547 U.S. at 259, 126 S.Ct. 1695. It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must cause the injury. *Id*. Specifically, it must be a "but-for" cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive. *Id*., at 260, 126 S.Ct. 1695 (recognizing that although it "may be dishonorable to act with an unconstitutional motive," an official's "action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway").

Here, Plaintiffs' First Amendment speech fails as a matter of law. In *Nieves v. Bartlett*, 139 S. Ct. 1715, 1721, 204 L. Ed. 2d 1 (2019), a deputy arrested Bartlett for disorderly conduct and resisting arrest. *Id*. Bartlett filed suit alleging his First Amendment rights were violated as the deputy only arrested him in retaliation for his speech. *Id*.

The USSC found that in qualified immunity cases, courts should take the "no-probable cause" approach for First Amendment retaliatory claims. That is, Plaintiffs must prove an absence of probable cause in order to succeed. *Id*. at 1723-24. The USSC does carve out an exception that states the no-probable cause requirement should not apply

21

when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been. *Nieves*, 139 S. Ct. at 1727. Cf. *United States v. Armstrong*, 517 U.S. 456, 465, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996). The Court used the misdemeanor of "jaywalking" as a misdemeanor where individuals are not routinely arrested, yet, allows crimes such as disorderly conduct and resisting arrest the ability to use the 'no probable cause' exception.

In Mississippi, animal neglect, disorderly conduct, and resisting arrest are all similar misdemeanors for which citizens are arrested. Pursuant to Section 97-41-16, animal cruelty is a misdemeanor where if individuals are found guilty, they face a potential six (6) month imprisonment. Miss. Code Ann. § 97-41-16. It can be considered a felony if convicted multiple times. *Id*. Similarly in Mississippi, disorderly conduct and resisting arrest are also misdemeanors with a similar fine to animal cruelty, as both can lead to imprisonment of six (6) months with a fine of five hundred ($500.00) dollars. Miss. Code Ann. §§ 97-9-73, 97-35-7. Comparatively, disorderly conduct, resisting arrest, and animal cruelty are all similar misdemeanors that are not exceptions to the USSC's no-probable cause requirement. Inasmuch as Plaintiffs are unable to show a lack of probable cause their First Amendment claim fails. *See,* Sec. A.

Furthermore, even if Plaintiffs' claim did not fail as a matter of law. Darious admits that Dep. Sumrall told him "that ain't no dog food in there." *D. Leggett Depo.*, p. 24:9-12. Dep. Sumrall specifically states that once Darious came back with the empty container he decided to arrest him for animal neglect. *Dep. Sumrall Depo.*, 19:7-14. Thus, there is no

competent summary judgment evidence to establish any causal connection between Darious refusal to allow Dep. Sumrall into the home and his decision to arrest Darious.

Furthermore, Plaintiffs have wholly failed to allege any statements that Antrinet made to the officers about reporting them to anyone, thus their claim against her fails[14]. *A. Leggett Depo.*, p:24:13-19, 27-28.

### E. Equal Protection.

Plaintiffs assert an Equal Protection claim against Deputies alleging that the assault and arrest of the Leggetts were racially motivated. *Compl.*, ¶¶ 73-75. The Equal Protection Clause of the Fourteenth Amendment commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The central purpose of the Equal Protection Clause "is to prevent the States from purposely discriminating between individuals on the basis of race." *Shaw v. Reno*, 509 U.S. 630, 642, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993).

Traditionally, for an Equal Protection claim, "a § 1983 plaintiff must [show] that a state actor ***intentionally discriminated*** against the plaintiff because of membership in a protected class." *Williams v. Bramer*, 180 F.3d 699, 705 (5th Cir. 1999)(emphasis added). The purpose of the Equal Protection Clause is to secure every person within the state's jurisdiction against intentional and arbitrary discrimination. *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000). Thus, to prove a cause of action under § 1983, the plaintiff must

---

[14] It is worth noting that Selena Howard was on the phone with dispatch during this whole incident regarding the officer's actions. Yet, Deputies did not arrest her or place her in handcuffs in retaliation for this.

demonstrate that "officials acted with a discriminatory purpose." *Woods v. Edwards*, 51 F.3d 577, 580 (5th Cir. 1995).

First, Howard's equal protection claim fails as she has not alleged that she is part of a protected class or that there were any discriminatory actions by the deputies towards her. *See, Compl.*

As to the Leggetts' equal protection claims, Darious was arrested because he was the owner of the dog being neglected. As evidenced from the record, Darious initiated a conversation with Dep. Sumrall about the animals and walked off the porch towards the officers to engage with them during their investigatory stop. *D. Leggett Depo.*, p. 20:8-15, 21:4-10, 22:19-25-23:1-7. Additionally, he admits that the dogs are co-owned by him and Howard. *Id.*, at 46:20-21, 47:14-16; *see also*, Darrious Leggett's Interrogatory Response No. 20.  In fact, Darious repeatedly testifies that he told the deputies they were his dogs[15].  *Id.* at 22:3-18.

