IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

SELENA HOWARD, DARIOUS LEGGETT; AND ANTRINET LEGGETT PLAINTIFFS

VERSUS NO. 2:19-CV-84-KS-MTP

FORREST COUNTY; CHEY SUMRALL INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY; BLAKE BASS, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY DEFENDANTS

***************************************************

DEPOSITION OF CHEY SUMRALL
VIA ZOOM VIDEO CONFERENCE

****************************************************

APPEARANCES NOTED HEREIN

DATE: APRIL 27, 2020
PLACE: ZOOM VIDEO CONFERENCE
TIME: 2:00 p.m.

REPORTED BY: AMANDA MAGEE WOOTTON
CSR #1238

________________________________________________

AW Reporting
amanda@awreporting.net
338 Indian Gate Circle
Ridgeland, Mississippi 39157
601.573.0961



**EXHIBIT B**

APPEARANCES VIA ZOOM VIDEO CONFERENCE:

Christina Smith, Esquire
Allen, Allen, Breeland & Allen
Post Office Box 751
Brookhaven, Mississippi
csmith@aabalegal.com

Daniel M. Waide, Esquire
Johnson, Ratliff & Waide, PLLC
P. O. Box 17738
Hattiesburg, Ms 39404
dwaide@jhrlaw.net

Mary Lee Holmes, Esquire
Holmes, McLelland & Ferraez, PLLC
601 E Central Avenue
Petal, Mississippi 39465-2974
marylee@hmflawfirm.com

---

AMANDA MAGEE WOOTTON
AW REPORTING
338 Indian Gate Circle
Ridgeland, Mississippi 39157
(601) 898-9990

A Correct.

Q Okay. All right. Like I said, I'm not going to get into the details. I just didn't know if there were anything else involved in your separation.

A Thank you.

Q Is there anything else besides the wreck with your separation?

A No, sir.

Q Okay. All right. Now, you're aware that this entire matter stems from an incident September 27, 2017, correct?

A Yes, sir.

Q All right. Do you recall when you were dispatched to the Elks Road house where Ms. Howard and Mr. Leggett were living?

A We were never dispatched. It was information from a county worker. And I believe it was -- I'm certain that it was earlier that morning that she had advised us about the dogs.

Q Okay. Who was that? Who was the county worker?

A Her name was Haley Ryals.

Q Okay. And who is she?

A She works -- she's a volunteer firefighter, but she does some type of maintenance for the county.

information from another county worker that mows -- I guess there is a cemetery behind the Leggetts' residence, and that county worker had been seeing this dog tied to a tree with no food or water. So that's what she told us.

Q Okay. But when you -- when you went to Ms. Howard's house, at that time you knew that the information you had received was secondhand at best?

A Correct.

Q Okay. All right. And the property you were going to was private property, correct?

A I'm not sure.

Q Okay. Well, were the -- the house that you went to where Ms. Howard lived, that wasn't a public park or anything like that, was it?

A No, sir.

Q Okay. It was a private resident, and they lived there?

A Yes, sir.

Q All right. Now, before you got to the house that day, had -- have you had any formal training on doing welfare checks for animals?

A Not any formal training, no, sir.

Q Had you ever been trained on what the laws are in regards to animal welfare?

Q And there was nothing stopping you from getting a warrant that day, correct?

A No, sir.

Q Okay. You could have gone to obtain a warrant before going to the house, right?

A I guess so. But, like, it was secondhand information, so...

Q Okay. When you say it was secondhand information, are you saying the judge wouldn't have given you a warrant on that?

A I can't say what a judge would have done.

Q Okay. But you didn't have firsthand knowledge at that time to go get a warrant, right?

A No, sir.

Q Okay. All right. Now, when you got to the property, Mr. Sumrall, what happened?

A When we pulled down the driveway, we saw the dog tied to the tree. We parked our patrol cars, exited the patrol car, went over to the dog that was tied to the tree and began an investigation.

Q Okay. You say you began an investigation. How long were you on the property before you made contact with people who lived there?

A I'm not sure.

Q Okay. Before you -- how long did you see

the dogs -- let me see if I can ask you a better question.

A Yes, sir.

Q Who was the first person you saw on the property?

A I honestly can't recall who the first person was that we made contact with.

Q Okay. Now, when you drove up to the house, how long is that driveway to get to the house?

A It's several yards long. It is a fairly long driveway.

Q Okay. When you say several yards, you mean several hundred yards?

A Maybe a hundred yards, 150.

Q Okay. But longer than several yards, right?

A Correct. Yes, sir.

Q Okay. And can you see the dogs from the road without pulling into the driveway?

A No, sir.

Q Okay. And where were you -- when you were pulling up to the house, do you recall when you could first see the dogs?

A Probably 50 yards down the driveway you could see the dog tied to the tree.

Q Okay. And how long were you on the

property -- well, I think I've already asked you this.

A Yes, sir.

Q Do you recall how long it was before you actually made contact with a person on that property?

A As best I can remember, it was minutes.

Q Okay. So do you know how long those dogs had been tied to the tree before you arrived?

A I do not.

Q Okay. All right. And how many dogs -- when you went to the -- were those two dogs, were they in separate places or the same spot?

A Well, the dog in question, I didn't know how many dogs were at the property. We only saw one dog that was tied to the tree, so...