Darious clearly held himself out as the owner of the dogs to the deputies. Furthermore, Dep. Bass states that he assumed Darious owned the dog as he went into the house "to get dog food for his dogs." *Dep. Bass Depo.*, p. 26:22-25. Thus, Plaintiffs are unable to prove that deputies *intentionally* discriminated against Darious. By all accounts, Darious was the owner of the dog and officers arrested him because he obviously exhibited ownership over the animals.

---

[15] Darious said he made remarks like "You're saying it's a problem with my dogs being on a chain" and that he can have "my [his] dogs on a leash." *D. Leggett Depo.*, p.  22:3-18.

Additionally, the Leggetts were the only ones who resisted arrest and failed to comply with the deputies' verbal commands. *See*, Sec. A(1). Deputies did not arrest Howard as she did not intervene with officers and admits she complied with their orders. *S. Howard Depo..*, p. 31:1-10.

Finally, all the Plaintiffs were post-arrested, not just the Leggetts. *Id.* at 42:6-8. *Incident Report*; *Justice Court Affidavits*. There was no discrimination as to who was issued citations, as they all were. *Id.* Thus, Plaintiffs are unable to prove officers intentionally discriminated against the Leggetts due to their race. To the contrary, the Leggetts were arrested based upon the deputies' belief that Darious was the owner of the dog as he held himself out to be and Antrinet was arrested for disorderly conduct and resisting arrest.

### F. Fabrication/Misrepresentation of Evidence.

Plaintiffs contend that the defendants fabricated evidence of animal neglect or any other crime. *Compl.* ¶ 82. Plaintiffs allege that officers provided "recklessly false/misleading evidence" to prosecute Plaintiffs in Justice Court. *Id.* at ¶ 82.

A Plaintiff may state a claim under section 1983 for a violation of his or her "[Fourteenth Amendment substantive] due process right not to have police deliberately fabricate evidence and use it to frame and bring false charges against a person." *Cole v. Carson*, 802 F.3d 752, 771 (5th Cir. 2015), *cert. granted, judgment vacated on other grounds sub nom. Hunter v. Cole*, 137 S. Ct. 497 (2016), *opinion reinstated in part*, Nos. 14-10228 & 15-10045, 2018 WL 4577156 (5th Cir. Sept. 25, 2018).

As the Fifth Circuit explained in *Cole*, "[w]here police intentionally fabricate evidence and successfully get someone falsely charged with a felony as cover for their

colleagues' actions, and the Fourth Amendment is unavailing, there may be a [substantive] due process violation." *Id.* at 773. Therefore, in order to state a fabricated evidence, claim within the meaning of *Cole*, a plaintiff must allege: (1) the police deliberately fabricated evidence and (2) the police successfully used the fabricated evidence to bring false charges against a person. *See Id.* at 771, 773. *Ramirez v. Killian,* No. 2:18-CV-107-D-BR, 2018 WL 6706094, at *7 (N.D. Tex. Nov. 5, 2018).

Here, Plaintiffs have wholly failed to identify what evidence or statements are false or even where those statements may be located. Plaintiffs' Complaint merely states that Deputies "knew that no Plaintiff initiated an altercation with the officers" to substantiate charges. *Compl.* ¶ 84. There is simply no record evidence to support Plaintiffs' blanket statement that a constitutional violation for fabrication of evidence occurred. *White v. Wilder*, No. CIVA2:07CV37KS-MTP, 2007 WL 3357315, at *4 (S.D. Miss. Nov. 7, 2007). laintiffs' allegations have wholly failed to identify what evidence or statements were fabricated, and the same should be dismissed.

To the extent Plaintiffs make these claims regarding the Justice Court Affidavits, none of them refer to an "altercation" between the parties. *Justice Court Affidavits*. Dep. Sumrall does put in the affidavit that "Mr. Leggett stepped in Deputy Sumrall's face," however this allegation has been confirmed by all parties. *Id*; *A. Leggett Depo..* p. 29:14-24; *Dep. Sumrall Depo..*, p. 32:24-25; *D. Leggett Depo..*, p. 49:7-15. Thus, there is no evidence of fabricated evidence and the same must be dismissed.