Q Okay.

A Which is what the initial complaint was, was for the dog that was tied to the tree.

Q Okay. Let me ask you this. The claim that a dog is tied up, that in and of itself is not a crime, correct?

A Correct.

Q Okay. Where was the other dog when you arrived?

A When I arrived, I did not see another dog.

Q Okay. Now, the time that you arrived on the

property, you had no evidence of any felony being committed, right?

A Correct.

Q And what you ultimately charged my clients with was a misdemeanor, right?

A Correct.

Q In regards to the dogs?

A Correct.

Q All right. And you had -- no one had relayed to you, had they, that they thought the dogs had been beaten?

A No, sir.

Q No one had thought the dogs had been burned or tortured?

A No, sir.

Q Okay. Is the only thing that you had prior to coming on the property that the dog was tied to a tree?

A With no food or water, or shelter, for that matter.

Q Okay. Do you know how -- that's all secondhand information, right?

A Correct.

Q Okay. And you don't remember if you spoke to Ms. Howard or Mr. Leggett first?

those unpaid fines?

A I had stopped her vehicle on a traffic -- well, not her vehicle. I had stopped a vehicle that Ms. Leggett was a passenger in, and I ran both the driver and Ms. Leggett. Ms. Leggett had warrants.

Q Okay. All right. And after -- on this particular date, do you recall when you made contact with Ms. Leggett?

A I don't, no, sir.

Q Okay. After you and Darious and Blake were out of the tree with the dog, Darious did unhook the dog, right?

A Yes, sir, he did.

Q Okay. What happened after that?

A The only thing I can remember is I asked Darious -- because there was only one bowl by the tree. I asked Darious if he had food for the dog. He explained that sometimes they eat table scraps, but he did have food inside. I asked him -- I followed him to the house. He was going to show me the food. We got to the door. He brought out an empty container. There was no food in the container.

Q Okay. Now, did you ever try to enter the house?

A Yes, sir, I did.

Q Okay. And were you told not to?
A Yes, sir. He asked me not to come inside the house.
Q All right. And how long was Darious inside; do you remember?
A Thirty, 45 seconds.
Q Okay. And when Darious brought the -- apparently, as I understand it, empty food bucket outside, what happened then?
A I asked him to turn around and put his hands behind his back.
Q Okay. And at that point in time, what crime were you arresting Mr. Leggett for?
A The animal neglect.
Q All right. And had you been trained on what constitutes animal neglect?
A Yes, sir.
Q Okay. What evidence did you have that Mr. Leggett had been intentionally withholding food from his animals?
A I had no evidence that he had been intentionally withholding food from his animals.
Q Okay. And what evidence -- well, what evidence, then, were you relying on in deciding to arrest Mr. Leggett?

A The condition of the dog, the no shelter, no water, and there was no vaccine ever -- rabies vaccine ever provided to us.

Q Well, now, just on the day in question, at the time that you were there, how long had you witnessed the animal tied around the tree?

A Just that time period I was there.

Q So at that point in time in which you say you placed Mr. Leggett under arrest, would it be more than ten minutes?

A Yes, sir.

Q Okay. More than 20 minutes?

A Twenty minutes is probably the max.

Q Okay. And do you know how long the dog's water bowl had been empty?

A I do not.

Q Okay. And you don't know how long the dog, other than the 20 minutes you were there, how long the dog had been tied to a tree?

A I do not.

Q Okay. What evidence did you have at that time to show that Mr. Leggett was intentionally neglecting this dog?

A I had none.

Q Okay. Well, are you aware that the statute

EXAMINATION BY MS. HOLMES:

Q So I'm going to ask that -- Chey, prior to the taser being deployed, can you describe the demeanor of Darious?

A The entire time we were at the property, from us initially -- well, the entire time from when I initially made contact with Darious, he was cussing the entire time. The best way I can describe it is aggressive the whole time we were there. I used -- I tried to deescalate the situation as best I knew how, and he was very upset, so -- and he was -- even prior to this incident, on the traffic stop with his mother, who I did not know the relation between the two, he was hostile on the traffic stop. So...

Q Did he -- prior to the taser being deployed, did he act physically violent?

A Yes, he did. Yes.

Q Did he get in your face?

A He did get in my face on the porch, yes.

Q And he refused to comply with any of your verbal commands?

A Yes.

MS. HOLMES: Unless you've got some questions, Christina, that's all I wanted to follow up on.

A Correct.

Q Okay.

MS. SMITH: I think that's all of the questions I have for you, Chey.

THE WITNESS: Okay.

MR. WAIDE: Chey, I've got a couple of follow-up questions.

THE WITNESS: Sure.

E X A M I N A T I O N

EXAMINATION BY MR. WAIDE:

Q So your testimony is that at 8 a.m. on September 27th, 2017, it was already hot?

A It was a warm day. Yes, sir.

Q Okay. Would you dispute if the weather records indicate it wasn't more than 75 degrees at 8 a.m.?

A No, sir. I wouldn't dispute that, but that's warm.

Q Okay.

MR. WAIDE: That's all I have.

THE WITNESS: Thank you, Mr. Waide. I appreciate it.

(WHEREUPON, THE DEPOSITION WAS CONCLUDED AT APPROXIMATELY 2:40 p.m.)