## II.   RACE DISCRIMINATION - 42 U.S.C. § 1981, 1983

Next, Plaintiff asserts a claim under Section 1981 for racial discrimination. Section

1981 provides that:

> All persons within the jurisdiction of the United States shall have
> the same right in every State and Territory to make and enforce
> contracts, to sue, be parties, give evidence, and to the full and
> equal benefit of all laws and proceedings for the security of
> persons and property as is enjoyed by white citizens, and shall
> be subject to like punishment, pains, penalties, taxes, licenses,
> and exactions of every kind, and to no other.

42 U.S.C.A. § 1981. To state a claim under § 1981, the plaintiff must offer factual

allegations sufficient to support the following elements: "(1) the plaintiff is a member of

a racial minority; (2) an intent to discriminate on the basis of race by the defendant[s];

and (3) the discrimination concerns one or more activities enumerated in the statute."

*Green v. State Bar of Tex.*, 27 F.3d 1083, 1086 (5th Cir. 1994). "Though section 1981 'on its

face relates primarily to racial discrimination in the making and enforcement of

contracts,' some other Circuits have held that racially motivated arrests and searches

made in the absence of probable cause come under Section 1981 because they fall within

the 'equal benefits' and 'like punishments' clauses of Section 1981(a)." *Shaw v. Hardberger,*

No. CIV A SA06-CA751-XR, 2007 WL 1174202, at *3 (W.D. Tex. Apr. 19, 2007)(citations

omitted).

The Fifth Circuit has not ruled on a Section 1981 claim for police misconduct.

However, the Fifth Circuit has held that should Plaintiffs seek damages for a violation of

§ 1981 against a state actor, it must be pursued under § 1983," thus making qualified

immunity an available defense. *Felton v. Polles*, 315 F.3d 470, 483 (5th Cir.2002); *Jackson v.*

*Harris Cty., Texas*, No. CV H-17-3885, 2020 WL 973387, at *6 (S.D. Tex. Feb. 26, 2020); *Felton*, 315 F.3d at 482.

First, Howard has not alleged that she is a member of a racial minority, thus cannot meet the first prong under Section 1981. *See generally, Compl.*

Plaintiffs allege that "non-black individuals" were given citation, while the Leggetts were detained. *Compl.* ¶ 80. Yet, Plaintiffs fail to provide any competent summary judgment evidence to prove that officers do not arrest everyone for animal neglect. Additionally, as explained above, Darious was arrested because he held himself out as the owner of the dogs to the deputies and was placed under arrest for animal neglect[16]. *See*, Sec I(A). There is no proof that deputies intended to discriminate against Darious and instead merely allege conclusory statements[17].

Additionally, the Leggetts were the only people who engaged with the officers by resisting arrest and failing to comply with the deputies' verbal commands. Howard did not intervene with officers and admits she complied with their orders. *S. Howard Depo.*, p. 31:1-10. Furthermore, all Plaintiffs were detained at the house during the animal welfare investigation, not just the Leggetts. Thus, Plaintiffs are unable to prove officers intentionally discriminated against the Leggetts due to their race and this claim must be dismissed.

---

[16] Notably, Darious walked out and initiated conversation with Dep. Sumrall about the animals and walked off the porch towards the officers to engage with them. *D. Leggett Depo.*, p. 21:4-10.

[17] According to Darious and Blake, they were friends in high school, played on the same football team, and had no animus towards each other. *Dep. Bass Depo.*, p. 6:12-17; *D. Leggett Depo.*, p. 53:13-25-54:1-9.

### A. **Section 1985**

Additionally, Plaintiffs also make a racial discrimination claim under § 1985(3). To maintain the same a plaintiff must allege that "(1) the defendants conspired (2) for the purposes of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws, and (3) one or more of the conspirators committed some act in furtherance of the conspiracy; whereby (4) another person is injured in his person or property or deprived of having and exercising any right or privilege of a citizen of the United States; and (5) the action of the conspirators is motivated by racial animus." *Horaist v. Doctor's Hosp. of Opelousas,* 255 F.3d 261, 270 n. 12 (5th Cir.2001)(quoting *Wong v. Stripling,* 881 F.2d 200, 202-3 (5th Cir.1989)). *Molette v. City of Alexandria*, No. CIV.A. CV040501A, 2005 WL 2445432, at *6 (W.D. La. Sept. 30, 2005). Plaintiffs claim fails on the first element in that, they neglect to allege any conspiracy took place between Dep. Bass and Dep. Sumrall to deprive any of the Plaintiffs any constitutional right[18]. Furthermore, the Plaintiffs have failed to allege an actionable conspiracy, since the County and its employees **cannot conspire with itself**. *See, Benningfield v. City of Houston*, 157 F. 3d 369, 378 (5th Cir. 1998); *Hilliard v. Ferguson*, 30 F. 3d 649, 653 (5th Cir. 1994).

### III. *MONELL*

Finally, Plaintiffs seek to hold the County liable for the actions of its employees. As this court is well aware, a local governmental entity can only be held liable under

---

[18] The Fifth Circuit has stated that an employee may be liable if Plaintiff alleges a "personal purpose." *Benningfield*, 157 F.3d at 378. There are no allegations here of any personal purpose by the deputies.

Section 1983 for violating a citizen's constitutional rights only if "the governmental body itself 'subjects' [that] person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011). Governmental entities are "responsible only for [their] own illegal acts" and are "not vicariously liable under § 1983 for [their] employees' actions." *Id*. Thus, there is no *respondeat superior* liability under Section 1983; rather, the key to municipal liability is demonstrating that the deprivation of a constitutional right was inflicted pursuant to an official policy or custom of the municipality in question. *Monell*, 436 U.S. at 694. Simply put, the unconstitutional conduct asserted "must be directly attributable to the municipality through some sort of official action or imprimatur." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001).

Here, to establish liability against Forrest County, Plaintiff must demonstrate (1) an official policy or custom, of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose "moving force" is that policy or custom. *Rivera v. Houston Independent School Dist.*, 349 F.3d at 244, 247 (5th Cir. 2003). "Proof of an official policy or custom can be shown in several ways, including: (1) formally adopted policies; (2) informal customs or practices; (3) a custom or policy of inadequate training, supervision, discipline, screening, or hiring; or (4) a single act by an official with final policymaking authority." *Thomas v. Prevou,* 2008 WL 111293, *3 (S.D. Miss. 2008)(citing *Monell v. City of New York Dept. of Social Servs*., 436 U.S. 658, 694 (1978); *Snow v. City of El Paso, Texas*, 501 F. Supp. 2d 826, 831 (W.D. Tex. 2006)).

Plaintiff must also demonstrate a link between the policy and the constitutional violation, and the policy must be maintained with "objective deliberate indifference" to a constitutionally protected right. *Lawson v. Dallas County*, 286 F.3d 257, 263 (5th Cir. 2002). A municipality acts with objective deliberate indifference if it promulgates a policy or custom despite the "known or obvious consequences that constitutional violations would result." *Piotrowski*, 237 F.3d at 567. Deliberate indifference of this sort is a stringent test, and "a showing of simple or even heightened negligence will not suffice" to prove municipal culpability. *Id.* at 579.

As stated above, Plaintiffs have failed to demonstrate any constitutional violations amidst his multitude of claims, which is fatal to any official capacity or municipal liability claim. *See, Becerra v. Asher*, 105 F.3d 1042, 1048 (5th Cir. 1997). Further, even if Plaintiffs could demonstrate a constitutional deprivation, they have been unable to demonstrate that an official policy or custom of Forrest County was the moving force for the deprivation. The pleadings conclusory state that Forrest County has a policy, practice, or custom for every constitutional violation alleged, yet fails to provide an instance of the same. Thus, Plaintiffs' claims against Forrest County should be dismissed.

<u>CONCLUSION</u>

WHEREFORE PREMISES CONSIDERED for all the reasons stated herein, as well as in Defendants' Motion for Summary Judgment, Forrest County, Mississippi, Deputy Chey Sumrall, and Deputy Blake Bass respectfully request that this honorable court dismiss all claims against them.

**DATE:**      **May 26, 2020.**

Respectfully submitted,

**FORREST COUNTY, MISSISSIPPI,
CHEY SUMRALL, AND BLAKE BASS**

BY:    /s/ Christina J. Smith
          One of Their Attorneys

WILLIAM R. ALLEN (MSB #100541)
CHRISTINA J. SMITH (MSB #105483)
Allen, Allen, Breeland & Allen, PLLC
214 Justice Street
P. O. Box 751
Brookhaven, MS  39602-0751
Tel. 601-833-4361
Fax 601-833-6647
Email:  wallen@aabalegal.com
Email:  csmith@aabalegal.com

## CERTIFICATE

I, the undersigned of Allen, Allen, Breeland & Allen, PLLC, hereby certify that on this day, I electronically filed the foregoing Memorandum in Support of Motion for Summary Judgment with the Clerk of the Court using the ECF system, which gave notice of the same to the following:

> Daniel M. Waide, Esq.
> Johnson, Ratliff & Waide, PLLC
> P.O. Box 17738
> Hattiesburg, MS 39404
> dwaide@jhrlaw.net
> *Attorney for Plaintiffs*

This the 26th day of May, 2020.

/s/ Christina J. Smith
OF COUNSEL